(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JUNE MEDICAL SERVICES L. L. C. ET AL. *v.* RUSSO, INTERIM SECRETARY, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 18–1323.   Argued March 4, 2020—Decided June 29, 2020*

Louisiana's Act 620, which is almost word-for-word identical to the Texas "admitting privileges" law at issue in *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, requires any doctor who performs abortions to hold "active admitting privileges at a hospital . . . located not further than thirty miles from the location at which the abortion is performed or induced," and defines "active admitting privileges" as being "a member in good standing" of the hospital's "medical staff . . . with the ability to admit a patient and to provide diagnostic and surgical services to such patient."

In these consolidated cases, five abortion clinics and four abortion providers challenged Act 620 before it was to take effect, alleging that it was unconstitutional because (among other things) it imposed an undue burden on the right of their patients to obtain an abortion. (The plaintiff providers and two additional doctors are referred to as Does 1 through 6.) The plaintiffs asked for a temporary restraining order (TRO), followed by a preliminary injunction to prevent the law from taking effect. The defendant (State) opposed the TRO request but also urged the court not to delay ruling on the preliminary injunction motion, asserting that there was no doubt about the physicians' standing. Rather than staying the Act's effective date, the District Court provisionally forbade the State to enforce the Act's penalties, while directing

———————
*Together with No. 18–1460, *Russo, Interim Secretary, Louisiana Department of Health and Hospitals* v. *June Medical Services L. L. C. et al.*, also on certiorari to the same court.

the plaintiff doctors to continue to seek privileges and to keep the court apprised of their progress. Several months later, after a 6-day bench trial, the District Court declared Act 620 unconstitutional on its face and preliminarily enjoined its enforcement. On remand in light of *Whole Woman's Health,* the District Court ruled favorably on the plaintiffs' request for a permanent injunction on the basis of the record previously developed, finding, among other things, that the law offers no significant health benefit; that conditions on admitting privileges common to hospitals throughout the State have made and will continue to make it impossible for abortion providers to obtain conforming privileges for reasons that have nothing to do with the State's asserted interests in promoting women's health and safety; and that this inability places a substantial obstacle in the path of women seeking an abortion. The court concluded that the law imposes an undue burden and is thus unconstitutional. The Fifth Circuit reversed, agreeing with the District Court's interpretation of the standards that apply to abortion regulations, but disagreeing with nearly every one of the District Court's factual findings.

*Held*: The judgment is reversed.

905 F. 3d 787, reversed.

JUSTICE BREYER, joined by JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN, concluded:

1. The State's unmistakable concession of standing as part of its effort to obtain a quick decision from the District Court on the merits of the plaintiffs' undue-burden claims and a long line of well-established precedents foreclose its belated challenge to the plaintiffs' standing in this Court. Pp. 11–16.

2. Given the District Court's factual findings and precedents, particularly *Whole Woman's Health,* Act 620 violates the Constitution. Pp. 16–40.

(a) Under the applicable constitutional standards set forth in the Court's earlier abortion-related cases, particularly *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, and *Whole Woman's Health,* " '[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right' " and are therefore "constitutionally invalid," *Whole Woman's Health,* 579 U. S., at ___. This standard requires courts independently to review the legislative findings upon which an abortion-related statute rests and to weigh the law's "asserted benefits against the burdens" it imposes on abortion access. *Id.*, at ___. The District Court here, like the trial court in *Whole Woman's Health*, faithfully applied these standards. The

Fifth Circuit disagreed with the District Court, not so much in respect to the legal standards, but in respect to the factual findings on which the District Court relied in assessing both the burdens that Act 620 imposes and the health-related benefits it might bring.

Under well-established legal standards, a district court's findings of fact "must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. Rule. Civ. Proc. 52(a)(6). When the district court is "sitting without a jury," the appellate court "is not to decide factual issues *de novo*," *Anderson* v. *Bessemer City*, 470 U. S. 564, 573. Provided "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.,* at 573–574. Viewed in light of this standard, the testimony and other evidence contained in the extensive record developed over the 6-day trial support the District Court's conclusion on Act 620's constitutionality. Pp. 16–19.

(b) Taken together, the District Court's findings and the evidence underlying them are sufficient to support its conclusion that enforcing the admitting-privileges requirement would drastically reduce the number and geographic distribution of abortion providers, making it impossible for many women to obtain a safe, legal abortion in the State and imposing substantial obstacles on those who could. Pp. 19–35.

(1) The evidence supporting the court's findings in respect to Act 620's impact on abortion providers is stronger and more detailed than that in *Whole Woman's Health.* The District Court supervised Does 1, 2, 5, and 6 for more than 18 months as they tried, and largely failed, to obtain conforming privileges from 13 relevant hospitals; it relied on a combination of direct evidence that some of the doctors' applications were denied for reasons having nothing to do with their ability to perform abortions safely, and circumstantial evidence—including hospital bylaws with requirements like those considered in *Whole Woman's Health* and evidence that showed the role that opposition to abortion plays in some hospitals' decisions—that explained why other applications were denied despite the doctors' good-faith efforts. Just as in *Whole Woman's Health*, that evidence supported the District Court's factual finding that Louisiana's admitting-privileges requirement serves no "relevant credentialing function." 579 U. S., at ___. The Fifth Circuit's conclusion that Does 2, 5, and 6 acted in bad faith cannot be squared with the clear-error standard of review that applies to the District Court's contrary findings. Pp. 19–31.

(2) The District Court also drew from the record evidence sev-

eral conclusions in respect to the burden that Act 620 is likely to impose upon women's ability to access an abortion in Louisiana. It found that enforcing that requirement would prevent Does 1, 2, and 6 from providing abortions altogether. Doe 3 gave uncontradicted, in-court testimony that he would stop performing abortions if he was the last provider in northern Louisiana, so the departure of Does 1 and 2 would also eliminate Doe 3. And Doe 5's inability to obtain privileges in the Baton Rouge area would leave Louisiana with just one clinic with one provider to serve the 10,000 women annually who seek abortions in the State. Those women not altogether prevented from obtaining an abortion would face "longer waiting times, and increased crowding." *Whole Woman's Health*, 579 U. S., at ___. Delays in obtaining an abortion might increase the risk that a woman will experience complications from the procedure and may make it impossible for her to choose a non-invasive medication abortion. Both expert and lay witnesses testified that the burdens of increased travel to distant clinics would fall disproportionately on poor women, who are least able to absorb them. Pp. 31–35.

(c) An examination of the record also shows that the District Court's findings regarding the law's asserted benefits are not "clearly erroneous." The court found that the admitting-privileges requirement serves no "relevant credentialing function." 250 F. Supp. 3d 27, 87. Hospitals can, and do, deny admitting privileges for reasons unrelated to a doctor's ability safely to perform abortions, focusing primarily upon a doctor's ability to perform the inpatient, hospital-based procedures for which the doctor seeks privileges—not outpatient abortions. And nothing in the record indicates that the vetting of applicants for privileges adds significantly to the vetting already provided by the State Board of Medical Examiners. The court's finding that the admitting-privileges requirement "does not conform to prevailing medical standards and will not improve the safety of abortion in Louisiana," *ibid.,* is supported by expert and lay trial testimony. And, as in *Whole Woman's Health*, the State introduced no evidence "showing that patients have better outcomes when their physicians have admitting privileges" or "of any instance in which an admitting privileges requirement would have helped even one woman obtain better treatment," 250 F. Supp. 3d*.,* at 64. Pp. 35–38.

(d) In light of the record, the District Court's significant factual findings—both as to burdens and as to benefits—have ample evidentiary support and are not "clearly erroneous." Thus, the court's related factual and legal determinations and its ultimate conclusion that Act 620 is unconstitutional are proper. P. 38.

THE CHIEF JUSTICE agreed that abortion providers in this case have

Syllabus

standing to assert the constitutional rights of their patients and concluded that because Louisiana's Act 620 imposes a burden on access to abortion just as severe as that imposed by the nearly identical Texas law invalidated four years ago in *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, it cannot stand under principles of *stare decisis*. Pp. 1–16.

BREYER, J., announced the judgment of the Court and delivered an opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed an opinion concurring in the judgment. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which GORSUCH, J., joined, in which THOMAS, J., joined except as to Parts III–C and IV–F, and in which KAVANAUGH, J., joined as to Parts I, II, and III. GORSUCH, J., and KAVANAUGH, J., filed dissenting opinions.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 18–1323 and 18–1460

JUNE MEDICAL SERVICES L. L. C., ET AL., PETITIONERS
18–1323 *v.*
STEPHEN RUSSO, INTERIM SECRETARY, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS

STEPHEN RUSSO, INTERIM SECRETARY, LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, PETITIONER
18–1460 *v.*
JUNE MEDICAL SERVICES L. L. C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

JUSTICE BREYER announced the judgment of the Court and delivered an opinion, in which JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join.

In *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_ (2016), we held that "'[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right'" and are therefore "constitutionally invalid." *Id.,* at \_\_\_ (slip op., at 1) (quoting *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 878 (1992) (plurality opinion); alteration in original). We explained that

this standard requires courts independently to review the legislative findings upon which an abortion-related statute rests and to weigh the law's "asserted benefits against the burdens" it imposes on abortion access. 579 U. S., at ___ (slip op., at 21) (citing *Gonzales* v. *Carhart*, 550 U. S. 124, 165 (2007)).

The Texas statute at issue in *Whole Woman's Health* required abortion providers to hold "'active admitting privileges at a hospital'" within 30 miles of the place where they perform abortions. 579 U. S., at ___ (slip op., at 1) (quoting Tex. Health & Safety Ann. Code §171.0031(a) (West Cum. Supp. 2015)). Reviewing the record for ourselves, we found ample evidence to support the District Court's finding that the statute did not further the State's asserted interest in protecting women's health. The evidence showed, moreover, that conditions on admitting privileges that served no "relevant credentialing function," 579 U. S., at ___ (slip op., at 25), "help[ed] to explain" the closure of half of Texas' abortion clinics, *id.,* at ___ (slip op., at 24). Those closures placed a substantial obstacle in the path of Texas women seeking an abortion. *Ibid.* And that obstacle, "when viewed in light of the virtual absence of any health benefit," imposed an "undue burden" on abortion access in violation of the Federal Constitution. *Id.,* at ___ (slip op., at 26); see *Casey*, 505 U. S., at 878 (plurality opinion).

In this case, we consider the constitutionality of a Louisiana statute, Act 620, that is almost word-for-word identical to Texas' admitting-privileges law. See La. Rev. Stat. Ann. §40:1061.10(A)(2)(a) (West 2020). As in *Whole Woman's Health,* the District Court found that the statute offers no significant health benefit. It found that conditions on admitting privileges common to hospitals throughout the State have made and will continue to make it impossible for abortion providers to obtain conforming privileges for reasons that have nothing to do with the State's asserted interests in promoting women's health and safety. And it

found that this inability places a substantial obstacle in the path of women seeking an abortion. As in *Whole Woman's Health*, the substantial obstacle the Act imposes, and the absence of any health-related benefit, led the District Court to conclude that the law imposes an undue burden and is therefore unconstitutional. See U. S. Const., Amdt. 14, §1.

The Court of Appeals agreed with the District Court's interpretation of the standards we have said apply to regulations on abortion. It thought, however, that the District Court was mistaken on the facts. We disagree. We have examined the extensive record carefully and conclude that it supports the District Court's findings of fact. Those findings mirror those made in *Whole Woman's Health* in every relevant respect and require the same result. We consequently hold that the Louisiana statute is unconstitutional.

## I

### A

In March 2014, five months after Texas' admitting-privileges requirement forced the closure of half of that State's abortion clinics, Louisiana's Legislature began to hold hearings to consider a substantially identical proposal. Compare *Whole Woman's Health*, 579 U. S., at \_\_\_ – \_\_\_ (slip op., at 1–2), with *June Medical Services LLC* v. *Kliebert*, 250 F. Supp. 3d 27, 53 (MD La. 2017); Record 11220. The proposal became law in mid-June 2014. 2014 La. Acts p. 2330.

As was true in Texas, Louisiana law already required abortion providers *either* to possess local hospital admitting privileges *or* to have a patient "transfer" arrangement with a physician who had such privileges. Compare *Whole Woman's Health*, 579 U. S., at \_\_\_ (slip op., at 2) (citing Tex. Admin. Code, tit. 25, §139.56 (2009)), with former La. Admin. Code, tit. 48, pt. I, §4407(A)(3) (2003), 29 La. Reg. 706–707 (2003). The new law eliminated that flexibility. Act 620 requires any doctor who performs abortions to hold "active admitting privileges at a hospital that is located not

further than thirty miles from the location at which the abortion is performed or induced and that provides obstetrical or gynecological health care services." La. Rev. Stat. Ann. §40:1061.10(A)(2)(a).

The statute defines "active admitting privileges" to mean that the doctor must be "a member in good standing" of the hospital's "medical staff . . . with the ability to admit a patient and to provide diagnostic and surgical services to such patient." *Ibid.*; La. Admin. Code, tit. 48, pt. I, §4401. Failure to comply may lead to fines of up to $4,000 per violation, license revocation, and civil liability. See *ibid.*; La. Rev. Stat. Ann. §40:1061.29.

## B

A few weeks before Act 620 was to take effect in September 2014, three abortion clinics and two abortion providers filed a lawsuit in Federal District Court. They alleged that Act 620 was unconstitutional because (among other things) it imposed an undue burden on the right of their patients to obtain an abortion. App. 24. The court later consolidated their lawsuit with a similar, separate action brought by two other clinics and two other abortion providers. (Like the courts below, we shall refer to the two doctors in the first case as Doe 1 and Doe 2; we shall refer to the two doctors in the second case as Doe 5 and Doe 6; and we shall refer to two other doctors then practicing in Louisiana as Doe 3 and Doe 4.)

The plaintiffs immediately asked the District Court to issue a temporary restraining order (TRO), followed by a preliminary injunction that would prevent the law from taking effect. *June Medical Services LLC* v. *Caldwell*, No. 14–cv–00525 (MD La., Aug. 22, 2014), Doc. No. 5.

The State of Louisiana, appearing for the defendant Secretary of the Department of Health and Hospitals, filed a response that opposed the plaintiffs' TRO request. App. 32–39. But the State went on to say that, if the court granted

the TRO or if the parties reached an agreement that would allow the plaintiffs time to obtain privileges without a TRO, the court should hold a hearing on the preliminary injunction request as soon as possible. *Id.*, at 43. The State argued that there was no reason to delay a ruling on the merits of the plaintiffs' undue-burden claims. *Id.*, at 43–44. It asserted that there was "no question that the physicians had standing to contest the law." *Id.*, at 44. And, in light of the State's "overriding interest in vindicating the constitutionality of its admitting-privileges law," the plaintiffs' suit was "the proper vehicle" to "remov[e] any cloud upon" Act 620's "validity." *Id.*, at 45.

The District Court declined to stay the Act's effective date. Instead, it provisionally forbade the State to enforce the Act's penalties, while directing the plaintiff doctors to continue to seek conforming privileges and to keep the court apprised of their progress. See TRO in No. 14–cv–00525, Doc. No. 31, pp. 2–3; see, *e.g.,* App. 48–55, 64–82. These updates continued through the date of the District Court's decision. 250 F. Supp. 3d, at 77.

### C

In June 2015, the District Court held a 6-day bench trial on the plaintiffs' request for a preliminary injunction. It heard live testimony from a dozen witnesses, including three Louisiana abortion providers, June Medical's administrator, the Secretary (along with a senior official) of the State's Department of Health and Hygiene, and three experts each for the plaintiffs and the State. *Id.,* at 33–34. It also heard from several other witnesses via deposition. *Ibid.* Based on this evidentiary record, the court issued a decision in January 2016 declaring Act 620 unconstitutional on its face and preliminarily enjoining its enforcement. *June Medical Services LLC* v. *Kliebert*, 158 F. Supp. 3d 473 (MD La.).

The State immediately asked the Court of Appeals for the

Fifth Circuit to stay the District Court's injunction. The Court of Appeals granted that stay. But we then issued our own stay at the plaintiffs' request, thereby leaving the District Court's preliminary injunction (at least temporarily) in effect. See *June Medical Services, L. L. C.* v. *Gee,* 814 F. 3d 319 (CA5), vacated, 577 U. S. ___ (2016).

Approximately two months later, in June 2016, we issued our decision in *Whole Woman's Health,* reversing the Fifth Circuit's judgment in that case. We remanded this case for reconsideration, and the Fifth Circuit in turn remanded the case to the District Court permitting it to engage in further factfinding. See *June Medical Services, L.L.C.* v. *Gee,* 2016 WL 11494731 (CA5, Aug. 24, 2016) (*per curiam*). All the parties agreed that the District Court could rule on the plaintiffs' request for a permanent injunction on the basis of the record it had already developed. Minute Entry in No. 14–cv–00525, Doc. No. 253. The court proceeded to do so.

## D

Because the issues before us in this case primarily focus upon the factual findings (and fact-related determinations) of the District Court, we set forth only the essential findings here, giving greater detail in the analysis that follows.

With respect to the Act's asserted benefits, the District Court found that:

- "[A]bortion in Louisiana has been extremely safe, with particularly low rates of serious complications." 250 F. Supp. 3d, at 65. The "testimony of clinic staff and physicians demonstrated" that it "rarely . . . is necessary to transfer patients to a hospital: far less than once a year, or less than one per several thousand patients." *Id.,* at 63. And "[w]hether or not a patient's treating physician has admitting privileges is not relevant to the patient's care." *Id.,* at 64.

- There was accordingly "'no significant health-related

problem that the new law helped to cure.' The record does not contain any evidence that complications from abortion were being treated improperly, nor any evidence that any negative outcomes could have been avoided if the abortion provider had admitting privileges at a local hospital." *Id.,* at 86. (quoting *Whole Woman's Health*, 579 U. S., at \_\_\_ (slip op., at 22)); see also 250 F. Supp. 3d, at 86–87 (summarizing conclusions).

- There was also "no credible evidence in the record that Act 620 would further the State's interest in women's health beyond that which is already insured under existing Louisiana law." *Id.,* at 65.

Turning to Act 620's impact on women's access to abortion, the District Court found that:

- Approximately 10,000 women obtain abortions in Louisiana each year. *Id.,* at 39. At the outset of this litigation, those women were served by six doctors at five abortion clinics. *Id.,* at 40, 41–44. By the time the court rendered its decision, two of those clinics had closed, and one of the doctors (Doe 4) had retired, leaving only Does 1, 2, 3, 5, and 6. *Ibid.*

- "[N]otwithstanding the good faith efforts of Does 1, 2, 4, 5 and 6 to comply with the Act by getting active admitting privileges at a hospital within 30 miles of where they perform abortions, they have had very limited success for reasons related to Act 620 and not related to their competence." *Id.,* at 78.

- These doctors' inability to secure privileges was "caused by Act 620 working in concert with existing laws and practices," including hospital bylaws and criteria that "preclude or, at least greatly discourage, the granting of privileges to abortion providers." *Id.,* at 50.

- These requirements establish that admitting privileges serve no "'relevant credentialing function'" because physicians may be denied privileges "for reasons unrelated to competency." *Id.,* at 87 (quoting *Whole Woman's Health*, 579 U. S., at ___ (slip. op., at 25)).

- They also make it "unlikely that the [a]ffected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges." 250 F. Supp. 3d, at 82.

- Doe 3 testified credibly "that, as a result of his fears, and the demands of his private OB/GYN practice, if he is the last physician performing abortion in either the entire state or in the northern part of the state, he will not continue to perform abortions." *Id.,* at 79; see also *id.,* at 78–79 (summarizing that testimony).

- Enforcing the admitting-privileges requirement would therefore "result in a drastic reduction in the number and geographic distribution of abortion providers, reducing the number of clinics to one, or at most two, and leaving only one, or at most two, physicians providing abortions in the entire state," Does 3 and 5, who would only be allowed to practice in Shreveport and New Orleans. *Id.,* at 87. Depending on whether Doe 3 stopped practicing, or whether his retirement was treated as legally relevant, the impact would be a 55%–70% reduction in capacity. *Id.,* at 81.

- "The result of these burdens on women and providers, taken together and in context, is that many women seeking a safe, legal abortion in Louisiana will be unable to obtain one. Those who can will face substantial obstacles in exercising their constitutional right to choose abortion due to the dramatic

reduction in abortion services." *Id.,* at 88; see *id.,* at 79, 82, 87–88.

- In sum, "Act 620 does not advance Louisiana's legitimate interest in protecting the health of women seeking abortions. Instead, Act 620 would increase the risk of harm to women's health by dramatically reducing the availability of safe abortion in Louisiana." *Id.,* at 87; see also *id.,* at 65–66.

The District Court added that

"there is no legally significant distinction between this case and [*Whole Woman's Health*]: Act 620 was modeled after the Texas admitting privileges requirement, and it functions in the same manner, imposing significant obstacles to abortion access with no countervailing benefits." *Id.,* at 88.

On the basis of these findings, the court held that Act 620 and its implementing regulations are unconstitutional. It entered an injunction permanently forbidding their enforcement.

E

The State appealed. A divided panel of the Court of Appeals reversed the District Court's judgment. The panel majority concluded that Act 620's impact was "dramatically less" than that of the Texas law invalidated in *Whole Woman's Health. June Medical Services L. L. C.* v. *Gee*, 905 F. 3d 787, 791 (CA5 2018). "Despite its diligent effort to apply [*Whole Woman's Health*] faithfully," the majority thought that the District Court had "clearly erred in concluding otherwise." *Id.,* at 815.

With respect to the Act's asserted benefits, the majority thought that, "[u]nlike Texas, Louisiana presents some evidence of a minimal benefit." *Id.,* at 805. Rejecting the District Court's contrary finding, it concluded that the admitting-privileges requirement "performs a real, and

previously unaddressed, credentialing function that promotes the wellbeing of women seeking abortion." *Id.,* at 806. The majority believed that the process of obtaining privileges would help to "verify an applicant's surgical ability, training, education, experience, practice record, and criminal history." *Id.,* at 805, and n. 53. And it accepted the State's argument that the law "brings the requirements regarding outpatient abortion clinics into conformity with the *preexisting* requirement that physicians at ambulatory surgical centers ('ASCs') must have privileges at a hospital within the community." *Id.,* at 805.

Moving on to Act 620's burdens, the appeals court wrote that "everything turns on whether the privileges requirement actually would prevent doctors from practicing in Louisiana." *Id.,* at 807. Although the State challenged the District Court's findings only with respect to Does 2 and 3, the Court of Appeals went further. It disagreed with nearly every one of the District Court's findings, concluding that "the district court erred in finding that only Doe 5 would be able to obtain privileges and that the application process creates particular hardships and obstacles for abortion providers in Louisiana." *Id.,* at 810. The court noted that "[a]t least three hospitals have proven willing to extend privileges." *Ibid.* It thought that "only Doe 1 has put forth a good-faith effort to get admitting privileges," while "Doe 2, Doe 5, and Doe 6 could likely obtain privileges," *ibid.*, and "Doe 3's personal choice to stop practicing cannot be legally attributed to Act 620," *id.,* at 811.

Having rejected the District Court's findings with respect to all but one of the physicians, the Court of Appeals concluded that "there is no evidence that Louisiana facilities will close from Act 620." *Id.,* at 810. The appeals court allowed that the Baton Rouge clinic where Doe 5 had not obtained privileges would close. But it reasoned that "[b]ecause obtaining privileges is not overly burdensome,

. . . the fact that one clinic would have to close is not a substantial burden that can currently be attributed to Act 620 as distinguished from Doe 5's failure to put forth a good faith effort." *Ibid.* The Court of Appeals added that the additional work that Doe 2 and Doe 3 would have to do to compensate for Doe 1's inability to perform abortions "does not begin to approach the capacity problem in" *Whole Woman's Health*. 905 F. 3d, at 812. It estimated that Act 620 would "resul[t] in a potential increase" in waiting times "of 54 minutes at one of the state's clinics for at most 30% of women." *Id.,* at 815.

On the basis of these findings, the panel majority concluded that Louisiana's admitting-privileges requirement would impose no "substantial burden at all" on Louisiana women seeking an abortion, "much less a substantial burden on a large fraction of women as is required to sustain a facial challenge." *Ibid.* Judge Higginbotham dissented.

The Court of Appeals denied the plaintiffs' petition for en banc rehearing over dissents by Judges Dennis and Higginson, joined by four of their colleagues. See *June Medical Services, L. L. C.* v. *Gee*, 913 F. 3d 573 (2019) (*per curiam*). The plaintiffs then asked this Court to stay the Fifth Circuit's judgment. We granted their application, thereby allowing the District Court's injunction to remain in effect. *June Medical Services, L. L. C.* v. *Gee*, 586 U. S. \_\_\_ (2019). The plaintiffs subsequently filed a petition for certiorari addressing the merits of the appeals court's decision. The State filed a cross-petition, challenging the plaintiffs' authority to maintain this action. We granted both petitions.

## II

We initially consider a procedural argument that the State raised for the first time in its cross-petition for certiorari. As we have explained, the plaintiff abortion providers and clinics in this case have challenged Act 620 on the ground that it infringes their patients' rights to access an

abortion. The State contends that the proper parties to assert these rights are the patients themselves. We think that the State has waived that argument.

The State's argument rests on the rule that a party cannot ordinarily "'rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski* v. *Tesmer*, 543 U. S. 125, 129 (2004) (quoting *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975)). This rule is "prudential." 543 U. S., at 128–129. It does not involve the Constitution's "case-or-controversy requirement." *Id.,* at 129; see *Craig* v. *Boren*, 429 U. S. 190, 193 (1976); *Singleton* v. *Wulff*, 428 U. S. 106, 112 (1976). And so, we have explained, it can be forfeited or waived. See *Craig*, 429 U. S., at 193–194.

As we pointed out, *supra,* at 4–5, the State's memorandum opposing the plaintiffs' TRO request urged the District Court to proceed swiftly to the merits of the plaintiffs' undue-burden claim. It argued that there was "no question that the physicians had standing to contest" Act 620. App. 44. And it told the District Court that the Fifth Circuit had found that doctors challenging Texas' "identical" law "had third-party standing to assert their patients' rights." *Id.,* at 43–44. Noting that the Texas law had "already been upheld," the State asserted that it had "a keen interest in removing any cloud upon the validity of its law." *Id.,* at 45. It insisted that this suit was "the proper vehicle to do so." *Ibid.* The State did not mention its current objection until it filed its cross-petition—more than five years after it argued that the plaintiffs' standing was beyond question.

The State's unmistakable concession of standing as part of its effort to obtain a quick decision from the District Court on the merits of the plaintiffs' undue-burden claims bars our consideration of it here. See *Wood* v. *Milyard*, 566 U. S. 463, 474 (2012); cf. *post,* at 24–25 (ALITO, J., dissenting) (addressing the Court's approach to claims forfeited, rather than waived); *post*, at 7–8 (GORSUCH, J., dissenting)

(addressing waiver of structural rather than prudential objections).

The State refers to the Fifth Circuit's finding of standing in *Whole Woman's Health* as an excuse for its concession. Brief for Respondent in No. 18–1323, p. 52 (Brief for Respondent). But the standing argument the State makes here rests on reasons that it tells us are specific to abortion providers *in Louisiana.* See *id.,* at 41–48. We are not persuaded that the State could have thought it was precluded from making those arguments by a decision with respect to *Texas* doctors.

And even if the State had merely forfeited its objection by failing to raise it at any point over the last five years, we would not now undo all that has come before on that basis. What we said some 45 years ago in *Craig* applies equally today: "[A] decision by us to forgo consideration of the constitutional merits"—after "the parties have sought or at least have never resisted an authoritative constitutional determination" in the courts below—"in order to await the initiation of a new challenge to the statute by injured third parties would be impermissibly to foster repetitive and time-consuming litigation under the guise of caution and prudence." 429 U. S., at 193–194 (quotation altered).

In any event, the rule the State invokes is hardly absolute. We have long permitted abortion providers to invoke the rights of their actual or potential patients in challenges to abortion-related regulations. See, *e.g., Whole Woman's Health*, 579 U. S., at \_\_\_; *Gonzales*, 550 U. S., at 133; *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 324 (2006); *Stenberg* v. *Carhart*, 530 U. S. 914, 922 (2000); *Mazurek* v. *Armstrong*, 520 U. S. 968, 969–970 (1997) (*per curiam*); *Casey*, 505 U. S., at 845 (majority opinion); *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 440, n. 30 (1983); *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 62 (1976); *Doe* v. *Bolton*, 410 U. S. 179, 188–189 (1973).

And we have generally permitted plaintiffs to assert third-party rights in cases where the "'enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights.'" *Kowalski*, 543 U. S., at 130 (quoting *Warth*, 422 U. S., at 510); see, *e.g., Department of Labor* v. *Triplett*, 494 U. S. 715, 720 (1990) (Scalia, J., for the Court) (attorney raising rights of clients to challenge restrictions on fee arrangements); *Craig*, 429 U. S., at 192 (convenience store raising rights of young men to challenge sex-based restriction on beer sales); *Doe*, 410 U. S., at 188 (abortion provider raising the rights of pregnant women to access an abortion); *Carey* v. *Population Services Int'l*, 431 U. S. 678 (1977) (distributors of contraceptives raising rights of prospective purchasers to challenge restrictions on sales of contraceptives); *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972) (similar); *Griswold* v. *Connecticut*, 381 U. S. 479, 481 (1965) (similar); *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229 (1969) (white property owner raising rights of black contractual counterparty to challenge discriminatory restrictions on ability to contract); *Barrows* v. *Jackson*, 346 U. S. 249 (1953) (similar). In such cases, we have explained, "the obvious claimant" and "the least awkward challenger" is the party upon whom the challenged statute imposes "legal duties and disabilities." *Craig*, 429 U. S., at 196–197; see *Akron*, 462 U. S., at 440, n. 30; *Danforth*, 428 U. S., at 62; *Doe*, 410 U. S., at 188.

The case before us lies at the intersection of these two lines of precedent. The plaintiffs are abortion providers challenging a law that regulates their conduct. The "threatened imposition of governmental sanctions" for noncompliance eliminates any risk that their claims are abstract or hypothetical. *Craig*, 429 U. S., at 195. That threat also assures us that the plaintiffs have every incentive to "resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Ibid.* And, as the parties who must actually

go through the process of applying for and maintaining ad-
mitting privileges, they are far better positioned than their
patients to address the burdens of compliance. See *Single-
ton*, 428 U. S., at 117 (plurality opinion) (observing that
"the physician is uniquely qualified to litigate the constitu-
tionality of the State's interference with, or discrimination
against," a woman's decision to have an abortion). They
are, in other words, "the least awkward" and most "obvious"
claimants here. *Craig*, 429 U. S., at 197.

Our dissenting colleagues suggest that this case is differ-
ent because the plaintiffs have challenged a law ostensibly
enacted to protect the women whose rights they are assert-
ing. See *post,* at 25–26 (opinion of ALITO, J.); *post*, at 7
(opinion of GORSUCH, J.). But that is a common feature of
cases in which we have found third-party standing. The re-
striction on sales of 3.2% beer to young men challenged by
a drive-through convenience store in *Craig* was defended on
"public health and safety grounds," including the premise
that young men were particularly susceptible to driving
while intoxicated. 429 U. S., at 199–200; see Hager, Gender
Discrimination and the Courts: New Ground to Cover,
Washington Post, Sept. 26, 1976, p. 139. And the rule re-
quiring approval from the Department of Labor for attorney
fee arrangements challenged by a lawyer in *Triplett* was
"designed to protect [their clients] from their improvident
contracts, in the interest not only of themselves and their
families but of the public." 494 U. S., at 722 (internal quo-
tation marks omitted).

Nor is this the first abortion case to address provider
standing to challenge regulations said to protect women.
Both the hospitalization requirement in *Akron*, 462 U. S.,
at 435, and the hospital-accreditation requirement in *Doe*,
410 U. S., at 195, were defended as health and safety regu-
lations. And the ban on saline amniocentesis in *Danforth*
was based on the legislative finding "that the technique is
deleterious to maternal health." 428 U. S., at 76 (internal

quotation marks omitted).

In short, the State's strategic waiver and a long line of well-established precedents foreclose its belated challenge to the plaintiffs' standing. We consequently proceed to consider the merits of the plaintiffs' claims.

### III
### A

Turning to the merits, we apply the constitutional standards set forth in our earlier abortion-related cases, and in particular in *Casey* and *Whole Woman's Health.* At the risk of repetition, we remind the reader of the standards we described above. In *Whole Woman's Health*, we quoted *Casey* in explaining that "'a statute which, while furthering [a] valid state interest has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.'" 579 U. S., at ___ (slip op., at 19) (quoting *Casey*, 505 U. S., at 877 (plurality opinion)). We added that "'*[u]nnecessary* health regulations'" impose an unconstitutional "'undue burden'" if they have "'the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion.'" 579 U. S., at ___ (slip op., at 19) (quoting *Casey*, 505 U. S., at 878; emphasis added).

We went on to explain that, in applying these standards, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." 579 U. S., at ___ – ___ (slip op., at 19–20). We cautioned that courts "must review legislative 'factfinding under a deferential standard.'" *Id.,* at ___ (slip op., at 20) (quoting *Gonzales*, 550 U. S., at 165). But they "must not 'place dispositive weight' on those 'findings,'" for the courts "'retai[n] an independent constitutional duty to review factual findings where constitutional rights are at stake.'" 579 U. S., at ___ (slip op., at 20) (quoting *Gonzales*, 550 U. S., at 165; emphasis deleted).

We held in *Whole Woman's Health* that the trial court faithfully applied these standards. It "considered the evidence in the record—including expert evidence, presented in stipulations, depositions, and testimony." 579 U. S., at \_\_\_ (slip op., at 21). It "then weighed the asserted benefits" of the law "against the burdens" it imposed on abortion access. *Ibid.* And it concluded that the balance tipped against the statute's constitutionality. The District Court in this suit did the same.

B

The Court of Appeals disagreed with the District Court, not so much in respect to the legal standards that we have just set forth, but because it did not agree with the factual findings on which the District Court relied in assessing both the burdens that Act 620 imposes and the health-related benefits it might bring. Compare, *e.g., supra,* at 6–9, with *supra,* at 9–11. We have consequently reviewed the record in detail ourselves. In doing so, we have applied well-established legal standards.

We start from the premise that a district court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. Rule Civ. Proc. 52(a)(6). In "'applying [this] standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*'" *Anderson* v. *Bessemer City*, 470 U. S. 564, 573 (1985) (quoting *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U. S. 100, 123 (1969)). Where "the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U. S., at 573–574. "A finding that

is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper* v. *Harris*, 581 U. S. ___, ___ (2017) (slip op., at 4).

Our dissenting colleagues suggest that a different, less-deferential standard should apply here because the District Court enjoined the admitting-privileges requirement before it was enforced. See *post*, at 11–12 (opinion of ALITO, J.); *post*, at 11–13 (opinion of GORSUCH, J.). We are aware of no authority suggesting that appellate scrutiny of factual determinations varies with the timing of a plaintiff's lawsuit or a trial court's decision. And, in any event, the record belies the dissents' claims that the District Court's findings in this case were "conjectural" or premature. As we have explained, the District Court's order on the plaintiffs' motion for a temporary restraining order suspended only Act 620's penalties. The plaintiffs were required to continue in their efforts to obtain admitting privileges. See *supra,* at 5. The District Court supervised those efforts through the trial and beyond. See 250 F. Supp. 3d, at 77. It based its findings on this real-world evidence, not speculative guesswork. Nor can we agree with the suggestion that the timing of the District Court's decision somehow prejudiced the State. From the start, the State urged that the District Court decide the merits of the plaintiffs' claims without awaiting a decision on their applications for admitting privileges. See App. 43–44. And, when this case returned to the District Court in August 2016, following our decision in *Whole Woman's Health*, the State stipulated that the case was ripe for decision on the record as it stood in June 2015. See *supra,* at 5–6. In short, we see no legal or practical basis to depart from the familiar standard that applies to all "[f]indings of fact." Fed. Rule Civ. Proc. 52(a).

Under that familiar standard, we find that the testimony and other evidence contained in the extensive record developed over the 6-day trial support the District Court's ulti-

mate conclusion that, "[e]ven if Act 620 could be said to fur-ther women's health to some marginal degree, the burdens it imposes far outweigh any such benefit, and thus the Act imposes an unconstitutional undue burden." 250 F. Supp. 3d, at 88.

## IV
### *The District Court's Substantial-Obstacle Determination*

The District Court found that enforcing the admitting-privileges requirement would "result in a drastic reduction in the number and geographic distribution of abortion pro-viders." *Id.,* at 87. In light of demographic, economic, and other evidence, the court concluded that this reduction would make it impossible for "many women seeking a safe, legal abortion in Louisiana . . . to obtain one" and that it would impose "substantial obstacles" on those who could. *Id.,* at 88. We consider each of these findings in turn.

## A
### *Act 620's Effect on Abortion Providers*

We begin with the District Court's findings in respect to Act 620's impact on abortion providers. As we have said, the court found that the Act would prevent Does 1, 2, and 6 from providing abortions. And it found that the Act would bar Doe 5 from working in his Baton Rouge-based clinic, relegating him to New Orleans. See *supra,* at 7–8.

### 1

In *Whole Woman's Health*, we said that, by presenting "direct testimony" from doctors who had been unable to se-cure privileges, and "plausible inferences to be drawn from the timing of the clinic closures" around the law's effective date, the plaintiffs had "satisfied their burden" to establish that the Texas admitting-privileges requirement caused the closure of those clinics. 579 U. S., at ___ (slip op., at 26).

We wrote that these inferences were bolstered by the sub-

missions of *amici* in the medical profession, which "describe[d] the undisputed general fact that hospitals often" will restrict admitting privileges to doctors likely to seek a "certain number of admissions per year." *Id.,* at ___ (slip op., at 24) (internal quotation marks omitted). The likely effect of such requirements was that abortion providers "would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit." *Id.*, at ___ (slip op., at 25). We also referred to "common prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures"; for example, requirements that doctors have "treated a high number of patients in the hospital setting in the past year, clinical data requirements, residency requirements, and other discretionary factors." *Ibid.*

To illustrate how these criteria impacted abortion providers, we noted the example of an obstetrician with 38 years' experience who had been denied admitting privileges for reasons "'not based on clinical competence considerations.'" *Ibid.* This, we said, showed that the law served no "relevant credentialing function," but prevented qualified providers from serving women who seek an abortion. *Id.,* at ___ (slip op., at 25). And that, in turn, "help[ed] to explain why the new [law's admitting-privileges] requirement led to the closure of" so many Texas clinics. *Id.,* at ___ (slip op., at 24).

The evidence on which the District Court relied in this case is even stronger and more detailed. The District Court supervised Does 1, 2, 5, and 6 for over a year and a half as they tried, and largely failed, to obtain conforming privileges from 13 relevant hospitals. See 250 F. Supp. 3d, at 77–78; App. 48–55, 64–82. The court heard direct evidence that some of the doctors' applications were denied for reasons that had nothing to do with their ability to perform abortions safely. 250 F. Supp. 3d, at 68–70, 76–77;

App. 1310, 1435–1436. It also compiled circumstantial evidence that explains why other applications were denied and explains why, given the costs of applying and the reputational risks that accompany rejection, some providers could have chosen in good faith *not* to apply to every qualifying hospital. *Id.,* at 1135, 1311 (discussing the costs associated with unsuccessful applications). That circumstantial evidence includes documents and testimony that described the processes Louisiana hospitals follow when considering applications for admitting privileges, including requirements like the ones we cited in *Whole Woman's Health* that are unrelated to a doctor's competency to perform abortions. See generally Brief for Medical Staff Professionals as *Amici Curiae* 11–30 (reviewing the hospital bylaws in the record).

The evidence shows, among other things, that the fact that hospital admissions for abortion are vanishingly rare means that, unless they also maintain active OB/GYN practices, abortion providers in Louisiana are unlikely to have any recent in-hospital experience. 250 F. Supp. 3d, at 49. Yet such experience can well be a precondition to obtaining privileges. Doe 2, a board-certified OB/GYN with nearly 40 years' experience, testified that he had not "done any in-hospital work in ten years" and that just two of his patients in the preceding 5 years had required hospitalization. App. 387, 400. As a result, he was unable to comply with one hospital's demand that he produce data on "patient admissions and management, consultations and procedures performed" in-hospital before his application could be "processed." *Id.,* at 1435; see *id.,* at 437–438. Doe 1, a board-certified family doctor with over 10 years' experience, was similarly unable to "submit documentation of hospital admissions and management of patients." *Id.,* at 1436.

The evidence also shows that many providers, even if they could initially obtain admitting privileges, would be unable to keep them. That is because, unless they have a practice that requires regular in-hospital care, they will

lose the privileges for failing to use them. Doe 6, a board-certified OB/GYN practitioner with roughly 50 years' experience, provides only medication abortions. *Id.,* at 1308. Of the thousands of women he served over the decade before the District Court's decision, during which he also performed surgical abortions, just two required a direct transfer to a hospital and one of them was treated without being admitted. *Id.,* at 1309. That safety record would make it impossible for Doe 6 to maintain privileges at any of the many Louisiana hospitals that require newly appointed physicians to undergo a process of "focused professional practice evaluation," in which they are observed by hospital staff as they perform in-hospital procedures. See Record 2635, 2637, 2681, 9054; Brief for Medical Staff Professionals as *Amici Curiae* 28–29 (describing this practice); cf. Record 10755 (requiring an "on-going review" of practice "in the Operating Room"). And it would likewise disqualify him at hospitals that require physicians to admit a minimum number of patients, either initially or on an ongoing basis. See, *e.g., id.,* at 9040, 9068–9069, 9150–9153; cf. App. 1193, 1182 (provider with no patient contacts in first year assigned to "Affiliate" status, without admitting privileges).

The evidence also shows that opposition to abortion played a significant role in some hospitals' decisions to deny admitting privileges. 250 F. Supp. 3d, at 48–49, 51–53 (collecting evidence). Some hospitals expressly bar anyone with privileges from performing abortions. App. 1180, 1205. Others are unwilling to extend privileges to abortion providers as a matter of discretion. *Id.,* at 1127–1129. For example, Doe 2 testified that he was told not to bother asking for admitting privileges at University Health in Shreveport because of his abortion work. *Id.,* at 383–384. And Doe 1 was told that his abortion work was an impediment to his application. *Id.,* at 1315–1316.

Still other hospitals have requirements that abortion providers cannot satisfy because of the hostility they face in

Louisiana. Many Louisiana hospitals require applicants to identify a doctor (called a "covering physician") willing to serve as a backup should the applicant admit a patient and then for some reason become unavailable. See Record 9154, 9374, 9383, 9478, 9667, 10302, 10481, 10637, 10659–10661, 10676. The District Court found "that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician." 250 F. Supp. 3d, at 49; cf. *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 25) (citing testimony describing similar problems faced by Texas providers seeking covering physicians). Doe 5 is a board-certified OB/GYN who had been practicing for more than nine years at the time of trial. Of the thousands of abortions he performed in the three years prior to the District Court's decision, not one required a direct transfer to a hospital. App. 1134. Yet he was unable to secure privileges at three Baton Rouge hospitals because he could not find a covering physician willing to be publicly associated with an abortion provider. *Id.,* at 1335–1336. Doe 3, a board-certified OB/GYN with nearly 45 years of experience, testified that he, too, had difficulty arranging coverage because of his abortion work. *Id.,* at 200–202.

Just as in *Whole Woman's Health*, the experiences of the individual doctors in this case support the District Court's factual finding that Louisiana's admitting-privileges requirement, like that in Texas' law, serves no "'relevant credentialing function.'" 250 F. Supp. 3d, at 87 (quoting *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 25).

2

The Court of Appeals found another explanation for the doctors' inability to obtain privileges more compelling. It conceded that Doe 1 would not be able to obtain admitting privileges in spite of his good-faith attempts. It concluded, however, that Does 2, 5, and 6 had acted in bad faith. 905

F. 3d, at 807.  The problem is that the law requires appel-
late courts to review a trial court's findings under the def-
erential clear-error standard we have described.  See *supra,*
at 17–18.  Our review of the record convinces us that the
Court of Appeals misapplied that standard.

JUSTICE ALITO does not dispute that the District Court's
findings are not "clearly erroneous."  He argues instead that
both the District Court and the Court of Appeals applied
the wrong legal standard to the record in this case.  By ask-
ing whether the doctors acted in "good faith," he contends,
the courts below failed to account for the doctors' supposed
"incentive to do as little as" possible to obtain conforming
privileges.  *Post*, at 12–14 (dissenting opinion); cf. *post,* at
11–12 (GORSUCH, J., dissenting).  But that is not a legal ar-
gument at all.  It is simply another way of saying that the
doctors acted in *bad* faith.  The District Court, after moni-
toring the doctors' efforts for a year and a half, found other-
wise.  And "[w]hen the record is examined in light of the
appropriately deferential standard, it is apparent that it
contains nothing that mandates a finding that the District
Court's conclusion was clearly erroneous."  *Anderson*, 470
U. S., at 577.

## *Doe 2*

The District Court found that Doe 2 tried in good faith to
get admitting privileges within 30 miles of his Shreveport-
area clinic.  250 F. Supp. 3d, at 68.  The Court of Appeals
thought that conclusion clearly erroneous for three reasons.

First, the appeals court suggested that Doe 2 failed to
submit the data needed to process his application to Boss-
ier's Willis-Knighton Health Center.  905 F. 3d, at 808.  It
is true that Doe 2 submitted no additional information in
response to the last letter he received from Willis-Knighton.
But the record explains that failure.  Doe 2 reasonably be-
lieved there was no point in doing so.  The hospital's letter

explained that the data Doe 2 had already "submitted supports the outpatient [abortion] procedures you perform[ed]." App. 1435. But, the letter added, this data did "not support your request for hospital privileges" because it did not allow the hospital to "evaluate patient admissions and management, consultations, and procedures performed." *Ibid.* Doe 2 testified at trial that he understood this to mean that he would have to submit records of *hospital* admissions, even though he had not "done any in-hospital work in ten years." *Id.,* at 387; see *id.,* at 437 ("I've explained that that information doesn't exist"). Doe 2's understanding was consistent with Willis-Knighton's similar letter to Doe 1, which explicitly stated that "we require that you submit documentation of hospital admissions and management of patients . . . ." *Id.,* at 1436. The record also shows that Doe 2 could not have maintained the "adequate number of inpatient contacts" Willis-Knighton requires to support continued privileges. Record 9640; see App. 387–390, 404. JUSTICE ALITO faults Doe 2 for failing to pursue an application for "courtesy staff" privileges. See *post,* at 18–19. For one thing, it is far from clear that courtesy privileges entitle a physician to admit patients, as Act 620 requires. Compare, *e.g.,* Record 9640 with *id.,* at 9643. For another, that would not solve the problem that Doe 2 lacked the required in-hospital experience. JUSTICE ALITO wonders whether Willis-Knighton might have conferred courtesy privileges even without that experience. But the factors the hospital considers for both tiers of privileges are facially identical. *Id.,* at 9669. We have no license to reverse a trial court's factual findings based on speculative inferences from facts not in evidence.

Second, the Court of Appeals found Doe 2's explanation that Christus Schumpert Hospital "would not staff an abortion provider" to be "blatantly contradicted by the record." 905 F. 3d, at 808. The record, however, contains Christus' bylaws. They state that "[n]o activity prohibited by" the

Ethical and Religious Directives to which the hospital sub-
scribes "shall be engaged in by any Medical Staff appointee
or any other person exercising clinical privileges at the
Health System." App. 1180. These directives provide that
abortion "is never permitted." *Id.,* at 1205. And they warn
against "the danger of scandal in any association with abor-
tion providers." *Ibid.*

The State suggests that the Court of Appeals, in speaking
of a "contradic[tion]," was referring to the fact that Doe 3
had admitting privileges at Christus, as had Doe 2 at an
earlier time. Brief for Respondent 75. Doe 3 testified, how-
ever, that he did not know whether Christus was "aware
that I was performing abortions" and that he did not "feel
like testing the waters there"—*i.e.,* by "asking [Christus]
how they would feel" if they were aware that he "was per-
forming abortions." App. 273. And nothing in the record
suggests that Christus, 10 years earlier, was aware of Doe
2's connection with abortion. JUSTICE ALITO imagines a
number of ways that Christus may have become aware of
Doe 2 or Doe 3's abortion practice. See *post,* at 17–18, and
n. 10 (dissenting opinion). The State apparently did not see
fit to test these theories or probe the doctors' accounts on
cross-examination, however. And the District Court's find-
ing of good faith is plainly permissible on the record before
us.

Finally, the Court of Appeals faulted Doe 2 for failing to
apply to Minden Hospital. The record also explains that
decision. Minden subjects all new appointees to "not less
than" six months of "focused professional practice evalua-
tion." Record 9281; see also *id.,* at 9252. That evaluation
requires an assessment of the provider's in-hospital work.
See *supra,* at 22. Doe 2 could not meet that requirement
because, as we have said, Doe 2 does not do in-hospital
work, and only two of his patients in the past five years
have required hospitalization. App. 400. Moreover, Min-
den's bylaws express a preference for applicants whom

"members of the current Active Staff of the Hospital" have recommended. *Id.,* at 1211. Doe 2 testified that Minden Hospital was "a smaller hospital," "very close to the [geographic] limits," where he "[did]n't really know anyone." *Id.,* at 454. He applied to those hospitals where he believed he had the highest likelihood of success. *Ibid.* Given this evidence, the Fifth Circuit was wrong to conclude that the District Court's findings in respect to Doe 2 were "clearly erroneous." See *Anderson,* 470 U. S., at 575.

### *Doe 5*

The District Court found that Doe 5 was unable to obtain admitting privileges at three hospitals in range of his Baton Rouge clinic in spite of his good-faith efforts to satisfy each hospital's requirement that he find a covering physician. 250 F. Supp. 3d, at 76; see App. 1334–1335 (Women's Hospital); Record 2953 (Baton Rouge General), 10659–10661 (Lane Regional). The Court of Appeals disagreed. It thought that Doe 5's efforts reflected a "lackluster approach" because he asked only one doctor to cover him. 905 F. 3d, at 809.

The record shows, however, that Doe 5 asked the doctor most likely to respond affirmatively: the doctor with whom Doe 5's Baton Rouge clinic already had a patient transfer agreement. App. 1135. Yet Doe 5 testified that even this doctor was "too afraid to be my covering physician at the hospital" because, while the transfer agreement could apparently be "kept confidential," he feared that an agreement to serve as a covering physician would not remain a secret. *Id.,* at 1135–1136. And, if the matter became well known, the doctor whom Doe 5 asked worried that it could make him a target of threats and protests. *Ibid.*

Doe 5 was familiar with the problem. Anti-abortion protests had previously forced him to leave his position as a staff member of a hospital northeast of Baton Rouge. *Id.,* at 1137–1138, 1330. And activists had picketed the school

attended by the children of a former colleague, who then stopped performing abortions as a result. Record 14036–14037.

With his own experience and their existing relationship in mind, Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would. And it was well within the District Court's discretion to credit that reading of the record. Cf. *Cooper*, 581 U. S., at ___ (slip op., at 4). Doe 5's testimony was internally consistent and consistent with what the District Court called the "mountain of un-contradicted and un-objected to evidence" in the record that supported its general finding "that opposition to abortion can present a major, if not insurmountable hurdle, for an applicant getting the required covering physician," including Doe 3's similar experience. 250 F. Supp. 3d, at 51, 49; see *id.,* at 51–53; App. 200–202.

The Court of Appeals did not address this general finding or the evidence the District Court relied on to support it, and neither do our dissenting colleagues. Cf. *post*, at 20–21 (opinion of ALITO, J.); *post*, at 12 (opinion of GORSUCH, J.). The Court of Appeals pointed to what it described as Doe 4's testimony that "finding a covering physician is not overly burdensome." 905 F. 3d, at 809. Doe 4's actual testimony was that he did not believe requiring doctors to obtain a covering physician was "an overburdensome requirement for admitting privileges." Record 14154. In context, that statement is most naturally read as saying that such a requirement was reasonable, not that it was easy to fulfill. In fact, Doe 4 testified that he had been unable to apply to two hospitals for admitting privileges because he could not find a covering physician. *Id.,* at 14154–14155. Moreover, Doe 4's statement referred to his efforts to obtain admitting privileges in New Orleans, not in Baton Rouge. *Ibid.* Doe 5 testified that he could more easily find a covering physician

in New Orleans (where he did obtain privileges) because attitudes toward abortion there were less hostile than in Baton Rouge, so the doctors' testimony would be consistent even under the Fifth Circuit's view. App. 1335–1336. Once again, the appeals court's conclusion cannot be squared with the standard of review. Cf. *Anderson*, 470 U. S., at 575.

### *Doe 6*

Finally, the District Court found that, notwithstanding his good-faith efforts, Doe 6 would not be able to obtain admitting privileges within 30 miles of the clinic in New Orleans where he worked. The Court of Appeals did not question Doe 6's decision not to apply to Tulane Hospital. Nor did it take issue with the District Court's finding that his application to East Jefferson Hospital had been denied *de facto* through no fault of his own. 250 F. Supp. 3d, at 77; App. 54. But the appeals court reversed the District Court's finding on the ground that Doe 6 should have (but did not) apply for admitting privileges at seven other hospitals in New Orleans, including Touro Hospital, which had granted limited privileges to Doe 5. 905 F. 3d, at 809–810.

Doe 6 testified that he did not apply to other hospitals because he did not admit a sufficient number of patients to receive active admitting privileges. App. 1310. As we have explained, *supra,* at 21–22, Doe 6 provides only medication abortions involving no surgical intervention. See App. 1308. The *State*'s own admitting-privileges expert, Dr. Robert Marier, testified that a doctor in Doe 6's position would "probably not" be able to obtain "active admitting and surgical privileges" at *any* hospital. *Id.,* at 884; see 250 F. Supp. 3d, at 44 (finding Dr. Marier "generally well qualified" to express an opinion on "the issue of admitting privileges and hospital credentialing").

The record contains the bylaws of four of the seven hospitals to which the Court of Appeals referred. All four directly

support the testimony of Doe 6 and the State's expert. Three hospitals require doctors who receive admitting privileges to undergo a process of "focused professional practice evaluation." See Record 2635, 2637, 2681 (Touro Hospital), 9054 (New Orleans East Hospital), 10755 (East Jefferson Hospital). As we have explained, this evaluation requires hospital staff to observe a doctor with admitting privileges while he or she performs a certain number of procedures. See *supra,* at 22. If the doctor admits no patients (and Doe 6 has no patients requiring admission), there is nothing to observe. Another hospital requires physicians to admit a minimum number of patients, either initially or after receiving admitting privileges. Record 9150–9153 (West Jefferson Hospital). And one requires both. *Id.,* at 9040, 9069 (New Orleans East Hospital). The record apparently is silent as to the remaining three hospitals, but that silence cannot contradict the well-supported testimony of Doe 6 and the State's expert that Doe 6 would not receive admitting privileges from any of them. Good faith does not require an exercise in futility.

We recognize that Doe 5 was able to secure limited admitting privileges at Touro Hospital, to which Doe 6 did not apply. But, unlike Doe 6, Doe 5 primarily performs surgical abortions. App. 1330. And while Doe 5 was a hospital-based physician as recently as 2012, Doe 6 has not held privileges at any hospital since 2005. *Id.,* at 1310, 1329. Doe 5's success therefore does not directly contradict the evidence that we have described in respect to Doe 6 or render the District Court's conclusion as to Doe 6 clearly erroneous. And, as we have said, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper*, 581 U. S., at ___ (slip op., at 4).

Without actually disputing any of the evidence we have discussed, JUSTICE ALITO maintains that the plaintiffs could have introduced still more evidence to support the District Court's determination. See *post*, at 20. As we have

said, however, "the trial on the merits should be 'the "main event" . . . rather than a "tryout on the road."'" *Anderson*, 470 U. S., at 575. "[T]he parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level"—let alone another nine in this Court—"is requiring too much." *Ibid.*

### *Other Doctors*

Finally, JUSTICE ALITO and JUSTICE GORSUCH suggest that the District Court failed to account for the possibility that new abortion providers might eventually replace Does 1, 2, 3, 5, and 6. See *post,* at 11–12 (opinion of ALITO, J.); *post,* at 11–13 (opinion of GORSUCH, J.). But the Court of Appeals did not dispute, and the record supports, the District Court's additional finding that, for "the same reasons that Does 1, 2, 4, 5, and 6 have had difficulties getting active admitting privileges, reasons unrelated to their competence . . . it is unlikely that the [a]ffected clinics will be able to comply with the Act by recruiting new physicians who have or can obtain admitting privileges." 250 F. Supp. 3d, at 82.

### B
#### *Act 620's Impact on Abortion Access*

The District Court drew from the record evidence, including the factual findings we have just discussed, several conclusions in respect to the burden that Act 620 is likely to impose upon women's ability to access abortions in Louisiana. To better understand the significance of these conclusions, the reader should keep in mind the geographic distribution of the doctors and their clinics. Figure 1 shows the distribution of doctors and clinics at the time of the District Court's decision. Figure 2 shows the projected distribution if the admitting-privileges requirement were enforced, as

found by the District Court.  The figures in parentheses indicate the approximate number of abortions each physician performed annually, according to the District Court.

*Figure 1* — Distribution of Abortion Clinics and Providers at the Time of the District Court's Decision



See 250 F. Supp. 3d, at 40–41; App. 1122, 1125, 1134, 1138, 1141, 1256.

*Figure 2* — Projected Distribution of Abortion Clinics and Providers Following Enforcement of Act 620



**Shreveport (Hope Clinic)**
Doe 3 (1,000–1,500)

**New Orleans (Women's Health)**
Doe 5 (2,950)

See 250 F. Supp. 3d, at 80–81; App. 207, 1134.

1

As we have seen, enforcing the admitting-privileges requirement would eliminate Does 1, 2, and 6. The District Court credited Doe 3's uncontradicted, in-court testimony that he would stop performing abortions if he was the last provider in northern Louisiana. 250 F. Supp. 3d, at 79; see App. 263–265. So the departure of Does 1 and 2 would also eliminate Doe 3. That would leave only Doe 5. And Doe 5's inability to obtain privileges in the Baton Rouge area would leave Louisiana with just one clinic with one provider to serve the 10,000 women annually who seek abortions in the State. 250 F. Supp. 3d, at 80, 87–88; cf. *Whole Woman's Health*, 579 U. S., at \_\_\_ (slip op., at 26).

Working full time in New Orleans, Doe 5 would be able to absorb no more than about 30% of the annual demand for abortions in Louisiana. App. 1134, 1331; see *id.,* at 1129. And because Doe 5 does not perform abortions beyond 18 weeks, women between 18 weeks and the state legal limit

of 20 weeks would have little or no way to exercise their constitutional right to an abortion. *Id.,* at 1330–1331.

Those women not altogether prevented from obtaining an abortion would face other burdens. As in *Whole Woman's Health*, the reduction in abortion providers caused by Act 620 would inevitably mean "longer waiting times, and increased crowding." 579 U. S., at ___ (slip op., at 26). The District Court heard testimony that delays in obtaining an abortion increase the risk that a woman will experience complications from the procedure and may make it impossible for her to choose a noninvasive medication abortion. App. 220, 290, 312–313; see also *id.,* at 1139, 1305, 1313, 1316, 1323.

Even if they obtain an appointment at a clinic, women who might previously have gone to a clinic in Baton Rouge or Shreveport would face increased driving distances. New Orleans is nearly a five hour drive from Shreveport; it is over an hour from Baton Rouge; and Baton Rouge is more than four hours from Shreveport. The impact of those increases would be magnified by Louisiana's requirement that every woman undergo an ultrasound and receive mandatory counseling at least 24 hours before an abortion. La. Rev. Stat. Ann. §40:1061.10(D). A Shreveport resident seeking an abortion who might previously have obtained care at one of that city's local clinics would either have to spend nearly 20 hours driving back and forth to Doe 5's clinic twice, or else find overnight lodging in New Orleans. As the District Court stated, both experts and laypersons testified that the burdens of this increased travel would fall disproportionately on poor women, who are least able to absorb them. App. 106–107, 178, 502–508, 543; see also *id.,* at 311–312.

2

We note that the Court of Appeals also faulted the Dis-

trict Court for factoring Doe 3's departure into its calcula-
tions. The appeals court thought that Doe 3's personal
choice to stop practicing could not be attributed to Act 620.
905 F. 3d, at 810–811. That is beside the point. Even if we
pretended as though (contrary to the record evidence) Doe
3 would continue to provide abortions at Shreveport-based
Hope Clinic, the record nonetheless supports the District
Court's alternative finding that Act 620's burdens would re-
main substantial. See 250 F. Supp. 3d, at 80–81, 84, 87.

The record tells us that Doe 3 is presently able to see
roughly 1,000–1,500 women annually. *Id.,* at 81; see App.
207, 243–244. Doe 3 testified that this was in addition to
"working very, very long hours maintaining [his] private
[OB/GYN] practice." *Id.,* at 265, 1323; see *id.,* at 118, 1147.
And, the District Court found that Doe 5 can perform no
more than roughly 3,000 abortions annually. See *supra,* at
33. So even if Doe 3 remained active in Shreveport, the an-
nual demand for abortions in Louisiana would be more than
double the capacity. And although the availability of abor-
tions in Shreveport might lessen the driving distances faced
by some women, it would still leave thousands of Louisiana
women with no practical means of obtaining a safe, legal
abortion, and it would not meaningfully address the health
risks associated with crowding and delay for those able to
secure an appointment with one of the State's two remain-
ing providers.

*      *      *

Taken together, we think that these findings and the ev-
idence that underlies them are sufficient to support the Dis-
trict Court's conclusion that Act 620 would place substan-
tial obstacles in the path of women seeking an abortion in
Louisiana.

## V

### *Benefits*

We turn finally to the law's asserted benefits. The District Court found that there was "'no significant health-related problem that the new law helped to cure.'" 250 F. Supp. 3d, at 86 (quoting *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 22)). It found that the admitting-privileges requirement "[d]oes [n]ot [p]rotect [w]omen's [h]ealth," provides "no significant health benefits," and makes no improvement to women's health "compared to prior law." 250 F. Supp. 3d, at 86 (boldface deleted). Our examination of the record convinces us that these findings are not "clearly erroneous."

First, the District Court found that the admitting-privileges requirement serves no "relevant credentialing function." *Id.,* at 87 (quoting *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 25)). As we have seen, hospitals can, and do, deny admitting privileges for reasons unrelated to a doctor's ability safely to perform abortions. And Act 620's requirement that physicians obtain privileges at a hospital within 30 miles of the place where they perform abortions further constrains providers for reasons that bear no relationship to competence.

Moreover, while "competency is a factor" in credentialing decisions, 250 F. Supp. 3d, at 46, hospitals primarily focus upon a doctor's ability to perform the inpatient, hospital-based procedures for which the doctor seeks privileges—not outpatient abortions. App. 877, 1373; see *id.,* at 907; Brief for Medical Staff Professionals as *Amici Curiae* 26; Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 12. Indeed, the State's admitting-privileges expert, Dr. Robert Marier, testified that, when he served as the Executive Director of Louisiana's Board of Medical Examiners, he concurred in the Board's position that a physician was competent to perform first-trimester

surgical abortions and to "recognize and address complications from the procedure" so long as they had completed an accredited residency in obstetrics and gynecology or been trained in abortion procedures during another residency—irrespective of their affiliation with any hospital. App. 872–873, 1305; cf. *post,* at 5–6 (ALITO, J., dissenting). And nothing in the record indicates that the background vetting for admitting privileges adds significantly to the vetting that the State Board of Medical Examiners already provides. 250 F. Supp. 3d, at 87; App. 1355–1356, 1358–1359.

Second, the District Court found that the admitting-privileges requirement "does not conform to prevailing medical standards and will not improve the safety of abortion in Louisiana." 250 F. Supp. 3d, at 64; see *id.,* at 64–66. As in *Whole Woman's Health*, the expert and lay testimony presented at trial shows that:

- "Complications from surgical abortion are relatively rare," and "[t]hey very rarely require transfer to a hospital or emergency room and are generally not serious." App. 287; see *id.*, at 129; cf. *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 22–23).

- For those patients who do experience complications at the clinic, the transfer agreement required by existing law is "sufficient to ensure continuity of care for patients in an emergency." App. 1050; see *id.*, at 194, 330–332, 1059.

- The "standard protocol" when a patient experiences a complication after returning home from the clinic is to send her "to the hospital that is nearest and able to provide the service that the patient needs," which is not necessarily a hospital within 30 miles of the clinic. *Id.*, at 351; see *id.*, at 115–116, 180, 793; La. Rev. Stat. Ann. §40:1061.10(A)(2)(b)(ii) (requiring abortion providers to furnish patients with

the name and telephone number of the hospital nearest to their home); cf. *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 23).

As in *Whole Woman's Health*, the State introduced no evidence "showing that patients have better outcomes when their physicians have admitting privileges" or "of any instance in which an admitting privileges requirement would have helped even one woman obtain better treatment." 250 F. Supp. 3d, at 64; *Whole Woman's Health*, 579 U. S., at ___ – ___ (slip op., at 23–24); see also Centers for Medicare and Medicaid Services, 84 Fed. Reg. 51790–51791 (2019) ("Under modern procedures, emergency responders (and patients themselves) take patients to hospital emergency rooms without regard to prior agreements between particular physicians and particular hospitals"); Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 6 (local admitting-privileges requirements for abortion providers offer no medical benefit and do not meaningfully advance continuity of care).

## VI

### *Conclusion*

We conclude, in light of the record, that the District Court's significant factual findings—both as to burdens and as to benefits—have ample evidentiary support. None is "clearly erroneous." Given the facts found, we must also uphold the District Court's related factual and legal determinations. These include its determination that Louisiana's law poses a "substantial obstacle" to women seeking an abortion; its determination that the law offers no significant health-related benefits; and its determination that the law consequently imposes an "undue burden" on a woman's constitutional right to choose to have an abortion. We also agree with its ultimate legal conclusion that, in light of these findings and our precedents, Act 620 violates the Constitution.

## VII

As a postscript, we explain why we have found unconvincing several further arguments that the State has made. First, the State suggests that the record supports the Court of Appeals' conclusion that Act 620 poses no substantial obstacle to the abortion decision. See Brief for Respondent 73, 80. This argument misconceives the question before us. "The question we must answer" is "not whether the [Fifth] Circuit's interpretation of the facts was clearly erroneous, but whether the *District Court's* finding[s were] clearly erroneous." *Anderson*, 470 U. S., at 577 (emphasis added). As we have explained, we think the District Court's factual findings here are plausible in light of the record as a whole. Nothing in the State's briefing furnishes a basis to disturb that conclusion.

Second, the State says that the record does not show that Act 620 will burden *every* woman in Louisiana who seeks an abortion. Brief for Respondent 69–70 (citing *United States* v. *Salerno*, 481 U. S. 739, 745 (1987)). True, but beside the point. As we stated in *Casey*, a State's abortion-related law is unconstitutional on its face if "it will operate as a substantial obstacle to a woman's choice to undergo an abortion" in "a large fraction of the cases in which [it] is relevant." 505 U. S., at 895 (majority opinion). In *Whole Woman's Health*, we reaffirmed that standard. We made clear that the phrase refers to a large fraction of "those women for whom the provision is an actual rather than an irrelevant restriction." 579 U. S., at \_\_\_ (slip op., at 39) (quoting *Casey*, 505 U. S., at 895; brackets omitted). That standard, not an "every woman" standard, is the standard that must govern in this case.

Third, the State argues that Act 620 would not make it "nearly impossible" for a woman to obtain an abortion. Brief for Respondent 71–72. But, again, the words "nearly impossible" do not describe the legal standard that governs here. Since *Casey*, we have repeatedly reiterated that the

plaintiff's burden in a challenge to an abortion regulation is to show that the regulation's "purpose or effect" is to "plac[e] a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U. S., at 877 (plurality opinion); see *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 8); *Gonzales*, 550 U. S., at 156; *Stenberg*, 530 U. S., at 921; *Mazurek*, 520 U. S., at 971.

Finally, the State makes several arguments about the standard of review that it would have us apply in cases where a regulation is found *not* to impose a substantial obstacle to a woman's choice. Brief for Respondent 60–66. That, however, is not this case. The record here establishes that Act 620's admitting-privileges requirement places a substantial obstacle in the path of a large fraction of those women seeking an abortion for whom it is a relevant restriction.

\*    \*    \*

This case is similar to, nearly identical with, *Whole Woman's Health*. And the law must consequently reach a similar conclusion. Act 620 is unconstitutional. The Court of Appeals' judgment is erroneous. It is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

————

Nos. 18–1323 and 18–1460

————

JUNE MEDICAL SERVICES L. L. C., ET AL.,
PETITIONERS
18–1323                    *v.*
STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS


STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, PETITIONER
18–1460                    *v.*
JUNE MEDICAL SERVICES L. L. C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

CHIEF JUSTICE ROBERTS, concurring in the judgment.

In July 2013, Texas enacted a law requiring a physician performing an abortion to have "active admitting privileges at a hospital . . . located not further than 30 miles from the location at which the abortion is performed." Tex. Health & Safety Code Ann. §171.0031(a)(1)(A) (West Cum. Supp. 2019). The law caused the number of facilities providing abortions to drop in half. In *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_ (2016), the Court concluded that Texas's admitting privileges requirement "places a substantial obstacle in the path of women seeking a previability abortion" and therefore violated the Due Process Clause of the Fourteenth Amendment. *Id.,* at \_\_\_ (slip op., at 2) (citing *Planned Parenthood of Southeastern Pa.* v. *Casey,*

505 U. S. 833, 878 (1992) (plurality opinion)).

I joined the dissent in *Whole Woman's Health* and continue to believe that the case was wrongly decided. The question today however is not whether *Whole Woman's Health* was right or wrong, but whether to adhere to it in deciding the present case. See *Moore* v. *Texas*, 586 U. S. ___, ___ (2019) (ROBERTS, C. J., concurring) (slip op., at 1).

Today's case is a challenge from several abortion clinics and providers to a Louisiana law nearly identical to the Texas law struck down four years ago in *Whole Woman's Health*. Just like the Texas law, the Louisiana law requires physicians performing abortions to have "active admitting privileges at a hospital . . . located not further than thirty miles from the location at which the abortion is performed." La. Rev. Stat. Ann. §40:1061.10(A)(2)(a) (West Cum. Supp. 2020). Following a six-day bench trial, the District Court found that Louisiana's law would "result in a drastic reduction in the number and geographic distribution of abortion providers." *June Medical Services LLC* v. *Kliebert*, 250 F. Supp. 3d 27, 87 (MD La. 2017). The law would reduce the number of clinics from three to "one, or at most two," and the number of physicians providing abortions from five to "one, or at most two," and "therefore cripple women's ability to have an abortion in Louisiana." *Id.,* at 87–88.

The legal doctrine of *stare decisis* requires us, absent special circumstances, to treat like cases alike. The Louisiana law imposes a burden on access to abortion just as severe as that imposed by the Texas law, for the same reasons. Therefore Louisiana's law cannot stand under our precedents.

I

*Stare decisis* ("to stand by things decided") is the legal term for fidelity to precedent. Black's Law Dictionary 1696 (11th ed. 2019). It has long been "an established rule to abide by former precedents, where the same points come

again in litigation; as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." 1 W. Blackstone, Commentaries on the Laws of England 69 (1765). This principle is grounded in a basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them. Because the "private stock of reason . . . in each man is small, . . . individuals would do better to avail themselves of the general bank and capital of nations and of ages." 3 E. Burke, Reflections on the Revolution in France 110 (1790).

Adherence to precedent is necessary to "avoid an arbitrary discretion in the courts." The Federalist No. 78, p. 529 (J. Cooke ed. 1961) (A. Hamilton). The constraint of precedent distinguishes the judicial "method and philosophy from those of the political and legislative process." Jackson, Decisional Law and Stare Decisis, 30 A. B. A. J. 334 (1944).

The doctrine also brings pragmatic benefits. Respect for precedent "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). It is the "means by which we ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986). In that way, "*stare decisis* is an old friend of the common lawyer." Jackson, *supra,* at 334.

*Stare decisis* is not an "inexorable command." *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (slip op., at 20) (internal quotation marks omitted). But for precedent to mean anything, the doctrine must give way only to a rationale that goes beyond whether the case was decided correctly. The Court accordingly considers additional factors before overruling a precedent, such as its adminstrability, its fit

with subsequent factual and legal developments, and the reliance interests that the precedent has engendered. See *Janus* v. *State, County, and Municipal Employees,* 585 U. S. ___, ____–____ (2018) (slip op., at 34–35).

*Stare decisis* principles also determine how we handle a decision that itself departed from the cases that came before it. In those instances, "[r]emaining true to an 'intrinsically sounder' doctrine established in prior cases better serves the values of *stare decisis* than would following" the recent departure. *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 231 (1995) (plurality opinion). *Stare decisis* is pragmatic and contextual, not "a mechanical formula of adherence to the latest decision." *Helvering* v. *Hallock*, 309 U. S. 106, 119 (1940).

## II

### A

Both Louisiana and the providers agree that the undue burden standard announced in *Casey* provides the appropriate framework to analyze Louisiana's law. Brief for Petitioners in No. 18–1323, pp. 45–47; Brief for Respondent in No. 18–1323, pp. 60–62. Neither party has asked us to reassess the constitutional validity of that standard.

*Casey* reaffirmed "the most central principle of *Roe* v. *Wade*," "a woman's right to terminate her pregnancy before viability." *Casey*, 505 U. S., at 871 (plurality opinion).[1] At the same time, it recognized that the State has "important and legitimate interests in . . . protecting the health of the pregnant woman and in protecting the potentiality of human life." *Id.,* at 875–876 (internal quotation marks and brackets omitted).

To serve the former interest, the State may, "[a]s with

——————

[1] Although parts of *Casey*'s joint opinion were a plurality not joined by a majority of the Court, the joint opinion is nonetheless considered the holding of the Court under *Marks* v. *United States*, 430 U. S. 188, 193 (1977), as the narrowest position supporting the judgment.

any medical procedure," enact "regulations to further the health or safety of a woman seeking an abortion." *Id., at* 878. To serve the latter interest, the State may, among other things, "enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term." *Id.,* at 872. The State's freedom to enact such rules is "consistent with *Roe*'s central premises, and indeed the inevitable consequence of our holding that the State has an interest in protecting the life of the unborn." *Id.,* at 873.

Under *Casey*, the State may not impose an undue burden on the woman's ability to obtain an abortion. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.,* at 877. Laws that do not pose a substantial obstacle to abortion access are permissible, so long as they are "reasonably related" to a legitimate state interest. *Id.,* at 878.

After faithfully reciting this standard, the Court in *Whole Woman's Health* added the following observation: "The rule announced in *Casey* . . . requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." 579 U. S., at ___–___ (slip op., at 19–20). The plurality repeats today that the undue burden standard requires courts "to weigh the law's asserted benefits against the burdens it imposes on abortion access." *Ante,* at 2 (internal quotation marks omitted).

Read in isolation from *Casey*, such an inquiry could invite a grand "balancing test in which unweighted factors mysteriously are weighed." *Marrs* v. *Motorola, Inc.,* 577 F. 3d 783, 788 (CA7 2009). Under such tests, "equality of treatment is . . . impossible to achieve; predictability is destroyed; judicial arbitrariness is facilitated; judicial courage is impaired." Scalia, The Rule of Law as a Law of Rules, 56

U. Chi. L. Rev. 1175, 1182 (1989).

In this context, courts applying a balancing test would be asked in essence to weigh the State's interests in "protecting the potentiality of human life" and the health of the woman, on the one hand, against the woman's liberty interest in defining her "own concept of existence, of meaning, of the universe, and of the mystery of human life" on the other. *Casey*, 505 U. S., at 851 (opinion of the Court); *id.,* at 871 (plurality opinion) (internal quotation marks omitted). There is no plausible sense in which anyone, let alone this Court, could objectively assign weight to such imponderable values and no meaningful way to compare them if there were. Attempting to do so would be like "judging whether a particular line is longer than a particular rock is heavy," *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 897 (1988) (Scalia, J., concurring in judgment). Pretending that we could pull that off would require us to act as legislators, not judges, and would result in nothing other than an "unanalyzed exercise of judicial will" in the guise of a "neutral utilitarian calculus." *New Jersey* v. *T. L. O.*, 469 U. S. 325, 369 (1985) (Brennan, J., concurring in part and dissenting in part).

Nothing about *Casey* suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts. On the contrary, we have explained that the "traditional rule" that "state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty" is "consistent with *Casey*." *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007). *Casey* instead focuses on the existence of a substantial obstacle, the sort of inquiry familiar to judges across a variety of contexts. See, *e.g., Burwell* v. *Hobby Lobby Stores, Inc.*, 573 U. S. 682, 694–695 (2014) (asking whether the government "substantially burdens a person's exercise of religion" under the Religious Freedom Restoration Act); *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. 721,

748 (2011) (asking whether a law "imposes a substantial burden on the speech of privately financed candidates and independent expenditure groups"); *Murphy* v. *United Parcel Service, Inc.*, 527 U. S. 516, 521 (1999) (asking, in the context of the Americans with Disabilities Act, whether an individual's impairment "substantially limits one or more major life activities" (internal quotation marks omitted)).

*Casey*'s analysis of the various restrictions that were at issue in that case is illustrative. For example, the opinion recognized that Pennsylvania's 24-hour waiting period for abortions "has the effect of increasing the cost and risk of delay of abortions," but observed that the District Court did not find that the "increased costs and potential delays amount to substantial obstacles." 505 U. S., at 886 (joint opinion of O'Connor, Kennedy, and Souter, JJ.) (internal quotation marks omitted). The opinion concluded that "given the statute's definition of medical emergency," the waiting period did not "impose[] a real health risk." *Ibid.* Because the law did not impose a substantial obstacle, *Casey* upheld it. And it did so notwithstanding the District Court's finding that the law did "not further the state interest in maternal health." *Ibid.* (internal quotation marks omitted).

Turning to the State's various recordkeeping and reporting requirements, *Casey* found those requirements do not "impose a substantial obstacle to a woman's choice" because "[a]t most they increase the cost of some abortions by a slight amount." *Id.,* at 901. "While at some point increased cost could become a substantial obstacle," there was "no such showing on the record" before the Court. *Ibid.* The Court did not weigh this cost against the benefits of the law.

The same was true for Pennsylvania's parental consent requirement. *Casey* held that "a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided there is an adequate judicial bypass pro-

cedure." *Id.,* at 899 (citing, among other cases, *Ohio* v. *Akron Center for Reproductive Health*, 497 U. S. 502, 510–519 (1990)). *Casey* relied on precedent establishing that judicial bypass procedures "prevent another person from having an absolute veto power over a minor's decision to have an abortion." *Akron*, 497 U. S., at 510. Without a judicial bypass, parental consent laws impose a substantial obstacle to a minor's ability to obtain an abortion and therefore constitute an undue burden. See *Casey*, 505 U. S., at 899 (joint opinion).

The opinion similarly looked to whether there was a substantial burden, not whether benefits outweighed burdens, in analyzing Pennsylvania's requirement that physicians provide certain "truthful, nonmisleading information" about the nature of the abortion procedure. *Id.*, at 882. The opinion concluded that the requirement "cannot be considered a substantial obstacle to obtaining an abortion, and, *it follows*, there is no undue burden." *Id.*, at 883 (emphasis added).

With regard to the State's requirement that a physician, as opposed to a qualified assistant, provide the woman this information, the opinion reasoned: "*Since* there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion, we conclude that it is not an undue burden." *Id.,* at 884–885 (emphasis added). This was so "even if an objective assessment might suggest that those same tasks could be performed by others," meaning the law had little if any benefit. *Id.,* at 885.

The only restriction *Casey* found unconstitutional was Pennsylvania's spousal notification requirement. On that score, the Court recited a bevy of social science evidence demonstrating that "millions of women in this country . . . may have justifiable fears of physical abuse" or "devastating forms of psychological abuse from their husbands." *Id.,*

at 893 (opinion of the Court). In addition to "physical vio-lence" and "child abuse," women justifiably feared "verbal harassment, threats of future violence, the destruction of possessions, physical confinement to the home, the with-drawal of financial support, or the disclosure of the abortion to family and friends." *Ibid.* The spousal notification re-quirement was "thus likely to prevent a significant number of women from obtaining an abortion." *Ibid.* It did not "merely make abortions a little more difficult or expensive to obtain; for many women, it [imposed] a substantial ob-stacle." *Id.,* at 893–894. The Court emphasized that it would not "blind [itself] to the fact that the significant num-ber of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth had outlawed abortion in all cases." *Id.,* at 894.

The upshot of *Casey* is clear: The several restrictions that did not impose a substantial obstacle were constitutional, while the restriction that did impose a substantial obstacle was unconstitutional.

To be sure, the Court at times discussed the benefits of the regulations, including when it distinguished spousal no-tification from parental consent. See *Whole Woman's Health*, 579 U. S., at \_\_\_–\_\_\_ (slip op., at 19–20) (citing *Ca-sey*, 505 U. S., at 887–898 (opinion of the Court); *id.,* at 899–901 (joint opinion). But in the context of *Casey*'s governing standard, these benefits were not placed on a scale opposite the law's burdens. Rather, *Casey* discussed benefits in con-sidering the threshold requirement that the State have a "legitimate purpose" and that the law be "reasonably re-lated to that goal." *Id.*, at 878 (plurality opinion); *id.,* at 882 (joint opinion).

So long as that showing is made, the only question for a court is whether a law has the "effect of placing a substan-tial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.*, at 877 (plurality opinion). *Casey*

repeats that "substantial obstacle" standard nearly verba-
tim no less than 15 times. *Id.,* at 846, 894, 895 (opinion of
the Court); *id.,* at 877, 878 (plurality opinion); *id.,* at 883,
884, 885, 886, 887, 901 (joint opinion).[2]

The only place a balancing test appears in *Casey* is in Jus-
tice Stevens's partial dissent. "Weighing the State's inter-
est in potential life and the woman's liberty interest," Jus-
tice Stevens would have gone further than the plurality to
strike down portions of the State's informed consent re-
quirements and 24-hour waiting period. *Id.,* at 916–920
(opinion concurring in part and dissenting in part). But
that approach did not win the day.

*Mazurek* v. *Armstrong* places this understanding of *Ca-
sey*'s undue burden standard beyond doubt. *Mazurek* in-
volved a challenge to a Montana law restricting the perfor-
mance of abortions to licensed physicians. 520 U. S*.,* at 969.
It was "uncontested that there was insufficient evidence of
a 'substantial obstacle' to abortion." *Id.,* at 972. Therefore,
once the Court found that the Montana Legislature had not
acted with an "unlawful motive," the Court's work was com-
plete. *Ibid.* In fact, the Court found the challengers' argu-
ment—that the law was invalid because "all health evi-
dence contradicts the [State's] claim that there is any

--------

[2] JUSTICE GORSUCH correctly notes that *Casey* "expressly disavowed
any test as strict as strict scrutiny." *Post,* at 20 (dissenting opinion). But
he certainly is wrong to suggest that my position is in any way incon-
sistent with that disavowal. Applying strict scrutiny would require "*any*
regulation touching upon the abortion decision" to be the least restrictive
means to further a compelling state interest. *Casey*, 505 U. S., at 871
(plurality opinion) (emphasis added). *Casey* however recognized that
such a test would give "too little acknowledgement and implementation"
to the State's "legitimate interests in the health of the woman and in
protecting the potential life within her." *Ibid.* Under *Casey*, abortion
regulations are valid so long as they do not pose a substantial obstacle
and meet the threshold requirement of being "reasonably related" to a
"legitimate purpose." *Id.*, at 878; *id.*, at 882 (joint opinion).

health basis for the law"—to be "*squarely foreclosed* by *Casey* itself." *Id.,* at 973 (internal quotation marks omitted; emphasis added).

We should respect the statement in *Whole Woman's Health* that it was applying the undue burden standard of *Casey*. The opinion in *Whole Woman's Health* began by saying, "We must here decide whether two provisions of [the Texas law] violate the Federal Constitution as interpreted in *Casey*." 579 U. S., at \_\_\_ (slip op., at 1). Nothing more. The Court explicitly stated that it was applying "the standard, as described in *Casey*," and reversed the Court of Appeals for applying an approach that did "not match the standard that this Court laid out in *Casey*." *Id.,* at \_\_\_, \_\_\_ (slip op., at 19, 20).

Here the plurality expressly acknowledges that we are not considering how to analyze an abortion regulation that does not present a substantial obstacle. "That," the plurality explains, "is not this case." *Ante*, at 40. In this case, *Casey*'s requirement of finding a substantial obstacle before invalidating an abortion regulation is therefore a sufficient basis for the decision, as it was in *Whole Woman's Health*. In neither case, nor in *Casey* itself, was there call for consideration of a regulation's benefits, and nothing in *Casey* commands such consideration. Under principles of *stare decisis*, I agree with the plurality that the determination in *Whole Woman's Health* that Texas's law imposed a substantial obstacle requires the same determination about Louisiana's law. Under those same principles, I would adhere to the holding of *Casey*, requiring a substantial obstacle before striking down an abortion regulation.

## B

*Whole Woman's Health* held that Texas's admitting privileges requirement placed "a substantial obstacle in the path of women seeking a previability abortion," independent of its discussion of benefits. 579 U. S., at \_\_\_ (slip op.,

at 2) (citing *Casey*, 505 U. S., at 878 (plurality opinion)).[3] Because Louisiana's admitting privileges requirement would restrict women's access to abortion to the same degree as Texas's law, it also cannot stand under our precedent.[4]

To begin, the two laws are nearly identical. Prior to enactment of the Texas law, abortion providers were required either to possess local hospital admitting privileges or to have a transfer agreement with a physician who had such privileges. Tex. Admin. Code, tit. 25, §139.56(a) (2009). The new law, adopted in 2013, eliminated the option of having a transfer agreement. Providers were required to "[h]ave active admitting privileges at a hospital . . . located not further than 30 miles from the location at which the abortion is performed." Tex. Health & Safety Code Ann. §171.0031(a)(1)(A).

Likewise, Louisiana law previously required abortion providers to have either admitting privileges or a transfer agreement. La. Admin. Code, tit. 48, pt. I, §4407(A)(3)

---

[3] JUSTICE GORSUCH considers this is a "nonexistent ruling" nowhere to be found in *Whole Woman's Health*. *Post*, at 19 (dissenting opinion). I disagree. *Whole Woman's Health* first surveyed the benefits of Texas's admitting privileges requirement. 579 U. S., at ___–___ (slip op., at 23–24). The Court then transitioned to examining the law's burdens: "*At the same time*, the record evidence indicates that the admitting-privileges requirement places a substantial obstacle in the path of a woman's choice." *Id.*, at ___ (slip op., at 24) (internal quotation marks omitted; emphasis added). And the Court made clear that a law which has the purpose or effect of placing "a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability" imposes an "undue burden" and therefore violates the Constitution. *Id.*, at ___ (slip op., at 1) (internal quotation marks omitted; emphasis deleted). Thus the discussion of benefits in *Whole Woman's Health* was not necessary to its holding.

[4] For the reasons the plurality explains, *ante,* at 11–16, I agree that the abortion providers in this case have standing to assert the constitutional rights of their patients.

(2003), 29 La. Reg. 706–707 (2003). In 2014, Louisiana removed the option of having a transfer agreement. Just like Texas, Louisiana now requires abortion providers to "[h]ave active admitting privileges at a hospital . . . located not further than thirty miles from the location at which the abortion is performed." La. Rev. Stat. §40:1061.10(A)(2)(a).

Crucially, the District Court findings indicate that Louisiana's law would restrict access to abortion in just the same way as Texas's law, to the same degree or worse. In Texas, "as of the time the admitting-privileges requirement began to be enforced, the number of facilities providing abortions dropped in half, from about 40 to about 20." *Whole Woman's Health*, 579 U. S., at \_\_\_ (slip op., at 24). Eight abortion clinics closed in the months prior to the law's effective date. *Ibid.* Another 11 clinics closed on the day the law took effect. *Ibid.*

Similarly, the District Court found that the Louisiana law would "result in a drastic reduction in the number and geographic distribution of abortion providers." 250 F. Supp. 3d, at 87. At the time of the District Court's decision, there were three clinics and five physicians performing abortions in Louisiana. *Id.,* at 40, 41. The District Court found that the new law would reduce "the number of clinics to one, or at most two," and the number of physicians in Louisiana to "one, or at most two," as well. *Id.,* at 87. Even in the best case, "the demand for services would vastly exceed the supply." *Ibid.*

*Whole Woman's Health* found that the closures of the abortion clinics led to "fewer doctors, longer waiting times, and increased crowding." 579 U. S., at \_\_\_ (slip op., at 26). The Court also found that "the number of women of reproductive age living in a county more than 150 miles from a provider increased from approximately 86,000 to 400,000 and the number of women living in a county more than 200 miles from a provider from approximately 10,000 to 290,000." *Ibid.* (internal quotation marks and alterations

omitted).

The District Court here likewise found that the Louisiana law would result in "longer waiting times for appointments, increased crowding and increased associated health risk." 250 F. Supp. 3d, at 81. The court found that Louisiana women already "have difficulty affording or arranging for transportation and childcare on the days of their clinic visits" and that "[i]ncreased travel distance" would exacerbate this difficulty. *Id.,* at 83. The law would prove "particularly burdensome for women living in northern Louisiana . . . who once could access a clinic in their own area [and] will now have to travel approximately 320 miles to New Orleans." *Ibid.*

In Texas, "common prerequisites to obtaining admitting privileges that [had] nothing to do with ability to perform medical procedures," including "clinical data requirements, residency requirements, and other discretionary factors," made it difficult for well-credentialed abortion physicians to obtain such privileges. *Whole Woman's Health*, 579 U. S., at ___ (slip op., at 25). In particular, the Court found that "hospitals often condition[ed] admitting privileges on reaching a certain number of admissions per year." *Id.,* at ___ (slip op., at 24) (internal quotation marks omitted). But because complications requiring hospitalization are relatively rare, abortion providers were "unlikely to have any patients to admit" and thus were "unable to maintain admitting privileges or obtain those privileges for the future." *Id.,* at ___ (slip op., at 25).

So too here. "While a physician's competency is a factor in assessing an applicant for admitting privileges" in Louisiana, "it is only one factor that hospitals consider in whether to grant privileges." 250 F. Supp. 3d, at 46. Louisiana hospitals "may deny privileges or decline to consider an application for privileges for myriad reasons unrelated to competency," including "the physician's expected usage of the hospital and intent to admit and treat patients there,

the number of patients the physician has treated in the hospital in the recent past, the needs of the hospital, the mission of the hospital, or the business model of the hospital." *Ibid.*[5]

And the District Court found that, as in Texas, Louisiana "hospitals often grant admitting privileges to a physician because the physician plans to provide services in the hospital" and that "[i]n general, hospital admitting privileges are not provided to physicians who never intend to provide services in a hospital." *Id.,* at 49. But "[b]ecause, by all accounts, abortion complications are rare, an abortion provider is unlikely to have a consistent need to admit patients." *Id.,* at 50 (citations omitted).[6]

Importantly, the District Court found that "since the passage of [the Louisiana law], all five remaining doctors have attempted *in good faith* to comply" with the law by applying for admitting privileges, yet have had very little success. *Id.*, at 78 (emphasis added). This finding was necessary to ensure that the physicians' inability to obtain admitting privileges was attributable to the new law rather than a halfhearted attempt to obtain privileges. Only then could the District Court accurately identify the Louisiana law's burden on abortion access.

The question is not whether we would reach the same

—————————

[5] JUSTICE ALITO misunderstands my discussion of credentials as focusing on the law's lack of benefits. See *post*, at 4 (dissenting opinion). But my analysis, like *Casey*, is limited to the law's effect on the availability of abortion.

[6] I agree with JUSTICE ALITO that the validity of admitting privileges laws "depend[s] on numerous factors that may differ from State to State." *Post*, at 9 (dissenting opinion). And I agree with JUSTICE GORSUCH that "[w]hen it comes to the factual record, litigants normally start the case on a clean slate." *Post,* at 14 (dissenting opinion). Appreciating that others may in good faith disagree, however, I cannot view the record here as in any pertinent respect sufficiently different from that in *Whole Woman's Health* to warrant a different outcome.

findings from the same record. These District Court findings "entail[ed] primarily . . . factual work" and therefore are "review[ed] only for clear error." *U. S. Bank N. A.* v. *Village at Lakeridge*, *LLC*, 583 U. S. ___, ___, ___ (2018) (slip op., at 6, 9). Clear error review follows from a candid appraisal of the comparative advantages of trial courts and appellate courts. "While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living." *Taglieri* v. *Monasky*, 907 F. 3d 404, 408 (CA6 2018) (en banc).

We accordingly will not disturb the factual conclusions of the trial court unless we are "left with the definite and firm conviction that a mistake has been committed." *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948). In my view, the District Court's work reveals no such clear error, for the reasons the plurality explains. *Ante,* at 19–35. The District Court findings therefore bind us in this case.

\*      \*      \*

*Stare decisis* instructs us to treat like cases alike. The result in this case is controlled by our decision four years ago invalidating a nearly identical Texas law. The Louisiana law burdens women seeking previability abortions to the same extent as the Texas law, according to factual findings that are not clearly erroneous. For that reason, I concur in the judgment of the Court that the Louisiana law is unconstitutional.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 18–1323 and 18–1460

————————

JUNE MEDICAL SERVICES L. L. C., ET AL.,
PETITIONERS
18–1323　　　　　　　*v.*
STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS

STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, PETITIONER
18–1460　　　　　　　*v.*
JUNE MEDICAL SERVICES L. L. C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

JUSTICE THOMAS, dissenting.

Today a majority of the Court perpetuates its ill-founded abortion jurisprudence by enjoining a perfectly legitimate state law and doing so without jurisdiction. As is often the case with legal challenges to abortion regulations, this suit was brought by abortionists and abortion clinics. Their sole claim before this Court is that Louisiana's law violates the purported substantive due process right of a woman to abort her unborn child. But they concede that this right does not belong to them, and they seek to vindicate no private rights of their own. Under a proper understanding of Article III, these plaintiffs lack standing to invoke our jurisdiction.

Despite the fact that we granted Louisiana's petition specifically to address whether "abortion providers [can] be presumed to have third-party standing to challenge health and safety regulations on behalf of their patients," Conditional Cross-Pet. in No. 18–1460, p. i, a majority of the Court all but ignores the question. The plurality and THE CHIEF JUSTICE ultimately cast aside this jurisdictional barrier to conclude that Louisiana's law is unconstitutional under our precedents. But those decisions created the right to abortion out of whole cloth, without a shred of support from the Constitution's text. Our abortion precedents are grievously wrong and should be overruled. Because we have neither jurisdiction nor constitutional authority to declare Louisiana's duly enacted law unconstitutional, I respectfully dissent.

I

For most of its history, this Court maintained that private parties could not bring suit to vindicate the constitutional rights of individuals who are not before the Court. *Kowalski* v. *Tesmer*, 543 U. S. 125, 135 (2004) (THOMAS, J., concurring) (citing *Clark* v. *Kansas City*, 176 U. S. 114, 118 (1900)). But in the 20th century, the Court began to deviate from this traditional rule against third-party standing. See *Truax* v. *Raich*, 239 U. S. 33, 38–39 (1915); *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535–536 (1925). From these deviations emerged our prudential third-party standing doctrine, which allows litigants to vicariously assert the constitutional rights of others when "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, *supra,* at 130 (quoting *Powers* v. *Ohio*, 499 U. S. 400, 411 (1991)).[1]

───────────

[1] In practice, this doctrine's application has been unconvincing and unpredictable, which has long caused me to question its legitimacy. See, *e.g., United States* v. *Sineneng-Smith*, 590 U. S. ___, ___–___ (2020)

The plurality feints toward this doctrine, claiming that third-party standing for abortionists is well settled by our precedents. But, ultimately, it dodges the question, claiming that Louisiana's standing challenge was waived below. Both assertions are erroneous. First, there is no controlling precedent that sets forth the blanket rule advocated for by plaintiffs here—*i.e.*, abortionists may challenge health and safety regulations based solely on their role in the abortion process. Second, I agree with JUSTICE ALITO that Louisiana did not waive its standing challenge below. *Post*, at 24–25 (dissenting opinion).

But even if there were a waiver, it would not be relevant. Louisiana argues that the abortionists and abortion clinics lack standing under Article III to assert the putative rights of their potential clients. No waiver, however explicit, could relieve us of our independent obligation to ensure that we have jurisdiction before addressing the merits of a case. See *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 341 (2006). And under a proper understanding of Article III's case-or-controversy requirement, plaintiffs lack standing to invoke our jurisdiction because they assert no private rights of

––––––––––

(THOMAS, J., concurring) (slip op., at 6–9); *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___–___ (2016) (THOMAS, J., dissenting) (slip op., at 2–5); *Kowalski*, 543 U. S., at 135 (THOMAS, J., concurring). For example, the Court has held that attorneys cannot bring suit to vindicate the Sixth Amendment rights of their potential clients due to the lack of a current close relationship, *id.,* at 130–131, but the Court permits defendants to seek relief based on the Fourteenth Amendment equal protection rights of potential jurors whom they have never met, *Powers*, 499 U. S., at 410–416; *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127, 129 (1994). And today, the plurality reaffirms our precedent allowing beer vendors to assert the Fourteenth Amendment rights of their potential customers. *Ante,* at 14 (citing *Craig* v. *Boren*, 429 U. S. 190, 192 (1976)). But it is fair to wonder whether gun vendors could expect to receive the same privilege if they seek to vindicate the Second Amendment rights of their customers. Given this Court's ad hoc approach to third-party standing and its tendency to treat the Second Amendment as a second-class right, their time would be better spent waiting for Godot.

their own, seeking only to vindicate the putative constitutional rights of individuals not before the Court.

## A

The Court has previously asserted that the traditional rule against third-party standing is "not constitutionally mandated, but rather stem[s] from a salutary 'rule of self-restraint'" motivated by "prudential" concerns. *Craig* v. *Boren*, 429 U. S. 190, 193 (1976) (quoting *Barrows* v. *Jackson*, 346 U. S. 249, 255 (1953)). The plurality repeats this well-rehearsed claim, accepting its validity without question. See *ante*, at 12. But support for this assertion is shallow, to say the least, and it is inconsistent with our more recent standing precedents.

As an initial matter, this Court has never provided a coherent explanation for why the rule against third-party standing is properly characterized as prudential. Many cases reciting this claim rely on the Court's decision in *Barrows*, which stated that the rule against third-party standing is a "rule of self-restraint" "[a]part from the jurisdictional requirement" of Article III, 346 U. S., at 255. But *Barrows* provides no reasoning to support that distinction and even admits that the rule against third-party standing is "not always clearly distinguished from the constitutional limitation[s]" on standing. *Ibid.* The sole authority *Barrows* cites in support of the rule's "prudential" label is a single-Justice concurrence in *Ashwander* v. *TVA*, 297 U. S. 288, 346–348 (1936) (opinion of Brandeis, J.).

Justice Brandeis' concurrence, however, raises more questions than it answers. The opinion does not directly reference third-party standing. It only obliquely refers to the concept by invoking the broader requirement that a plaintiff must "show that he is injured by [the law's] operation." *Id.*, at 347. Justice Brandeis claims that this requirement was adopted by the Court "for its own governance in cases confessedly within its jurisdiction." *Id.*, at 346. But

most of the cases he cites frame the matter in terms of the Court's jurisdiction and authority; none of them invoke prudential justifications. See, *e.g., Tyler* v. *Judges of Court of Registration*, 179 U. S. 405, 407–410 (1900); *Hendrick* v. *Maryland*, 235 U. S. 610, 621 (1915); *Massachusetts* v. *Mellon*, 262 U. S. 447, 480 (1923). Thus, the "prudential" label for the rule against third-party standing remains a bit of a mystery.

It is especially puzzling that a majority of the Court insists on continuing to treat the rule against third-party standing as prudential when our recent decision in *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. 118 (2014), questioned the validity of our prudential standing doctrine more generally. In that case, we acknowledged that requiring a litigant who has Article III standing to also demonstrate "prudential standing" is inconsistent "with our recent reaffirmation of the principle that 'a federal court's "obligation" to hear and decide' cases within its jurisdiction 'is "virtually unflagging."'" *Id.*, at 125–126 (quoting *Sprint Communications, Inc.* v. *Jacobs*, 571 U. S. 69, 77 (2013)). The Court therefore suggested that the "prudential" label for these doctrines was "inapt." *Lexmark*, 572 U. S., at 127, n. 3. As an example, it noted that the Court previously considered the rule against generalized grievances to be "prudential" but now recognizes that rule to be a part of Article III's case-or-controversy requirement. *Ibid.* The Court specifically questioned the prudential label for the rule against third-party standing, but because *Lexmark* did not involve any questions of third-party standing, the Court stated that "consideration of that doctrine's proper place in the standing firmament [could] await another day." *Id.*, at 128, n. 3.

The Court's previous statements on the rule against third-party standing have long suggested that the "proper place" for that rule is in Article III's case-or-controversy re-

quirement. The Court has acknowledged that the traditional rule against third-party standing is "closely related to Art[icle] III concerns." *Warth* v. *Seldin*, 422 U. S. 490, 500 (1975). It has repeatedly noted that the rule "is not completely separable from Art[icle] III's requirement that a plaintiff have a sufficiently concrete interest in the outcome of [the] suit to make it a case or controversy." *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 955, n. 5 (1984) (internal quotation marks omitted); see also *Barrows*, *supra,* at 255 (the rule against third-party standing is "not always clearly distinguished from the constitutional limitation[s]" on standing). Moreover, the Court has even expressly stated that the rule against third-party standing is "grounded in Art[icle] III limits on the jurisdiction of federal courts to actual cases and controversies." *New York* v. *Ferber*, 458 U. S. 747, 767, n. 20 (1982).

And most recently, in *Spokeo, Inc.* v. *Robins*, 578 U. S. ___ (2016), the Court appeared to incorporate the rule against third-party standing into its understanding of Article III's injury-in-fact requirement. There, the Court stated that to establish an injury-in-fact a plaintiff must "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.,* at ___ (slip op., at 7) (quoting *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992)). The Court further explained that whether a plaintiff "alleges that [the defendant] violated *his* statutory rights" rather than "the statutory rights of other people" was a question of "particularization" for an Article III injury. 578 U. S., at ___ (slip op., at 8) (internal quotation marks omitted). It is hard to reconcile this language in *Spokeo* with the plurality's assertion that third-party standing is permitted under Article III.

B

A brief historical examination of Article III's case-or-controversy requirement confirms what our recent decisions suggest: The rule against third-party standing is constitutional, not prudential. The judicial power is limited to "'"cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."'" *Id.*, at ___ (THOMAS, J., concurring) (slip op., at 1) (quoting *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U. S. 765, 774 (2000)); see also *Muskrat* v. *United States*, 219 U. S. 346, 356–357 (1911). Thus, to ascertain the scope of Article III's case-or-controversy requirement, "we must 'refer directly to the traditional, fundamental limitations upon the powers of common-law courts.'" *Spokeo*, *supra,* at ___ (THOMAS, J., concurring) (slip op., at 2) (quoting *Honig* v. *Doe*, 484 U. S. 305, 340 (1988) (Scalia, J., dissenting)). "One focus" of these traditional limitations was "on the particular parties before the court, and whether the rights that they [were] invoking [were] really theirs to control." Woolhandler & Nelson, Does History Defeat Standing Doctrine? 102 Mich. L. Rev. 689, 732 (2004). An examination of these limitations reveals that a plaintiff could not establish a case or controversy by asserting the constitutional rights of others.

The limitations imposed on suits at common law varied based on the type of right the plaintiff sought to vindicate. *Spokeo*, 578 U. S., at ___ (THOMAS, J., concurring) (slip op., at 2). The rights adjudicated by common-law courts generally fell into one of two categories: public or private. Public rights are those "owed 'to the whole community . . . in its social aggregate capacity.'" *Id.*, at ___ (slip op., at 3) (quoting 4 W. Blackstone, Commentaries *5). Private rights, on the other hand, are those "'belonging to individuals, considered as individuals.'" *Spokeo*, *supra*, at ___ (THOMAS, J., concurring) (slip op., at 2) (quoting 3 Blackstone, Commentaries *2).

When a plaintiff sought to vindicate a private right, "courts historically presumed that the plaintiff suffered a *de facto* injury merely from having his personal, legal rights invaded." *Spokeo, supra,* at ___ (THOMAS, J., concurring) (slip op., at 2). But a plaintiff generally "need[ed] to have a private interest of his or her own to litigate; otherwise, no sufficient interest [was] at stake on the plaintiff's side, and the clash of interests necessary for a 'Case' or 'Controversy' [did] not exist." Woolhandler & Nelson, *supra,* at 723. Thus, 19th-century judges uniformly refused to "listen to an objection made to the constitutionality of an act by a party whose rights" were not at issue. *Clark,* 176 U. S., at 118 (internal quotation marks omitted); see also, *e.g., Tyler,* 179 U. S., at 406–407; *Supervisors* v. *Stanley,* 105 U. S. 305, 311 (1882); *United States* v. *Ferreira,* 13 How. 40, 51–52 (1852); *Owings* v. *Norwood's Lessee,* 5 Cranch 344, 348 (1809) (Marshall, C. J.); *In re Wellington,* 33 Mass. 87, 96 (1834) (Shaw, C. J.).[2]

Moreover, it was not enough for a plaintiff to allege *damnum*—*i.e.,* real-world damages or practical injury—if the law he was challenging did not violate a legally protected interest of his own. At common law, this sort of "factual harm without a legal injury was *damnum absque injuria* and provided no basis for relief." Hessick, Standing, Injury in Fact, and Private Rights, 93 Cornell L. Rev. 275, 280–281 (2008). As Justice Dodderidge explained in 1625, "injuria & damnum are the two grounds for the having [of]

---

[2] Common-law courts' recognition of prochain ami or "next friend" standing is not inconsistent with this point. In those cases, the third party was "no party to the suit in the technical sense" but rather served as "an officer of the court" and was legally "appointed by [the court] to look after the interests of [the party lacking legal capacity]," who remained the real party in interest on "whom the judgment in the action [was] consequently binding." *Blumenthal* v. *Craig,* 81 F. 320, 321–322 (CA3 1897) (internal quotation marks omitted). In contrast, the real parties in interest here—women seeking abortions in Louisiana—cannot be bound by a judgment against abortionists and abortion clinics.

all actions, and without [both of] these, no action lieth." *Cable* v. *Rogers*, 3 Bulst. 311, 312, 81 Eng. Rep. 259. In the 18th century, many common-law courts ceased requiring *damnum* in suits alleging violations of private rights. See, *e.g., Ashby* v. *White*, 2 Raym. Ld. 938, 92 Eng. Rep. 126, 137 (K. B.) (Holt, C. J.), aff'd, 3 Raym. Ld. 320, 92 Eng. Rep. 710, 712 (H. L. 1703); see also *Webb* v. *Portland Mfg. Co.*, 29 F. Cas. 506, 507 (No. 17,322) (CC Me. 1838) (Story, J.). But they continued to require legal injury, adhering to the "obvious" and "ancient maxim" that one's real-world damages alone cannot "lay the foundation of an action." *Parker* v. *Griswold*, 17 Conn. 288, 302–303 (1846). Thus, a plaintiff had to assert "[a]n injury, [which,] legally speaking, consists of a wrong done to a person, or, in other words, a violation of his right." *Id.*, at 302.

This brief historical review demonstrates that third-party standing is inconsistent with the case-or-controversy requirement of Article III. When a private plaintiff seeks to vindicate someone else's legal injury, he has no private right of his own genuinely at stake in the litigation. Even if the plaintiff has suffered damages as a result of another's legal injury, he has no standing to challenge a law that does not violate his own private rights.

C

Applying these principles to the case at hand, plaintiffs lack standing under Article III and we, in turn, lack jurisdiction to decide these cases. Thus, "[i]n light of th[e] 'overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of [an] important dispute and to "settle" it for the sake of convenience and efficiency.'" *Hollingsworth* v. *Perry*, 570 U. S. 693, 704–705 (2013) (ROBERTS, C. J., for the Court) (quoting *Raines* v. *Byrd*, 521 U. S. 811, 820 (1997)).

1

Contrary to the plurality's assertion otherwise, *ante*, at 16, abortionists' standing to assert the putative rights of their clients has not been settled by our precedents. It is true that this Court has reflexively allowed abortionists and abortion clinics to vicariously assert a woman's putative right to abortion. But oftentimes the Court has not so much as addressed standing in those cases. See, *e.g., Whole Woman's Health* v. *Hellerstedt*, 579 U. S. ___, ___ (2016); *Gonzales* v. *Carhart*, 550 U. S. 124 (2007); *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320 (2006); *Stenberg* v. *Carhart*, 530 U. S. 914 (2000); *Mazurek* v. *Armstrong*, 520 U. S. 968 (1997) (*per curiam*); *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). And questions "merely lurk[ing] in the record, neither brought to the attention of the court nor ruled upon," are not "considered as having been so decided as to constitute precedents." *Webster* v. *Fall*, 266 U. S. 507, 511 (1925); see also *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 183 (1979). Specifically, when it comes "to our own judicial power or jurisdiction, this Court has followed the lead of Chief Justice Marshall who held that this Court is not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed *sub silentio*." *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952) (citing *United States* v. *More*, 3 Cranch 159 (1805) (Marshall, C. J., for the Court)).

The first—and only—time the Court squarely addressed this question with a reasoned decision was in *Singleton* v. *Wulff*, 428 U. S. 106 (1976).[3] In that case, a fractured Court

_____

[3] Although the Court concluded that the abortionists had standing to challenge the constitutionality of abortion regulations in *Doe* v. *Bolton*, 410 U. S. 179 (1973), it did so only in dicta, *id.,* at 188–189. The abortionists' coplaintiffs were pregnant women whom the Court determined had standing to assert their own rights, and thus whether the abortionists had standing was "a matter of no great consequence." *Id.*, at 188.

concluded that two abortionists had standing to challenge
a State's refusal to provide Medicaid reimbursements for
abortions.　Perfunctorily applying this Court's require-
ments for third-party standing, Justice Blackmun, joined
by three other Justices, asserted that abortionists generally
had standing to litigate their clients' rights. *Id.*, at 113–118
(plurality opinion).　Justice Stevens concurred on consider-
ably narrower grounds, reasoning that the abortionists had
standing because they had a financial stake in the outcome
of the litigation and sought to vindicate their own constitu-
tional rights as well.　*Id.,* at 121 (opinion concurring in
part).　Notably, Justice Stevens declined to join the plural-
ity's discussion of third-party standing, explaining that he
was "not sure whether [that analysis] would, or should, sus-
tain the doctors' standing, apart from" their own legal
rights and financial interests being at stake in that specific
case.　*Id.,* at 122.　The four remaining Justices dissented in
part, concluding that the abortionists lacked standing to lit-
igate the rights of their clients.　*Id.,* at 122–131 (Powell, J.,
concurring in part and dissenting in part).　Because Justice
Stevens' opinion "concurred in the judgmen[t] on the nar-
rowest grounds," it is the controlling opinion regarding
abortionists' third-party standing.　*Marks* v. *United States*,

───────────

Even so, the Court only cursorily considered the question whether the
threat of prosecution faced by the abortionists was a sufficiently direct
injury under the Court's then-existing standing doctrine, *id.,* at 188–189,
which was considerably more lenient than our current understanding.
The Court did not engage in any meaningful Article III analysis or refer
to this Court's third-party standing doctrine. *Ibid.*; see also *Akron* v. *Ak-
ron Center for Reproductive Health, Inc.*, 462 U. S. 416, 440, n. 30 (1983)
(concluding without any analysis that an abortionist had standing to
raise a claim on behalf of his minor patients).　And notably, the abortion-
ists in that case had brought suit to vindicate their own constitutional
rights to "practic[e] their . . . professio[n]." *Doe, supra*, at 186*;* see also
*Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 62 (1976)
(concluding, without any analysis of Article III or the third-party stand-
ing doctrine, that abortionists had standing in a suit alleging violations
of both their own constitutional rights and those of their clients).

430 U. S. 188, 193 (1977).[4]

To the extent Justice Stevens' opinion could be read as concluding that abortionists have standing to vicariously assert their clients' rights so long as the abortionists establish standing on their own legal claims, his position has been abrogated by this Court's more recent decisions, which have "confirm[ed] that a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp.*, 547 U. S., at 352. But more importantly, Justice Stevens' opinion does not support the abortionists in these cases, because his opinion rested on case-specific facts not implicated here—namely, the fact that the abortionists would directly receive Medicaid payments from the defendant agency if they prevailed and that they asserted violations of *their own* constitutional rights. In these cases, there is no dispute that the abortionists' sole claim before this Court is that Louisiana's law violates the purported substantive due process rights *of their clients*.

2

Under a proper understanding of Article III, plaintiffs lack standing. As explained above, in suits seeking to vindicate private rights, the owners of those rights can establish a sufficient injury simply by asserting that their rights have been violated. Constitutional rights are generally considered "private rights" to the extent they "'belon[g] to individuals, considered as individuals.'" *Spokeo*, 578 U. S.*,* at ___ (THOMAS, J., concurring) (slip op., at 3) (quoting 3 Blackstone, Commentaries *2); see also *United States* v.

––––––––––
[4] Three Justices of this Court have recently taken the position that this rule from *Marks*, 430 U. S. 188, does not necessarily apply in all 4–1–4 cases, and that such decisions can sometimes produce "no controlling opinion at all." *Ramos* v. *Louisiana*, 590 U. S. ___, ___ (2020) (principal opinion) (slip op., at 18). But even under their view, Justice Blackmun's plurality in *Singleton* would not be considered binding precedent.

*Sineneng-Smith*, 590 U. S. \_\_\_, \_\_\_ (2020) (THOMAS, J., concurring) (slip op., at 8). And the purported substantive due process right to abort an unborn child is no exception—it is an individual right that is inherently personal. After all, the Court "creat[ed the] right" based on the notion that abortion "'involv[es] the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy.'" *Whole Women's Health*, 579 U. S., at \_\_\_ (THOMAS, J., dissenting) (slip op., at 5) (quoting *Casey*, 505 U. S., at 851 (majority opinion)). Because this right belongs to the woman making that choice, not to those who provide abortions, plaintiffs cannot establish a personal legal injury by asserting that this right has been violated.[5]

The only injury asserted by plaintiffs in this suit is the possibility of facing criminal sanctions if the abortionists conduct abortions without admitting privileges in violation of the law. See Response and Reply for Petitioners (No. 18–1460)/Cross-Respondents (No. 18–1323), p. 34. But plaintiffs do not claim any right to provide abortions, nor do they contest that the State has authority to regulate such procedures.[6] They have therefore demonstrated only real-world damages (or more accurately, the *possibility* of real-world damages), but no legal injury, or "invasion of a legally protected interest," that belongs to them. *Spokeo, supra,* at \_\_\_ (slip op., at 7) (internal quotation marks omitted). Thus, under a proper understanding of Article III, plaintiffs lack

_____

[5] Notably, plaintiffs point to no evidence in the record of women who seek abortions in Louisiana actually opposing this law on the ground that it violates their constitutional rights.

[6] Although plaintiffs initially argued that Louisiana's law also violated their procedural due process rights by requiring them to obtain admitting privileges in an unreasonably short time, App. 24, 28, they have since abandoned that claim. And even if they had asserted violations of their own rights before this Court, those legal injuries would be insufficient to establish standing for a distinct claim based on their clients' putative rights. See *supra,* at 12.

standing and, consequently, this Court lacks jurisdiction.

## II

Even if the plaintiffs had standing, the Court would still lack the authority to enjoin Louisiana's law, which represents a constitutionally valid exercise of the State's traditional police powers. The plurality and THE CHIEF JUSTICE claim that the Court's judgment is dictated by "our precedents," particularly *Whole Woman's Health. Ante*, at 38 (plurality opinion); see also *ante,* at 2, 11–16 (ROBERTS, C. J., concurring in judgment). For the detailed reasons explained by JUSTICE ALITO, this is not true. *Post*, at 3–23 (dissenting opinion).

But today's decision is wrong for a far simpler reason: The Constitution does not constrain the States' ability to regulate or even prohibit abortion. This Court created the right to abortion based on an amorphous, unwritten right to privacy, which it grounded in the "legal fiction" of substantive due process, *McDonald* v. *Chicago*, 561 U. S. 742, 811 (2010) (THOMAS, J., concurring in part and concurring in judgment). As the origins of this jurisprudence readily demonstrate, the putative right to abortion is a creation that should be undone.

## A

The Court first conceived a free-floating constitutional right to privacy in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965). In that case, the Court declared unconstitutional a state law prohibiting the use of contraceptives, finding that it violated a married couple's "right of privacy." *Id.*, at 486. The Court explained that this right could be found in the "penumbras" of *five* different Amendments to the Constitution—the First, Third, Fourth, Fifth, and Ninth. *Id.,* at 484. Rather than explain what free speech or the quartering of troops had to do with contraception, the Court simply declared that these rights had created "zones of privacy" with

their "penumbras," which were "formed by emanations from those guarantees that help give them life and substance." *Ibid*. This reasoning is as mystifying as it is baseless.

As Justice Black observed in his dissent, this general "right of privacy" was never before considered a constitutional guarantee protecting citizens from governmental intrusion. *Id.,* at 508–510. Rather, the concept was one of tort law, championed by Samuel Warren and the future Justice Louis Brandeis in their 1890 Harvard Law Review article entitled, "The Right to Privacy." 4 Harv. L. Rev. 193. Over 20 years after the Fourteenth Amendment was ratified and a century after the Bill of Rights was adopted, Warren and Brandeis were among the first to advocate for this privacy right in the context of tort relief for those whose personal information and private affairs were exploited by others. *Id.,* at 193, 195–196, 214–220. By "exalting a phrase . . . used in discussing grounds for tort relief, to the level of a constitutional rule," the Court arrogated to itself the "power to invalidate any legislative act which [it] find[s] irrational, unreasonable[,] or offensive" as an impermissible "interfere[nce] with 'privacy.'" *Griswold, supra*, at 510, n. 1, 511 (Black, J., dissenting).

Just eight years later, the Court utilized its newfound power in *Roe* v. *Wade*, 410 U. S. 113 (1973). There, the Court struck down a Texas law restricting abortion as a violation of a woman's constitutional "right of privacy," which it grounded in the "concept of personal liberty" purportedly protected by the Due Process Clause of the Fourteenth Amendment. *Id.*, at 153. The Court began its legal analysis by openly acknowledging that the Constitution's text does not "mention any right of privacy." *Id.,* at 152. The Court nevertheless concluded that it need not bother with our founding document's text, because the Court's prior decisions—chief among them *Griswold*—had already divined such a right from constitutional penumbras. *Roe*, 410 U. S.,

at 152. Without any legal explanation, the Court simply concluded that this unwritten right to privacy was "broad enough to encompass a woman's [abortion] decision." *Id.*, at 153.

B

*Roe* is grievously wrong for many reasons, but the most fundamental is that its core holding—that the Constitution protects a woman's right to abort her unborn child—finds no support in the text of the Fourteenth Amendment. *Roe* suggests that the Due Process Clause's reference to "liberty" could provide a textual basis for its novel privacy right. *Ibid.* But that Clause does not guarantee liberty *qua* liberty. Rather, it expressly contemplates the *deprivation* of liberty and requires only that such deprivations occur through "due process of law." Amdt. 14, §1. As I have previously explained, there is "'considerable historical evidence support[ing] the position that "due process of law" was [originally understood as] a separation-of-powers concept . . . forbidding only deprivations not authorized by legislation or common law.'" *Johnson* v. *United States*, 576 U. S. 591, 623 (2015) (opinion concurring in judgment) (quoting D. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789–1888, p. 272 (1985)). Others claim that the original understanding of this Clause requires that "statutes that purported to empower the other branches to deprive persons of rights without adequate procedural guarantees [be] subject to judicial review." Chapman & McConnell, Due Process as Separation of Powers, 121 Yale L. J. 1672, 1679 (2012). But, whatever the precise requirements of the Due Process Clause, "the notion that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty, or property could define the substance of those rights strains credulity for even the most casual user of words." *McDonald*, 561 U. S*.,* at 811 (opinion of THOMAS, J.).

More specifically, the idea that the Framers of the Fourteenth Amendment understood the Due Process Clause to protect a right to abortion is farcical. See *Roe*, 410 U. S., at 174–175 (Rehnquist, J., dissenting). In 1868, when the Fourteenth Amendment was ratified, a majority of the States and numerous Territories had laws on the books that limited (and in many cases nearly prohibited) abortion. See *id.,* at 175, n. 1.[7] It would no doubt shock the public at that time to learn that one of the new constitutional Amendments contained hidden within the interstices of its text a right to abortion. The fact that it took this Court over a century to find that right all but proves that it was more than hidden—it simply was not (and is not) there.

## C

Despite the readily apparent illegitimacy of *Roe*, "the

---

[7] See, *e.g.,* Ala. Rev. Code §3605 (1867); Terr. of Ariz., Howell Code, ch. 10, §45 (1865); Ark. Rev. Stat., ch. 44, div. III, Art. II, §6 (1838); 1861 Cal. Stat., ch. 521, §45, p. 588; Colo. (Terr.) Rev. Stat. §42 (1868); Conn. Gen. Stat., Tit. 12, §§22–24 (1861); Fla. Acts 1st Sess., ch. 1637, subch. III, §§10, 11, ch. 8, §§9, 10 (1868); Terr. of Idaho Laws, Crimes and Punishments §42 (1864); Ill. Stat., ch. 30, §47 (1868); Ind. Laws ch. LXXXI, §2 (1859); Iowa Rev. Gen. Stat., ch. 165, §4221 (1860); Kan. Gen. Stat., ch. 31, §§14, 15, 44 (1868); La. Rev. Stat., Crimes and Offenses §24 (1856); Me. Rev. Stat., Tit. XI, ch. 124, §8 (1857); 1868 Md. Laws ch. 179, §2, p. 315; Mass. Gen. Stat., ch. 165, §9 (1860); Mich. Rev. Stat., Tit. XXX, ch. 153, §§32, 33, 34 (1846); Terr. of Minn. Rev. Stat., ch. 100, §§10, 11 (1851); Miss. Rev. Code, ch. LXIV, Arts. 172, 173 (1857); Mo. Rev. Stat., Art. II, §§9, 10, 36 (1835); Terr. of Mont. Laws, Criminal Practice Acts §41 (1864); Terr. of Neb. Rev. Stat., Crim. Code §42 (1866); Terr. of Nev. Laws ch. 28, §42 (1861); 1848 N. H. Laws ch. 743, §§1, 2, p. 708; 1849 N. J. Laws, pp. 266–267; 1854 Terr. of N. M. Laws ch. 3, §§10, 11, p. 88; 1846 N. Y. Laws ch. 22, §1, p. 19; 1867 Ohio Laws §2, pp. 135–136; Ore. Gen. Laws, Crim. Code, ch. XLIII, §509 (1845–1864); 1860 Pa. Laws no. 374, §§87, 88, 89, pp. 404–405; Tex. Gen. Stat. Dig., Penal Code, ch. VII, Arts. 531–536 (1859); 1867 Vt. Acts & Resolves no. 57, §§1, 3, pp. 64–66; 1848 Va. Acts, Tit. II, ch. 3, §9, p. 96; Terr. of Wash. Stat., ch. II, §§37, 38 (1854); Wis. Rev. Stat., ch. 164, §§10, 11, ch. 169, §§58, 59 (1858).

Court has doggedly adhered to [its core holding] again and again, often to disastrous ends." *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (THOMAS, J., concurring) (slip op., at 16). In doing so, the Court has repeatedly invoked *stare decisis*. See, *e.g., Casey*, 505 U. S., at 854–869. And today, a majority of the Court insists that this doctrine compels its result. See *ante*, at 40 (plurality opinion); *ante,* at 2, 11 (opinion of ROBERTS, C. J.).

The Court's current "formulation of the *stare decisis* standard does not comport with our judicial duty under Article III," which requires us to faithfully interpret the Constitution. *Gamble*, 587 U. S*.,* at ___ (THOMAS, J., concurring) (slip op., at 2). Rather, when our prior decisions clearly conflict with the text of the Constitution, we are required to "privilege [the] text over our own precedents." *Id.,* at ___ (slip op., at 10). Because *Roe* and its progeny are premised on a "demonstrably erroneous interpretation of the Constitution," we should not apply them here. 587 U. S., at ___ (THOMAS, J., concurring) (slip op., at 10).

Even under THE CHIEF JUSTICE's approach to *stare decisis*, continued adherence to these precedents cannot be justified. *Stare decisis* is "not an inexorable command," *ante*, at 3 (internal quotation marks omitted), and this Court has recently overruled a number of poorly reasoned precedents that have proved themselves to be unworkable, see *Knick* v. *Township of Scott*, 588 U. S. ___, ___–___ (2019) (ROBERTS, C. J., for the Court) (slip op., at 20–23); *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___–___ (2019) (slip op., at 16–17); *Janus* v. *State, County, and Municipal Employees*, 585 U. S. ___, ___–___ (2018) (slip op., at 33–47). As I have already demonstrated, *supra,* at 14–17, *Roe*'s reasoning is utterly deficient—in fact, not a single Justice today attempts to defend it.

Moreover, the fact that no five Justices can agree on the proper interpretation of our precedents today evinces that

our abortion jurisprudence remains in a state of utter entropy. Since the Court decided *Roe*, Members of this Court have decried the unworkability of our abortion case law and repeatedly called for course corrections of varying degrees. See, *e.g.,* 410 U. S., at 171–178 (Rehnquist, J., dissenting); *Doe* v. *Bolton*, 410 U. S. 179, 221–223 (1973) (White, J., dissenting); *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 452–466 (1983) (O'Connor, J., dissenting); *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 785–797 (1986) (White, J., dissenting); *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 532–537 (1989) (Scalia, J., concurring in part and concurring in judgment); *Casey*, 505 U. S., at 944–966 (Rehnquist, C. J., concurring in judgment in part and dissenting in part); *id.,* at 979–1002 (Scalia, J., concurring in judgment in part and dissenting in part); *Stenberg*, 530 U. S., at 953–956 (Scalia, J., dissenting); *id.,* at 980–983 (THOMAS, J., dissenting); *Whole Woman's Health*, 579 U. S., at ___–___ (THOMAS, J., dissenting) (slip op., at 5–11). In *Casey*, the majority claimed to clarify this "jurisprudence of doubt," 505 U. S., at 844, but our decisions in the decades since then have only demonstrated the folly of that assertion, see *Stenberg*, 530 U. S., at 953–956 (Scalia, J., dissenting); *id.,* at 960–979 (Kennedy, J., dissenting); *Whole Woman's Health*, *supra*, at ___–___ (THOMAS, J., dissenting) (slip op., at 5–11). They serve as further evidence that this Court's abortion jurisprudence has failed to deliver the "'principled and intelligible'" development of the law that *stare decisis* purports to secure. *Ante,* at 3 (opinion of ROBERTS, C. J.) (quoting *Vasquez* v. *Hillery*, 474 U. S. 254, 265 (1986)).

THE CHIEF JUSTICE advocates for a Burkean approach to the law that favors adherence to "'the general bank and capital of nations and of ages.'" *Ante*, at 3 (quoting 3 E. Burke, Reflections on the Revolution in France 110 (1790)). But such adherence to precedent was conspicuously absent

when the Court broke new ground with its decisions in *Griswold* and *Roe*.  And no one could seriously claim that these revolutionary decisions—or *Whole Woman's Health*, decided just four Terms ago—are part of the *"inheritance from our forefathers,"* fidelity to which demonstrates "reverence to antiquity."  E. Burke, Reflections on the Revolution in France 27–28 (J. Pocock ed. 1987).

More importantly, we exceed our constitutional authority whenever we "appl[y] demonstrably erroneous precedent instead of the relevant law's text."  *Gamble, supra,* at ___ (THOMAS, J., concurring) (slip op., at 2).  Because we can reconcile neither *Roe* nor its progeny with the text of our Constitution, those decisions should be overruled.

\*    \*    \*

Because we lack jurisdiction and our abortion jurisprudence finds no basis in the Constitution, I respectfully dissent.[8]

---

[8] I agree with JUSTICE ALITO's application of our precedents except in Part IV–F of his opinion, but I would not remand for further proceedings. Because plaintiffs lack standing under Article III, I would instead remand with instructions to dismiss for lack of jurisdiction.  Alternatively, if I were to reach the merits because a majority of the Court concludes we have jurisdiction, I would affirm, as plaintiffs have failed to carry their burden of demonstrating that Act 620 is unconstitutional, even under our precedents.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 18–1323 and 18–1460

———————

JUNE MEDICAL SERVICES L. L. C., ET AL.,
PETITIONERS
18–1323	*v.*
STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS

STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, PETITIONER
18–1460	*v.*
JUNE MEDICAL SERVICES L. L. C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, with
whom JUSTICE THOMAS joins except as to Parts III–C and
IV–F, and with whom JUSTICE KAVANAUGH joins as to
Parts I, II, and III, dissenting.

The majority bills today's decision as a facsimile of *Whole
Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_, \_\_\_ (2016),
and it's true they have something in common. In both, the
abortion right recognized in this Court's decisions is used
like a bulldozer to flatten legal rules that stand in the way.

In *Whole Woman's Health*, res judicata and our standard
approach to severability were laid low. Even *Planned
Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833
(1992), was altered.

Today's decision claims new victims. The divided majority cannot agree on what the abortion right requires, but it nevertheless strikes down a Louisiana law, Act 620, that the legislature enacted for the asserted purpose of protecting women's health. To achieve this end, the majority misuses the doctrine of *stare decisis*, invokes an inapplicable standard of appellate review, and distorts the record.

The plurality eschews the constitutional test set out in *Casey* and instead employs the balancing test adopted in *Whole Woman's Health*. The plurality concludes that the Louisiana law does nothing to protect the health of women, but that is disproved by substantial evidence in the record. And the plurality upholds the District Court's finding that the Louisiana law would cause a drastic reduction in the number of abortion providers in the State even though this finding was based on an erroneous legal standard and a thoroughly inadequate factual inquiry.

THE CHIEF JUSTICE stresses the importance of *stare decisis* and thinks that precedent, namely *Whole Woman's Health,* dooms the Louisiana law. But at the same time, he votes to overrule *Whole Woman*'s *Health* insofar as it changed the *Casey* test.

Both the plurality and THE CHIEF JUSTICE hold that abortion providers can invoke a woman's abortion right when they attack state laws that are enacted to protect a woman's health. Neither waiver nor *stare decisis* can justify this holding, which clashes with our general rule on third-party standing. And the idea that a regulated party can invoke the right of a third party for the purpose of attacking legislation enacted to protect the third party is stunning. Given the apparent conflict of interest, that concept would be rejected out of hand in a case not involving abortion.

For these reasons, I cannot join the decision of the Court. I would remand the case to the District Court and instruct that court, before proceeding any further, to require the

joinder of a plaintiff with standing. If a proper plaintiff is added, the District Court should conduct a new trial and determine, based on proper evidence, whether enforcement of Act 620 would diminish the number of abortion providers in the State to such a degree that women's access to abortions would be substantially impaired. In making that determination, the court should jettison the nebulous "good faith" test that it used in judging whether the physicians who currently lack admitting privileges would be able to obtain privileges and thus continue to perform abortions if Act 620 were permitted to take effect. Because the doctors in question (many of whom are or were plaintiffs in this case) stand to lose, not gain, by obtaining privileges, the court should require the plaintiffs to show that these doctors sought admitting privileges with the degree of effort that they would expend if their personal interests were at stake.

I

Under our precedent, the critical question in this case is whether the challenged Louisiana law places a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U. S., at 877 (plurality opinion). If a law like that at issue here does not have that effect, it is constitutional. *Id.*, at 884 (joint opinion of O'Connor, Kennedy, and Souter, JJ.).

The petitioners urge us to adopt a rule that is more favorable to abortion providers. At oral argument, their attorney maintained that a law that has no effect on women's access to abortion is nevertheless unconstitutional if it is not needed to protect women's health. See Tr. of Oral Arg. 18–19. Of course, that is precisely the argument one would expect from a business that wishes to be free from burdensome regulations. But unless an abortion law has an adverse effect *on women*, there is no reason why the law should face greater constitutional scrutiny than any other measure that burdens a regulated entity in the name of

health or safety. See *Casey*, 505 U. S., at 884–885 (joint opinion). Many state and local laws that are justified as safety measures rest on debatable empirical grounds. But when a party saddled with such restrictions challenges them as a violation of due process, our cases call for the restrictions to be sustained if "it might be thought that the particular legislative measure was a rational way" to serve a valid interest. See *Williamson* v. *Lee Optical of Okla., Inc.*, 348 U. S. 483, 488 (1955). The test that petitioners advocate would give abortion providers an unjustifiable advantage over all other regulated parties, and for that reason, it was rejected in *Casey*. See 505 U. S., at 851 (majority opinion).

*Casey* also rules out the balancing test adopted in *Whole Woman's Health*. *Whole Woman's Health* simply misinterpreted *Casey,* and I agree that *Whole Woman's Health* should be overruled insofar as it changed the *Casey* test. Unless *Casey* is reexamined—and Louisiana has not asked us to do that—the test it adopted should remain the governing standard.

## II

Because the plurality adheres to the balancing test adopted in *Whole Woman's Health*, it considers whether the Louisiana law helps to protect the health of women seeking abortions, and it concludes that "nothing in the record indicates that the background vetting for admitting privileges adds significantly to the vetting that the State Board of Medical Examiners already provides." *Ante*, at 37. THE CHIEF JUSTICE seems to agree, *ante*, at 14–15 (opinion concurring in judgment), although it is unclear why this issue matters under the test he favors.

In any event, contrary to the view taken by the plurality and (seemingly) by THE CHIEF JUSTICE, there is ample evidence in the record showing that admitting privileges help to protect the health of women by ensuring that physicians

who perform abortions meet a higher standard of competence than is shown by the mere possession of a license to practice. In deciding whether to grant admitting privileges, hospitals typically undertake a rigorous investigative process to ensure that a doctor is responsible and competent and has the training and experience needed to perform the procedures for which the privileges are sought. As the Fifth Circuit explained, "hospitals verify an applicant's surgical ability, training, education, experience, practice record, and criminal history. These factors are reviewed by a board of multiple physicians." *June Medical Services, L. L. C.* v. *Gee*, 905 F. 3d 787, 805, n. 53 (2018).

The standards used by the great majority of hospitals in deciding whether to grant privileges clearly show that hospitals demand proof of a higher level of competence. The Joint Commission, a nonprofit organization that accredits healthcare institutions, has issued standards for granting admitting privileges, and all of the hospitals whose rules are relevant here (and the vast majority of Louisiana hospitals) comply with those standards.[1] These standards call for an examination of each applicant's licensure, education, training, and current competence. See Joint Commission, 2020 Hospital Accreditation Standards, pp. MS–23, 25, 26, 29. They require an examination of a doctor's health records, clinical data on performance, and peer recommendations, and they demand that a hospital make a careful assessment of the procedures a physician may perform. *Ibid.*

Dr. Robert Marier, the former director of the Louisiana Board of Medical Examiners (and the former dean of Louisiana State University Medical School), testified that the process conducted by hospitals in deciding whether to grant admitting privileges is "the primary way of determining

—————

[1] Quality Check, Find a Gold Seal Health Care Organization (2020), https://www.qualitycheck.org/search/?keyword=louisiana#keyword=louisiana&accreditationprogram=Hospital (listing "[o]rganizations that have achieved The Gold Seal of Approval from the Joint Commission").

competency." App. 818. That process, he explained, "thoroughly vet[s] the qualifications of [applicants] to ensure that [they] are competent to provide the services that are in question." *Ibid.*

June Medical's expert, Dr. Eva Pressman, agreed that "admitting privileges can serve the function of providing an evaluation mechanism for physician competency." *Id.*, at 1042, 1091; Record 10864. Doe 3, one of the doctors who currently performs abortions in Louisiana, also acknowledged the credentialing value of admitting privileges, App. 247–248, as did Doe 4, another Louisiana abortion doctor, Record 14155.

Although the plurality contends that the review conducted by hospitals adds little to the vetting undertaken by the State Board of Medical Examiners (Board), that is not true. Hospitals look beyond the mere possession of a license, and they do that for very obvious reasons. If nothing else, their review process serves the hospitals' interests by diminishing the risk of awards for malpractice committed by doctors practicing on their premises. In Louisiana, hospitals that perform negligent credentialing cannot benefit from the State's medical malpractice cap. See *Billeaudeau* v. *Opelousas General Hospital Auth.*, 2016–0846, p. 21 (La. 10/19/16), 218 So. 3d 513, 527. In addition, a hospital's "Medicare participation and other certifications depend on completing the credentialing process."[2]

The review conducted by hospitals goes beyond that of the Board in another way: it is continuous. Under the Joint Commission Standards, hospitals must monitor physicians

---

[2] Ryan, Negligent Credentialing: A Cause of Action for Hospital Peer Review Decisions, 59 How. L. J. 413, 419 (2016); see also Eskine, Square Pegs and Round Holes: Antitrust Law and the Privileging Decision, 44 U. Kan. L. Rev. 399, 401 (1996) ("[H]ospitals have strong incentives to award staff privileges only to those physicians who have proven to be capable and knowledgeable physicians").

with admitting privileges and can therefore make a running assessment of their competence. See Record 11850. The Board, on the other hand, conducts an inquiry before initially issuing a license, but the annual license renewal process entails nothing more than completing a standard form, paying the required fee, and documenting a certain number of continuing medical education credits. See 46 La. Admin. Code, pt. XLV, §417 (2020).

Because hospitals continue to evaluate doctors after privileges are granted, they may discover information that assists the Board in carrying out its responsibilities. In the past, hospitals have forwarded such information to the Board, and such referrals have led the Board to take serious disciplinary actions.[3]

The record shows that the vetting conducted by hospitals goes far beyond what is done at Louisiana abortion clinics. Some clinics demand nothing more than possession of a license. Take the example of petitioner June Medical. Doe 3, the only person at that clinic who evaluates applicants, testified that he does not perform background checks of any kind, not even criminal records checks. App. 249–250. In the past, Doe 3 hired a radiologist and ophthalmologist to perform abortions. *Id.*, at 249.

Delta Clinic in Baton Rouge and Women's Clinic in New Orleans have similarly lax practices. Leroy Brinkley, the president of both clinics, testified before a Pennsylvania grand jury that, in making hiring decisions, "'I don't judge the license. If they have a license and the state gave the license, it's not for me to determine if they are capable.'"[4] A

—————
[3] Brief for 207 Members of Congress as *Amici Curiae* 18–19 (lifetime ban from obstetric surgery in Louisiana); *id.*, at 19–20 (one-year probation of medical license).

[4] Brief for Louisiana State Legislators as *Amici Curiae* 8–9; App. to *id.*, at 67a.

"'background check,'" he said, is not within his "'framework.'"[5]

Doe 4, who practiced at the now-defunct Causeway Clinic near New Orleans, recounted the meager vetting that occurred when he was hired at that facility. He had to produce a valid medical license and DEA license but was not required "to undergo anything similar to review by a credentials committee." Record 14156.

In light of these practices, it is no surprise that the Louisiana Department of Health has issued Statements of Deficiency against abortion facilities for failing to adopt "'a detailed credentialing process for physicians,'" failing to investigate "'possible restrictions'" on physicians' licenses, and failing to look into "'evidence of prior malpractice claims/settlements.'"[6]

Louisiana adopted Act 620 in the aftermath of the Kermit Gosnell grand jury report, which expounded on the failures of regulatory oversight that allowed Gosnell's practices to continue for an extended period. See Report of Grand Jury in No. 0009901–2008 (1st Jud. Dist. Pa., Jan. 14, 2011). The grand jury concluded that closer supervision would have uncovered Gosnell's egregious health and safety violations. Gosnell had a medical license, but it is doubtful that any hospital would have given him admitting privileges.

In sum, contrary to the plurality's assertion, there is ample evidence in the record showing that requiring admitting privileges has health and safety benefits. There is certainly room for debate about the need for this requirement, but under our case law, this Court's task is not to ascertain whether a law "adds significantly" to the existing regulatory framework. Instead, when confronted with a genuine dispute about a law's benefits, we have afforded legislatures "wide discretion" in assessing whether a regulation serves

_____

[5] *Ibid.*

[6] *Id.*, at 9.

a legitimate medical need and is medically reasonable even in the face of medical and scientific uncertainty. *Gonzales* v. *Carhart*, 550 U. S. 124, 163 (2007); *Mazurek* v. *Armstrong*, 520 U. S. 968, 973 (1997) (*per curiam*); *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 458 (1983) (O'Connor, J., dissenting) ("[L]egislatures are better suited" than courts "to make the necessary factual judgments in this area"); accord, *Barsky* v. *Board of Regents of Univ. of N. Y.*, 347 U. S. 442, 451 (1954) (State has "legitimate concern for maintaining high standards of professional conduct" in the practice of medicine). Louisiana easily satisfied this standard.

For these reasons, both the plurality and THE CHIEF JUSTICE err in concluding that the admitting-privileges requirement serves no valid purpose.

## III

They also err in their assessment of Act 620's likely effect on access to abortion. They misuse the doctrine of *stare decisis* and the standard of appellate review for findings of fact.

## A

*Stare decisis* is a major theme in the plurality opinion and that of THE CHIEF JUSTICE. Both opinions try to create the impression that this case is the same as *Whole Woman's Health* and that *stare decisis* therefore commands the same result. In truth, however, the two cases are very different. While it is certainly true that the Texas and Louisiana *statutes* are largely the same, the two cases are not. The decision in *Whole Woman's Health* was not based on the face of the Texas statute, but on an empirical question, namely, the effect of the statute on access to abortion in that State. 579 U. S., at \_\_\_ (slip op., at 24). The Court's answer to that question depended on numerous factors that may differ from State to State, including the demand for abortions, the

number and location of abortion clinics and physicians, the geography of the State, the distribution of the population, and the ability of physicians to obtain admitting privileges. *Id.*, at \_\_\_–\_\_\_ (slip op., at 24–26). There is no reason to think that a law requiring admitting privileges will necessarily have the same effect in every state. As a result, just because the Texas admitting privileges requirement was found by this Court, based on evidence in the record of that case, to have substantially reduced access to abortion in that State, it does not follow that Act 620 would have comparable effects in Louisiana. See *id.*, at \_\_\_–\_\_\_ (slip op., at 22–26) (reviewing Texas record). The two States are neighbors, but they are not the same. Accordingly, the record-based empirical determination in *Whole Woman's Health* is not controlling here.

The suggestion that *Whole Woman's Health* is materially identical to this case is ironic, since the two cases differ in a way that was critical to the Court's reasoning in *Whole Woman's Health, i.e.,* the difference between a pre-enforcement facial challenge and a post-enforcement challenge based on evidence of the law's effects. See *id.*, at \_\_\_ (slip op., at 11). Before the Texas law went into effect, abortion providers mounted an unsuccessful facial challenge, arguing that the law would drastically limit abortion access. The Fifth Circuit held that the plaintiffs had not shown that the law would create a substantial obstacle for women seeking abortions, and a final judgment was entered against them. *Planned Parenthood of Greater Tex. Surgical Health Servs.* v. *Abbott*, 748 F. 3d 583, 590, 605 (2014). Then, after the law had been in operation for some time, many of the same plaintiffs filed a second suit and again argued that the admitting privileges requirement violated *Casey*. *Whole Woman's Health* v. *Cole*, 790 F. 3d 563, 577, and n. 14 (CA5 2015). The State defendants sought dismissal based on the doctrine of claim preclusion, but the *Whole Woman's Health* majority rejected that argument. 579 U. S., at \_\_\_ (slip op.,

at 11).

Why? Two words: "changed circumstances." *Id.*, at \_\_\_ (slip op., at 13). According to the Court, the pre-enforcement facial challenge was not the same "claim" as the post-enforcement claim because the "postenforcement consequences" of the challenged Texas law were "*unknowable* before [the law] went into effect." *Id.*, at \_\_\_ (slip op., at 14) (emphasis added); see also *ibid.* ("[I]t was still unclear how many clinics would be affected"); *id.*, at \_\_\_ (slip op., at 12) (discussing "new material facts"); *id.*, at \_\_\_ (slip op., at 14) (recounting "later, concrete factual developments").

The present case is in the same posture as the pre-enforcement facial challenge to the Texas law, and it should therefore be obvious that this Court's decision in *Whole Woman's Health* is not controlling.

## B

### 1

Aside from suggesting that *Whole Woman's Health* is dispositive, the plurality and THE CHIEF JUSTICE provide one other reason for concluding that Act 620, if allowed to go into effect, would create a substantial obstacle for women seeking abortions. Pointing to the District Court's finding that the Louisiana law would have a drastic effect on abortion access, *June Medical Services, LLC* v. *Kliebert*, 250 F. Supp. 3d 27, 87 (MD La. 2017), the plurality and THE CHIEF JUSTICE note that findings of fact may be overturned only if clearly erroneous, and they see no such error here. *Ante*, at 17 (opinion of BREYER, J.); *ante*, at 15–16 (opinion of ROBERTS, C. J.). In taking this approach, they overlook the flawed legal standard on which the District Court's finding depends, and they ignore the gross deficiencies of the evidence in the record.

Because the Louisiana law was not allowed to go into effect for any appreciable time, it was necessary for the District Court to predict what its effects would be. Attempting

to do that, the court apparently concluded that none of the doctors who currently perform abortions in the State would be replaced if the admitting privileges requirement forced them to leave abortion practice. 250 F. Supp. 3d, at 82. That inference is debatable, as it primarily rests on the anecdotal testimony of June Medical's administrator. See *id.*, at 81–82; App. 113–114. Neither the plurality nor THE CHIEF JUSTICE explains why it should be accepted. That alone casts doubt on the finding to which the majority defers, but the problems with the finding do not stop there.

The finding was based on a fundamentally flawed test. In attempting to ascertain how many of the doctors who perform abortions in the State would have to leave abortion practice for lack of admitting privileges, the District Court received evidence in a variety of forms—some live testimony, but also deposition transcripts, declarations, and even letters from counsel—about the doctors' unsuccessful efforts to obtain privileges. The District Court considered whether these doctors had proceeded in "good faith"; it found that they all met that standard; and it therefore concluded that the law would leave the State with very few abortion providers.

2

Under the reasoning just described, the factual finding on which the plurality and THE CHIEF JUSTICE rely—that the Louisiana law would drastically reduce access to abortion in the State—depends on the District Court's finding that the doctors in question exercised "good faith" in their quest for privileges, but that test is woefully deficient.

It has aptly been said that "good faith" "'is an elusive idea, taking on different meanings and emphases as we move from one context to another.'" Black's Law Dictionary 836 (11th ed. 2019). What the District Court understood the term to mean in the present context is uncertain, but

this is clear: The District Court ignored a factor of the utmost importance, the incentives of the doctors in question.

When the District Court made its assessment of the doctors' "good faith," enforcement of Act 620 had been preliminarily enjoined, and the doctors surely knew that enforcement would be permanently barred if the lawsuit was successful. Thus, the doctors had everything to lose and nothing to gain by obtaining privileges.[7] Two of the doctors—Does 1 and 2—are petitioners and cross-respondents in this Court. Two others, Does 5 and 6, were plaintiffs earlier but dropped out for unexplained reasons. See App. 1327. And Doe 3, although not a plaintiff, is the medical director of June Medical, a party to this case. *Id.*, at 186, 206, 245.

If these doctors had secured privileges, that would have tended to defeat the lawsuit. Not only that, acquiring privileges would have subjected all the doctors to the previously described hospital monitoring, as well as any other obligations that a hospital imposed on doctors with privileges, such as providing unpaid care for the indigent. See *infra*, at 21. Thus, in light of the situation at the time when the doctors made their attempts to get privileges, they had an incentive to do as little as they thought the District Court would demand, not as much as they would if they stood to benefit from success.

———————

[7] Petitioners maintain that an unsuccessful admitting privileges application is a "stain" on a doctor's medical record, because the rejection could appear in a federal database and would need to be disclosed on future applications for admitting privileges. Brief for Petitioners in No. 18–1323, p. 41, n. 7. As the record in this case shows, there is reason to doubt that the prospect of rejection provides a sufficient incentive for doctors to pursue privileges vigorously. See *infra*, at 15–23. Perhaps that is because only rejections for lack of "professional competence or professional conduct" need to be disclosed to the relevant federal database. 45 CFR §§60.12, 60.3 (2019). Petitioners also have not explained how a non-competence-based rejection would have any bearing on future applications for privileges.

Given this incentive structure, the District Court's "good faith" test was not up to the task. Although the District Court did not define exactly what the test required, "good faith" might easily mean only that a doctor lacked the subjective intent to avoid getting privileges. See Black's Law Dictionary, at 836 (defining "good faith" to mean, among other things, "absence of intent to defraud or seek unconscionable advantage").

In light of the doctors' incentives, more should have been required. The court should have asked whether the doctors' efforts to acquire privileges were equal to the efforts they would have made if they knew that their ability to continue to perform abortions was at stake. The District Court did not do that, and because its finding on abortion access rests on the wrong legal standard, it cannot stand. A finding based on an erroneous legal test is invalid; it cannot be sustained under the "clearly erroneous" rule. See *Abbott* v. *Perez*, 585 U. S. ___, ___ (2018) (slip op., at 25) ("'An appellate cour[t has] power to correct errors of law, including those that . . . infect . . . a finding of fact that is predicated on a misunderstanding of the governing rule of law'" (quoting *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 501 (1984))); *Pullman-Standard* v. *Swint*, 456 U. S. 273, 287 (1982) (similar); see also 9C C. Wright & A. Miller, Federal Practice & Procedure §2585, p. 392 (3d ed. 2008) (Wright & Miller) ("[I]t is axiomatic that the conclusions of law of the trial judge are not protected by the 'clearly erroneous' test").[8]

———————

[8] The plurality claims that my criticism of the District Court's "good faith" standard "is not a legal argument," and instead reflects a view of the facts—namely that the Does acted in "bad faith." *Ante*, at 24. But the District Court used "good faith" as the legal standard to assess whether Act 620 would cause the Does to stop performing abortions. Neither the District Court nor the plurality has defined "good faith." Unless that term reflects what the doctors would have done if the incentives had been reversed—and the plurality does not argue that it does—there is a legal issue.

3

Not only did the District Court apply the wrong test, but the evidence in the record fails to show that the doctors made anything more than perfunctory efforts to obtain privileges.

There are three abortion clinics in Louisiana: June Medical, d/b/a Hope Clinic, in Shreveport; Delta Clinic in Baton Rouge; and Women's Clinic in New Orleans. Five doctors perform abortions at those three locations: Doe 1, Doe 2, and Doe 3 at June Medical; Doe 5 at Delta Clinic and Women's Clinic; and Doe 6 at Women's Clinic. For purposes of the analysis that follows, I assume that Doe 1 could not get privileges.[9] If we also assume that none of these doctors would be replaced if they ceased to perform abortions, the impact of the challenged law on abortion access in the State depends on the ability of four doctors to secure such privileges: Doe 2 (June Medical, Shreveport), Doe 3 (June Medical, Shreveport), Doe 5 (Delta Clinic, Baton Rouge, and Women's Clinic, New Orleans), and Doe 6 (Women's Clinic, New Orleans). As I will show, under the correct legal standard, June Medical failed to prove that Act 620 would drive these four doctors out of the abortion practice.

***Doe 2***. The District Court concluded that Doe 2 made a

———————

[9]The Fifth Circuit concluded that it would be "nearly impossible" for Doe 1 to get privileges, *June Medical Services L. L. C.* v. *Gee*, 905 F. 3d 787, 812 (2018), and for this reason, the plurality does not linger on Doe 1. *Ante*, at 23. Under the correct legal standard, however, it is not at all clear that Doe 1 made the effort required, at least with respect to Christus Health in Shreveport. He applied there for courtesy privileges, received letters instructing him to pick up a badge, and when he called to clarify the meaning of letters sent to him, an unnamed doctor supposedly told him that he should apply for "some kind of a nonstaff caregiver type" position, App. 725, and he then ceased all efforts to get courtesy staff privileges at Christus, *id.*, at 728. A person with a strong personal incentive to obtain courtesy privileges would not necessarily have taken this somewhat cryptic advice as a definite rejection of his application.

good-faith effort to obtain privileges, and the Court now affirms that holding. *Ante*, at 27. It is painfully obvious, however, that Doe 2 did not act in the way one would expect if compliance with Act 620 had been to his benefit.

E-mails in the record reveal that Doe 2 only half-heartedly applied for privileges, did so on the advice of counsel, and calculated that an outright denial would be best for his legal challenge. See App. 1452 ("The lawyers think it is important that I at least have an application pending at a hospital"); *id.*, at 1453 ("It may, however, be more important from a legal challenge standpoint against this Bill just to have an application pending *or even denied*" (emphasis added)).

Consistent with this attitude, Doe 2 declined to apply for privileges at a Shreveport-area hospital, Christus Health, where he previously had privileges while performing abortions offsite and where another doctor who performed abortions, Doe 3, maintained privileges. *Id.*, at 382. Doe 2 knew that Doe 3 had privileges at Christus Health, a hospital that grants "courtesy privileges," which allow doctors to admit patients but do not require a minimum number of admissions. See *id.*, at 406; Record 12125 (bylaws).

Doe 2's stated reasons for not applying to Christus Health are not reasons that are likely to have deterred an individual with a strong personal incentive to obtain privileges. He testified that Christus is a Catholic hospital and that he did not apply there for that reason. App. 405–406. He added that he applied to other hospitals where he "knew people and might feel more comfortable," "places that [he] thought meant something" and where he would have "the highest likelihood" of obtaining privileges. *Id.*, at 454. A person with a strong personal incentive to get privileges is not likely to have found these reasons sufficient to justify failing even to apply.

The District Court did not address Doe 2's failure to apply

to Christus Health.  250 F. Supp. 3d, at 68–74.  The plurality, however, argues that Christus would not have granted Doe 2 privileges because its bylaws object to abortion practice.  *Ante,* at 25–26.  But as noted, Christus Health had previously granted privileges to doctors who perform abortions.  Not only did Doe 2 have privileges there while he was performing abortions, but Doe 3 has had privileges at Christus "off and on" for "30 years" and was reappointed to the Christus Health staff in 2012 and again in 2014.  App. 272; Record 12102 (2012–2014); *id.,* at 12112 (2014–2016).  Throughout this time, he performed abortions.  App. 206, 210.

Attempting to justify Doe 2's decision not to (re)apply to Christus, the plurality suggests that Doe 3 (and by extension Doe 2) successfully concealed their abortion practice from Christus, and that if Doe 2 had applied for privileges, Christus would have discovered that he was performing abortions and denied his application on that ground.  It is doubtful that Christus was actually in the dark, and speculative that an application would have been denied for this reason.[10]  But the important point is that a doctor with a

——————

[10] The suggestion that Doe 2's abortion practice could have eluded Christus (and therefore that it would be an impediment to obtaining privileges again) blinks reality.  There is no evidence that the hospital was unaware of Doe 2's abortion practice when he was on staff.  Nor is there reason to believe that Christus would not have reviewed Doe 2's professional practice history, Record 12190–12191, or demanded disclosure of past malpractice claims at the time he held privileges there, *id.*, at 12194; App. 374 (medical malpractice claim against Doe 2 arising from practice at June Medical); see also *supra*, at 4–7 (reviewing hospital credentialing).

The notion that Doe 3's abortion practice has escaped attention for 30 years is even harder to believe.  Christus has reappointed Doe 3 in recent years based on a biennial process that assesses "[p]erformance and conduct in each hospital and/or other healthcare organizatio[n]" outside of Christus.  Record 12136; see also *ibid.* (requiring staff members to submit "reapplication form [with] complete information to update his/her file on items listed in his/her original application").  Doe 3 spends "Thursday

strong personal incentive would have tried and not simply gone through the motions.

Instead of applying to Christus Health, Doe 2 made a formal application to Willis-Knighton Bossier City (WKBC) and an informal inquiry at University Hospital, but the record does not show that he pursued those requests with any zeal. At WKBC, he did not apply for courtesy privileges, which do not require a minimum number of admissions, Record 9642–9643, but instead sought an active staff position, *id.*, at 9751, and according to Doe 2, this application was doomed because he could not satisfy the minimum-admissions requirement for such a position, App. 384–390. Doe 2 later sent a three-paragraph e-mail to a WKBC e-mail address purporting to amend his 102-page application so as to seek only courtesy privileges, *id.*, at 1446, but the record does not reflect whether that e-mail was received or processed, and subsequent correspondence from WKBC does not acknowledge it, *id.*, at 1435. Doe 2 stated that he sought an active staff position "to keep [his] practice options for the future open," Record 9756, but that does not explain his lack of diligence in seeking courtesy staff privileges. Although it is true that WKBC requested inpatient records from Doe 2 for an active staff position, we do not know

_____

afternoon" and "all day on Saturday" at the abortion clinic, App. 206, and therefore presumably is unavailable for his on-call duties at Christus at those times, Record 12123. Doe 3 is affiliated with the National Abortion Federation and has attended "many" of their national conferences to obtain continuing medical education credits. App. 203. And Doe 3 indicated that all eight OB/GYNs in Bossier City learned of his abortion practice when discussing a possible on-call rotation system. See *id.*, at 200–202. If those facts did not tip off the hospital, perhaps Christus learned about Doe 3's abortion practice when one of his patients was transferred directly from June Medical to Christus, bleeding and in need of a hysterectomy, *id.*, at 217–218, or when Doe 1's privileges application named Doe 3 as a peer reference, Record 13025. Whatever the Christus bylaws say, abortion practice does not appear to have presented an obstacle to a successful association with the hospital.

whether the hospital would have made the same request had Doe 2 applied for courtesy privileges. *Id.*, at 1435.[11]

Doe 2 said he made an informal inquiry about admitting privileges at University Hospital, where he has consulting privileges, but that the head of the OB/GYN Department, Dr. Groome, "essentially said" that the hospital would not upgrade his credentials. *Id.*, at 384. Doe 2 attributed this to "the political nature of what I do and the controversy of what I do." *Ibid.* But Doe 2 did not introduce evidence (or seek to elicit testimony from Dr. Groome) substantiating his account of this informal inquiry.

Doe 2's account raises obvious questions. Since he was *already* a member of the University Hospital staff, it is not apparent why the hospital would reject his request for up-graded privileges because of "the political nature" of his practice. *Id.*, at 440–441. And University Hospital has long been on notice of Doe 2's abortion practice. He has been affiliated with that hospital since 1979, Record 9757, and has performed abortions since 1980, *id.*, at 9759.

In sum, Doe 2 all but admitted in his e-mails that his ef-forts to obtain privileges were perfunctory; he declined to apply at a hospital where he previously had privileges; at the only hospital where he made a formal application, he sought a position he knew he could not get for lack of a suf-ficient number of admissions; and at one other hospital (where he already had consulting privileges) he did no more than make an informal inquiry. The District Court should have considered whether Doe 2's efforts were consistent

——————

[11] Each year, a physician with courtesy staff privileges at WKBC may have as many as 49 "patient contacts," which are defined as "any admis-sion and management, consultation, procedure, response to emergency call, and newborns." Record 9628, 9642 (capitalization omitted). And contrary to the plurality's suggestion, the fact that WKBC imposes the same "[f]actors for [e]valuation" for courtesy and active staff-applicants says little, since those factors do not set out any quantum of patient rec-ords, and require only "relevant . . . experience" for the position sought. *Id.,* at 9669.

with the conduct of a person who really wanted to get privileges.

*Doe 5*.   Doe 5 is an OB/GYN who performs abortions at Women's Clinic in New Orleans and Delta Clinic in Baton Rouge.   Doe 5 did not testify at the hearing in District Court, but the District Court found that he proceeded in "good faith" based on a declaration and the transcript of a deposition.  250 F. Supp. 3d, at 75–76.

Doe 5 obtained courtesy privileges at Touro Hospital in New Orleans, see App. 1401, and therefore all agree that Act 620 would not prevent him from practicing at Women's Clinic, *id.*, at 1397.  The remaining question is whether the law would bar him from performing abortions in Baton Rouge.

Doe 5 could continue to do that if one hospital in that area granted him admitting privileges, and Doe 5 testified that one, Woman's Hospital, will grant him privileges once he finds a doctor who is willing to cover him when he is not available.  See *id.*, at 1334.  Doe 5 asked exactly one doctor to serve as his covering physician.  That does not show that he "could not find a covering physician," *ante,* at 23, if he made other inquiries.

The plurality justifies Doe 5's meager effort based on pure speculation.  Because the one doctor Doe 5 asked had a transfer agreement with the Baton Rouge abortion clinic, the plurality reasons that "Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would." *Ante*, at 28.  The plurality goes on to say that "it was well within the District Court's discretion to credit that reading of the record." *Ibid.*

This argument shows how far the plurality is willing to go to strike down the Louisiana law.  The plurality relies on speculation about why Doe 5 made only one inquiry and why the District Court found this one inquiry sufficient.  In fact, however, Doe 5 never explained why he asked only one doctor, and he never intimated that he gave up because that

doctor had a transfer agreement with the clinic. Nor did the District Court rely on that inference in finding that Doe 5 exhibited good faith. See 250 F. Supp. 3d, at 75–76. And in any event, even if Doe 5 had a particularly strong reason to hope that the doctor he asked would agree to cover for him, it hardly follows that other inquiries would necessarily fail.

Doe 5 applied for privileges at two other area hospitals, Lane and Baton Rouge, but he did not even call back to check on them because he thought his "best chances for privileges [were] at Woman's Hospital," App. 1334, and he noted that Lane and Baton Rouge require that their doctors treat some indigent patients "for free basically" while opening themselves up to liability, *id.*, at 1335. Also, Doe 5 explained, Lane is "further away" from the Delta Clinic than the other hospitals. *Ibid.*

To sum up Doe 5's situation: The challenged law would have no effect on him if he could find a covering doctor in Baton Rouge, but he asked only one doctor. He did little to pursue applications at two other hospitals because he was not optimistic about his chances and those hospitals required a certain amount of unpaid service to the poor.

*Doe 6*. Doe 6 is a Board-certified OB/GYN who practices at Women's Clinic in New Orleans. There are nine qualifying New Orleans-area hospitals, and according to his affidavit, Doe 6 made an informal inquiry at one and filed a formal application at another. The District Court found that he attempted in "good faith" to obtain admitting privileges even though Doe 6 did not testify and was never subjected to adversarial questioning. The only relevant information before the court were several paragraphs in Doe 6's declaration, *id.*, at 1307–1313, and hearsay in the declaration of the Women's Clinic administrator, *id.*, at 1119–1131; see also 250 F. Supp. 3d, at 76–77.

These questionable sources left many important questions unanswered, for example, why Doe 6 did not apply for

privileges at Touro Hospital, where Doe 5, who also performs abortions at Women's Clinic, has privileges.

The plurality provides an explanation that is found nowhere in the record, *i.e.*, that Doe 6 could not get privileges at Touro because, unlike Doe 5, who performs both surgical and medication abortions, Doe 6 performs only medication abortions. *Ante*, at 30. Not only is this pure speculation, but it is not evident why this difference might matter. The plurality notes that Doe 6's medication abortion patients have never been admitted to a hospital, but the plurality also argues that very few surgical abortion patients are admitted. *Ante*, at 30, 37. If Doe 6 had testified or been deposed, he could have been asked about his decision not to apply at Touro, but that did not occur.

Aside from Touro, there are eight other hospitals in the New Orleans area, but Doe 6 apparently made no attempt to get privileges at six of these, and nothing in the scant record explains why. He stated that he formally applied at East Jefferson Hospital and made an informal inquiry at Tulane Hospital, but much about these efforts is unknown. No representative from Tulane or East Jefferson testified or was deposed, and no documents relating to either application were offered.

With respect to Doe 6's informal inquiry at Tulane, all that the District Court had before it was a single paragraph in Doe 6's declaration in which he stated that he spoke to an unnamed individual and was told he should not bother to apply because he did not have the requisite number of admissions per year. App. 1310. Nothing in the record reveals the type of privileges about which Doe 6 inquired.

Doe 6 furnished even less information about his formal application to East Jefferson hospital—a hospital which offers courtesy privileges, and does not impose an admissions requirement for those privileges. Record 10679. In his declaration, which he signed in September 2014, Doe 6 wrote that he had applied but had not received a response. App.

1311. A few weeks later, June Medical's counsel informed the District Court by letter that Doe 6 had complied with East Jefferson's request for additional information, *id.*, at 54, but the record says nothing about any later developments. Presumably, East Jefferson did not grant privileges, but the record does not disclose why. Did Doe 6 provide all the information that the hospital requested and do everything else required by the application process? The record is silent, and the District Court was incurious.

*Doe 3*. Doe 3, who performs abortions at the June Medical clinic in Shreveport, would not be directly affected by Act 620 because he maintains privileges at two area hospitals, Christus Health and WKBC, but he stated that he would stop performing abortions if, as a result of that law, he was left as the only abortion doctor in the northern part of the State. *Id.,* at 236. Thus, if Doe 1 or Doe 2 got privileges and continued to perform abortions, Doe 3, according to his testimony, would remain as well.[12]

Putting all this together, it is apparent that the record does not come close to showing that Doe 2, Doe 5, and Doe 6 made the sort of effort that one would expect if their ability to continue performing abortions had depended on success. These doctors had an incentive to do the bare minimum that they thought the judge would demand—and as it turned out, the judge did not demand much, not even an appearance in his courtroom. In short, the record does not show that Act 620 would drive any of these doctors out of abortion practice, and therefore the Act would not lead Doe

---

[12] The plurality suggests that, if Doe 3 were to leave abortion practice, it would be attributable to Act 620. But even the most ardent opponents of Act 620 did not contemplate that the law would prompt abortion doctors who *satisfied* the law's requirements to quit. Record 11231–11234, 11291. And if this outcome was not foreseeable at the time of enactment, it is hard to see how the District Court could blame Act 620 for causing Doe 3 to leave abortion practice. Cf. Restatement (Second) of Torts §440, §442A (1964).

3 to leave either.  It follows that the District Court's finding on Act 620's likely effects cannot stand.

### C

The Court should remand this case for a new trial under the correct legal standards.  The District Court should apply *Casey*'s "substantial obstacle" test, not the *Whole Woman's Health* balancing test.  And it should require those challenging Act 620 to demonstrate that the doctors who lack admitting privileges attempted to obtain them with the same zeal they would have exhibited if the Act were in effect and they stood to lose by failing in those efforts.

### IV

On remand, the District Court should not permit June Medical to assert the rights of women wishing to obtain an abortion.  The court should require the joinder of a plaintiff whose own rights are at stake.  Our precedents rarely permit a plaintiff to assert the rights of a third party, and June Medical cannot satisfy our established test for third-party standing.  Indeed, what June Medical seeks is something we have never allowed.  It wants to rely on the rights of third parties whose interests conflict with its own.

### A

The plurality holds that Louisiana waived any objection to June Medical's third-party standing, *ante,* at 12, but that is a misreading of the record.  The plurality relies on a passing statement in a brief filed by the State in District Court in connection with the plaintiffs' request for a temporary restraining order, but the statement is simply an accurate statement of circuit precedent on the standing of abortion providers.  See App. 44.  It does not constitute a waiver.

It is true that Louisiana did not affirmatively make the third-party standing argument until it filed its cross-petition for certiorari, but "[w]e may make exceptions to our

general approach to claims not raised below." *Polar Tankers, Inc.* v. *City of Valdez,* 557 U. S. 1, 14 (2009). A party's failure to raise an issue does not deprive us of the power to take it up, so long as the court below has passed on the question. See *Lebron* v. *National Railroad Passenger Corporation,* 513 U. S. 374, 379 (1995) ("[E]ven if this were a claim not raised by petitioner below, we would ordinarily feel free to address it since it was addressed by the court below" (emphasis deleted)); S. Shapiro et al., Supreme Court Practice §6–26(b), p. 6–104 (11th ed. 2019) (collecting cases).

In this case, no one disputes that the Fifth Circuit passed on the issue of third-party standing in Louisiana's appeal from the District Court's entry of a preliminary injunction. *June Medical Services, L. L. C.* v. *Gee*, 814 F. 3d 319, 322–323 (2016). And when we granted the State's cross-petition, we took up this question and received briefing and argument on it. 589 U. S. ___ (2019).

We have a strong reason to decide the question of third-party standing because it implicates the integrity of future proceedings that should occur in this case. This case should be remanded for a new trial, and we should not allow that to occur without a proper plaintiff. Nothing compels us to forbear from addressing this issue. See *Carlson* v. *Green*, 446 U. S. 14, 17, n. 2 (1980); Shapiro, Supreme Court Practice §6.26(h), at 6–111.

B

This case features a blatant conflict of interest between an abortion provider and its patients. Like any other regulated entity, an abortion provider has a financial interest in avoiding burdensome regulations such as Act 620's admitting privileges requirement. Applying for privileges takes time and energy, and maintaining privileges may impose additional burdens. See App. 1335. Women seeking abor-

tions, on the other hand, have an interest in the preserva-
tion of regulations that protect their health. The conflict
inherent in such a situation is glaring.

Some may not see the conflict in this case because they
are convinced that the admitting privileges requirement
does nothing to promote safety and is really just a ploy. But
an abortion provider's ability to assert the rights of women
when it challenges ostensible safety regulations should not
turn on the merits of its claim.

The problem with the rule that the majority embraces is
highlighted if we consider challenges to other safety regu-
lations. Suppose, for example, that a clinic in a State that
allows certified non-physicians to perform abortions claims
that the State's certification requirements are too onerous
and that they imperil the clinic's continued operation.
Should the clinic be able to assert the rights of women in
attacking this regulation, which the state lawmakers
thought was important to protect women's health?

When an abortion regulation is enacted for the asserted
purpose of protecting the health of women, an abortion pro-
vider seeking to strike down that law should not be able to
rely on the constitutional rights of women. Like any other
party unhappy with burdensome regulation, the provider
should be limited to its own rights.

### C

This rule is supported by precedent and follows from gen-
eral principles regarding conflicts of interest. We have al-
ready held that third-party standing is not appropriate
where there is a potential conflict of interest between the
plaintiff and the third party. In *Elk Grove Unified School
Dist.* v. *Newdow*, 542 U. S. 1, 9, 15, and n. 7 (2004), a poten-
tial conflict of interest between the plaintiff and his daugh-
ter arose on appeal. The father had asserted that his
daughter had a constitutional right not to hear others recite
the words "'under God'" when the pledge of allegiance was

recited at her public school, but the child's mother maintained that her daughter had "no objection either to reciting or hearing" the full pledge. *Id.*, at 5, 9. The Court held that the father lacked prudential standing, because "the interests of this parent and this child are not parallel and, indeed, are potentially in conflict." *Id.*, at 15. The lower court's judgment (based, as it was, on a presentation by a conflicted party) was therefore reversed.

*Newdow* recognized the seriousness of conflicts of interest in the specific context of third-party claims, but the law is always sensitive to potential conflicts when a party sues in a representative capacity. Parties naturally "tailor their own presentation to the interest that each of them has," and a conflict therefore creates "a risk that the party will not provide adequate representation of the interest of the absentee." See 7C Wright & Miller §1909. Thus, in class-action suits, Federal Rule of Civil Procedure 23(a)(4) demands that the named plaintiff possess "the same interest and suffer the same injury" as class members. *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 156 (1982) (internal quotation marks omitted). That requirement, we have said, "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 625 (1997). Similarly, under Federal Rule of Civil Procedure 17(c), a party representing a minor or incompetent person may be replaced if the representative has conflicting interests. See *Sam M.* v. *Carcieri*, 608 F. 3d 77, 86 (CA1 2010); 6A Wright & Miller §1570. And of course, an attorney cannot represent a client if their interests conflict.[13]

## D

The conflict of interest inherent in a case like this is reason enough to reject third-party standing, and our standard

───────────
[13] See, *e.g.*, ABA Model Rules of Professional Conduct 1.7–1.9, 1.18 (2016).

rules on third-party standing provide a second, independent reason. As a general rule, a plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975). We have recognized a "limited" exception to this rule, but in order to qualify, a litigant must demonstrate (1) closeness to the third party and (2) a hindrance to the third party's ability to bring suit. *Kowalski* v. *Tesmer*, 543 U. S. 125, 129–130 (2004); see also *Powers* v. *Ohio*, 499 U. S. 400, 410–411 (1991).

The record shows that abortion providers cannot satisfy either prong of this test. First, a woman who obtains an abortion typically does not develop a close relationship with the doctor who performs the procedure. On the contrary, their relationship is generally brief and very limited. In Louisiana, a woman may make her first visit to an abortion clinic the day before the procedure, and if she goes to June Medical, she is likely to have a short meeting with a counselor, not the doctor who will actually perform the procedure. See App. 784–786. She will typically meet the abortion doctor for the first time just before the procedure, and if Doe 1's description is representative, their relationship consists of the doctor's telling the woman what he will do, offering to answer questions, informing her of his progress as the abortion is performed, and asking her to remain calm. *Id.*, at 688. Doe 4 testified that the surgical procedure itself takes "two or three minutes." Record 14144. Doe 3 testified that he can perform six abortions an hour and once performed 64 abortions in a 2-day period. App. 207, 243.

In the case of medication abortions, patients are required to schedule a follow-up appointment three weeks after the procedure, see *id.*, at 129–131, 690, but surgical abortions, which constitute the majority of the procedures at June Medical and across the State, do not require any follow-up, *id.*, at 691, and the great majority of women never return to

the clinic, *id.*, at 131; accord, *id.*, at 1342 (Doe 5).

This description of doctor-patient interactions at June Medical is similar to those recounted in testimony heard by the legislature. See Record 11263 ("there was no doctor/patient relationship"); *id.*, at 11226 ("I can tell you, women I've counseled, many times they don't know who the abortion provider is"). *Amici* who have had abortions recount similarly distant relationships with their abortion doctors.[14] For these reasons, the first prong of the third-party standing rule cannot be met.

Nor can the second, which requires that there be a hindrance to the ability of the third party to bring suit. See *Kowalski*, 543 U. S., at 130. The plurality opinion in *Singleton* v. *Wulff*, 428 U. S. 106, 117 (1976), found that women seeking abortions were hindered from bringing suit, but the reasoning in that opinion is hard to defend. The opinion identified two purported obstacles to suits by women wishing to obtain abortions—the women's desire to protect their privacy and the prospect of mootness. *Ibid.* But as Justice Powell said at the time, these "alleged 'obstacles' . . . are chimerical." *Id.*, at 126 (opinion concurring in part and dissenting in part).

First, a woman who challenges an abortion restriction can sue under a pseudonym, and many have done so. *Ibid.* ("Our docket regularly contains cases in which women, using pseudonyms, challenge statutes that allegedly infringe their right to exercise the abortion decision"). Other precautions may be taken during the course of litigation to avoid revealing their identities. See App. 196.[15] And there

_____

[14] See Brief for 2,624 Women Injured by Abortion et al. as *Amici Curiae* 14–22 (firsthand accounts of abortion procedures in Louisiana); Brief for Priests for Life et al. as *Amici Curiae* 7–8, and App. (accounts from Louisiana and other States).

[15] Four cases to reach this Court have featured exclusively women plaintiffs. See *Beal* v. *Doe*, 432 U. S. 438 (1977); *Maher* v. *Roe*, 432 U. S. 464 (1977); *Poelker* v. *Doe*, 432 U. S. 519 (1977) (*per curiam*); *H. L.* v.

is little reason to think that a woman who challenges an abortion restriction will have to pay for counsel. See Brief for Respondent/Cross-Petitioner 40–41.

Second, if a woman seeking an abortion brings suit, her claim will survive the end of her pregnancy under the capable-of-repetition-yet-evading-review exception to mootness. See *Roe* v. *Wade*, 410 U. S. 113, 125 (1973) ("Pregnancy provides a classic justification for a conclusion of nonmootness"). To be sure, when the pregnancy terminates, an individual plaintiff's immediate interest in prosecuting the case may diminish. But this is generally true whenever the capable-of-repetition-yet-evading-review exception applies. See 13C Wright & Miller §3533.8 (collecting examples).

The *Singleton* plurality opinion is the only opinion in which any Members of this Court have ever attempted to justify third-party standing for abortion providers, and judged on its own merits, the opinion is thoroughly unconvincing.

E

The Court does not address the conflict of interest inherent in this challenge, or plaintiffs' failure to satisfy the two prongs of our third-party standing doctrine. See *Kowalski*, 543 U. S., at 130. Instead, the plurality says that it "is . . . common" in third-party standing case law for "plaintiffs [to] challeng[e] a law ostensibly enacted to protect [a third party] whose rights they are asserting." *Ante*, at 15. In

---

*Matheson*, 450 U. S. 398 (1981). But there are a number of cases in which women have been co-plaintiffs along with abortion clinics or providers. See *Leavitt* v. *Jane L.*, 518 U. S. 137 (1996) (*per curiam*); *Ohio* v. *Akron Center for Reproductive Health*, 497 U. S. 502 (1990); *Hodgson* v. *Minnesota*, 497 U. S. 417 (1990); *Williams* v. *Zbaraz*, 448 U. S. 358 (1980); *Harris* v. *McRae*, 448 U. S. 297 (1980); *Bellotti* v. *Baird*, 443 U. S. 622 (1979); *Roe* v. *Wade*, 410 U. S. 113 (1973). More recently, abortion patients have litigated in the lower courts using their names, those of legal guardians, or pseudonyms. Brief for Respondent/Cross-Petitioner 39; see also Brief for State of Arkansas et al. as *Amici Curiae* 3, and n. 1.

support of this strange proposition, the plurality cites two of our prior decisions, but neither decision acknowledged or addressed any potential conflict of interest, and both cases involved circumstances very different from those present here. Both cases also featured facts assuring that third-party interests were fairly represented.

In the first case, *Craig* v. *Boren*, 429 U. S. 190 (1976), the sole appellant with a live claim at the time of decision was a beer vendor who challenged a law that allowed females to purchase 3.2% beer at the age of 18 but barred males from making such purchases until they turned 21. *Id.*, at 193. The Court's lead explanation for its refusal to dismiss had nothing to do with the merits of the vendor's third-party standing claim. The Court noted that the other appellant, Curtis Craig, had been under the age of 21 during the proceedings below, that the appellees had not raised a standing objection below, and that they had not pressed an objection in this Court. *Id.*, at 192–194.

Only after this discussion did the Court say anything about the merits of the third-party claim, and even then, the Court said nothing about a conflict of interest between the vendor and underage males. The plurality now claims there was a potential conflict: Young men under the age of 21 had an interest in being barred from buying beer in order to protect themselves from their own reckless conduct. Suffice it to say that there is no indication that this supposed conflict occurred to anybody when *Craig* was before this Court.

The plurality's second case, *Department of Labor* v. *Triplett*, 494 U. S. 715 (1990), is even weaker. A state bar ethics committee filed a disciplinary proceeding in state court against a lawyer who had entered into an attorney-fee arrangement that was prohibited by a provision of the Black Lung Benefits Act. When the State Supreme Court ruled in favor of the lawyer on the ground that the provision in question violated Black Lung claimants' constitutional

right to counsel, both the bar ethics committee and the Department of Labor, which had intervened in state court, successfully petitioned for review in this Court. We then held that the attorney could defend the decision below based on the rights of his client.

*Triplett* is inapposite here for at least two reasons. First, the lawyer in that case did not initiate the litigation. Second, because the case arose in state court, his right to invoke his client's rights in that forum was a question of state law. Had we prevented him from asserting those rights in this Court, he would have been unable to defend himself against the petitioners' arguments. And on top of all this, *Triplett,* as we noted in *Kowalski*, "involved the representation of known claimants," and that "existing attorney-client relationship [was] quite different from the hypothetical . . . relationship" between the abortion providers and clients in the present case. 543 U. S., at 131.      That *Craig* and *Triplett* are the best authorities the plurality can find is telling proof of the weakness of its position.

F

As THE CHIEF JUSTICE points out, *stare decisis* generally counsels adherence to precedent, and in deciding whether to overrule a prior decision, we consider factors beyond the strength of the precedent's reasoning. *Ante*, at 3–4. But here, such factors weigh in favor of overruling.

Reexamination of a precedent may be appropriate when it is an "outlier" and its reasoning cannot be reconciled with other established precedents, see *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 17); *Janus* v. *State, County, and Municipal Employees*, 585 U. S. ___, ___ (2018) (slip op., at 43); *United States* v. *Gaudin*, 515 U. S. 506, 521 (1995); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 484 (1989), and that is true of the rule allowing abortion providers to assert their patients' rights. The parties have not brought to our attention any

other situation in which a party is allowed to invoke the right of a third party with blatantly adverse interests. The rule that the majority applies here is an abortion-only rule.

THE CHIEF JUSTICE properly notes that subsequent legal developments may support overruling a precedent, *ante*, at 3–4, and that factor too is present here. Both our general standing jurisprudence and our treatment of third-party standing have changed since *Singleton*. We have stressed the importance of insisting that a plaintiff assert an injury that is particular to its own situation. See, *e.g.*, *Spokeo, Inc.* v. *Robins*, 578 U. S. \_\_\_, \_\_\_ (2016) (slip op., at 7); *Clapper* v. *Amnesty Int'l USA,* 568 U. S. 398, 409 (2013); *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992). Moreover, in *Kowalski*, 543 U. S. 125, we refined our rule for third-party standing, and in *Newdow*, 542 U. S. 1, we made it clear that a plaintiff cannot sue on behalf of a third party if the parties' interests may conflict.

The presence or absence of reliance is often a critical factor in applying the doctrine of stare decisis, see, *e.g.*, *Franchise Tax Bd.*, 587 U. S., at \_\_\_ (slip op., at 17); *Janus*, 585 U. S., at \_\_\_ (slip op., at 44); *South Dakota* v. *Wayfair, Inc.*, 585 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 20); *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 206–207 (1991), but neither the plurality nor THE CHIEF JUSTICE claims that any reliance interests are at stake here. Women wishing to obtain abortions have not taken any action in reliance on the ability of abortion providers to sue on their behalf, and eliminating third-party standing for providers would not interfere with the ability of women to sue. Nor does it appear that abortion providers have done anything in reliance on the special third-party standing rule they have enjoyed. If that rule were abrogated, they could still ask to intervene or appear as an *amicus curiae* in a suit brought by a woman, but it is deeply offensive to our rules of standing to permit them to sue in the name of their pa-

tients when they challenge laws enacted to protect their pa-
tients' safety.

On remand, the District Court should permit the joinder
of a plaintiff with standing and should not proceed until
such a plaintiff appears.

*     *     *

The decision in this case, like that in *Whole Woman's
Health*, twists the law, and I therefore respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

––––––––––

Nos. 18–1323 and 18–1460

––––––––––

JUNE MEDICAL SERVICES L.L.C., ET AL.,
PETITIONERS

18–1323　　　　　　　*v.*
STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS


STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, PETITIONER

18–1460　　　　　　　*v.*
JUNE MEDICAL SERVICES L.L.C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

JUSTICE GORSUCH, dissenting.

The judicial power is constrained by an array of rules. Rules about the deference due the legislative process, the standing of the parties before us, the use of facial challenges to invalidate democratically enacted statutes, and the award of prospective relief. Still more rules seek to ensure that any legal tests judges may devise are capable of neutral and principled administration. Individually, these rules may seem prosaic. But, collectively, they help keep us in our constitutionally assigned lane, sure that we are in the business of saying what the law is, not what we wish it to be.

Today's decision doesn't just overlook one of these rules. It overlooks one after another. And it does so in a case

touching on one of the most controversial topics in contemporary politics and law, exactly the context where this Court should be leaning most heavily on the rules of the judicial process. In truth, *Roe* v. *Wade*, 410 U. S. 113 (1973), is not even at issue here. The real question we face concerns our willingness to follow the traditional constraints of the judicial process when a case touching on abortion enters the courtroom.

\*

When confronting a constitutional challenge to a law, this Court ordinarily reviews the legislature's factual findings under a "deferential" if not "[u]ncritical" standard. *Gonzales* v. *Carhart*, 550 U. S. 124, 165–166 (2007). When facing such a challenge, too, this Court usually accepts that "the public interest has been declared in terms well-nigh conclusive" by the legislature's adoption of the law—so we may review the law only for its constitutionality, not its wisdom. *Berman* v. *Parker*, 348 U. S. 26, 32 (1954). Today, however, the plurality declares that the law before us holds no benefits for the public and bears too many social costs. All while sharing virtually nothing about the facts that led the legislature to conclude otherwise. The law might as well have fallen from the sky.

Of course, that's hardly the case. In Act 620, Louisiana's legislature found that requiring abortion providers to hold admitting privileges at a hospital within 30 miles of the clinic where they perform abortions would serve the public interest by protecting women's health and safety. Those in today's majority never bother to say so, but it turns out that Act 620's admitting privileges requirement for abortion providers tracks longstanding state laws governing physicians who perform relatively low-risk procedures like colonoscopies, Lasik eye surgeries, and steroid injections at ambulatory surgical centers. In fact, the Louisiana legislature

passed Act 620 only after extensive hearings at which experts detailed how the Act would promote safer abortion treatment—by providing "a more thorough evaluation mechanism of physician competency," promoting "continuity of care" following abortion, enhancing inter-physician communication, and preventing patient abandonment.

Testifying physicians explained, for example, that abortions carry inherent risks including uterine perforation, hemorrhage, cervical laceration, infection, retained fetal body parts, and missed ectopic pregnancy. Unsurprisingly, those risks are minimized when the physician providing the abortion is competent. Yet, unlike hospitals which undertake rigorous credentialing processes, Louisiana's abortion clinics historically have done little to ensure provider competence. Clinics have failed to perform background checks or to inquire into the training of doctors they brought on board. Clinics have even hired physicians whose specialties were unrelated to abortion—including a radiologist and an ophthalmologist. Requiring hospital admitting privileges, witnesses testified, would help ensure that clinics hire competent professionals and provide a mechanism for ongoing peer review of physician proficiency. Loss of admitting privileges, as well, might signal a problem meriting further investigation by state officials. At least one Louisiana abortion provider's loss of admitting privileges following a patient's death alerted the state licensing board to questions about his competence, and ultimately resulted in restrictions on his practice.

The legislature also heard testimony that Louisiana's clinics and the physicians who work in them have racked up dozens of citations for safety and ethical violations in recent years. Violations have included failing to use sterile equipment, maintaining unsanitary conditions, failing to monitor patients' vital signs, permitting improper administration of medications by unauthorized persons, and neglecting to obtain informed consent from patients. Some

clinics have failed to maintain supplies of emergency medications and medical equipment for treating surgical complications. One clinic used single-use hoses and tubes on multiple patients, and the solution needed to sterilize instruments was changed so infrequently that it often had pieces of tissue floating in it. Hospital credentialing processes, witnesses suggested, could help prevent such violations. In the course of the credentialing process, physicians' prior safety lapses, including criminal violations and medical malpractice suits, would be revealed and investigated, and incompetent doctors might be weeded out.

The legislature heard, too, from affected women and emergency room physicians about clinic doctors' record of abandoning their patients. One woman testified that, while she was hemorrhaging, her abortion provider told her, "'You're on your own. Get out.'" Eventually, the woman went to a hospital where an emergency room physician removed fetal body parts that the abortion provider had left in her body. Another patient who complained of severe pain following her abortion was told simply to go home and lie down. When she decided for herself to go to the emergency room, physicians discovered a tear in her uterus and a large hematoma containing a fetal head. The woman required an emergency hysterectomy. In another case, a clinic physician allowed a patient to bleed for three hours, yet a clinic employee testified that the physician would not let her call 911 because of possible media involvement. In the end, the employee called anyway and emergency room personnel discovered that the woman had a perforated uterus and a needed a hysterectomy. A different physician explained that she routinely treats abortion complications in the emergency room when the physician who performed the abortion lacks admitting privileges. In her experience, that situation "puts a woman's health at an unnecessary, unacceptable risk that results from a delay of care . . . and a lack of continuity of care." Admitting privileges would mitigate

these risks, she testified, because "the physician who performed the procedure would be the one best equipped to evaluate and treat the patient."

Nor did the legislature neglect to consider the law's potential burdens. As witnesses explained, the admitting privileges requirement in Act 620 for abortion clinic providers would parallel existing requirements for many physicians who work at ambulatory surgical centers. And there is no indication this parallel admitting privileges requirement has led to the closing of any surgical centers or otherwise presented obstacles to quality care in Louisiana. Further, legislators learned that at least one Louisiana abortion provider already had qualifying admitting privileges, suggesting other competent abortion providers would be able to comply with the new regulation as well.

Since trial, the State continues to accrue evidence supporting Act 620, and the State has sought to lodge that evidence with this Court. In particular, the State has learned of additional safety violations at Louisiana clinics, including evidence of an abortion provider deviating from the standard of care in a way that can result in the live births of nonviable fetuses. The State has also proffered new evidence of potential criminal conduct by Louisiana abortion providers, including the failure to report the forcible rape of a minor and performing an abortion on a minor without parental consent or judicial bypass.

\*

After overlooking so many facts and the deference owed to the legislative process, today's decision misapplies many of the rules that normally constrain the judicial process. Start with the question who can sue. To establish standing in federal court, a plaintiff typically must assert an injury to her own legally protected interests—not the rights of someone else. *Warth* v. *Seldin*, 422 U. S. 490, 499 (1975). This rule ensures that the judiciary stays focused on the

"factual situation before it," *New York* v. *Ferber*, 458 U. S. 747, 768 (1982), while "questions of wide public significance" remain with "governmental institutions . . . more competent to address" them, *Warth*, 422 U. S., at 500.

No one even attempts to suggest this usual prerequisite is satisfied here. The plaintiffs before us are abortion providers. They do not claim a constitutional right to perform that procedure, and no one on the Court contends they hold such a right. Instead, the abortion providers before us seek only to assert the constitutional rights of an undefined, unnamed, indeed unknown, group of women who they hope will be their patients in the future.

In narrow circumstances, to be sure, this Court has allowed cases to proceed based on "third-party standing." But to qualify, the plaintiff must demonstrate both that he has a "'close' relationship" with the person whose rights he wishes to assert *and* that some "'hindrance'" hampers the right-holder's "ability to protect his own interests." *Kowalski* v. *Tesmer*, 543 U. S. 125, 130 (2004). Think of parents and children, guardians and wards. In these special cases, the logic goes, the plaintiff's interests are so aligned with those of a particular right-holder that the litigation will proceed in much the same way as if the right-holder herself were present.

Nothing like that exists here. In the first place, the plaintiff abortion providers identify no reason to think affected women are unable to assert their own rights if they wish. Instead, the plaintiffs merely gesture to a 1976 plurality opinion suggesting that women seeking abortions "generally" face a hindrance in asserting their own rights. *Singleton* v. *Wulff*, 428 U. S. 106, 118 (1976). But whatever the supposition of a 1976 plurality, in the years since interested women have challenged abortion regulations on their own behalf in case after case. See, *e.g., McCormack* v. *Herzog*, 788 F. 3d 1017 (CA9 2015); *Jane L.* v. *Bangerter*, 102 F. 3d 1112 (CA10 1996); *Margaret S.* v. *Edwards*, 794 F. 2d 994

(CA5 1986); see also *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_, \_\_\_ (2016) (THOMAS, J., dissenting) (slip op., at 4) (collecting additional examples). And no one suggests this suit differs from those cases in any meaningful way. The truth is transparent: The plaintiffs hardly try to carry their burden of showing a hindrance because they can't.

Separately and additionally, the abortion providers cannot claim a "close relationship" with the women whose rights they assert. Normally, the fact that the plaintiffs do not even know who those women are would be enough to preclude third-party standing. This Court has held, for example, that a future "*hypothetical* attorney-client relationship" (as opposed to an "*existing*" one) cannot confer third-party standing. *Kowalski*, 543 U. S., at 131. Likewise, this Court has held that a pediatrician lacks standing to *defend* a State's abortion laws on the theory that fetuses are his future potential patients. *Diamond* v. *Charles*, 476 U. S. 54, 66 (1986). If standing isn't present in cases like those, it is hard to see how it might be present in this one.

Nor is that the end of the plaintiffs' standing problems. Even when a plaintiff can identify an actual and close relationship, this Court will normally refuse third-party standing if the plaintiff has a potential conflict of interest with the person whose rights are at issue. See *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 15, 17–18 (2004). And it's pretty hard to ignore the potential for conflict here. After all, Louisiana's law expressly aims to protect women from the unsafe conditions maintained by at least some abortion providers who, like the plaintiffs, are either unwilling or unable to obtain admitting privileges. Cf. *ante,* at 25–27 (ALITO, J., dissenting).

Seeking to set all these difficulties aside, today's decision contends that Louisiana has waived its prudential standing arguments. But in doing so, today's decision mistakes three more legal principles. First, what the plurality character-

izes as a waiver arises from the State's admission that applicable circuit law allowed the plaintiffs standing. At worst, that reflects a forfeiture of, or a failure to pursue, a possible argument against standing, not an affirmative waiver of the argument, or an intentional relinquishment of any interest in the issue. Cf. *ante,* at 24–25 (ALITO, J., dissenting). Second, this Court typically relies on a forfeiture or even a waiver only if the issue was "'not pressed or passed upon'" in the lower courts. *United States* v. *Williams*, 504 U. S. 36, 41 (1992). That rule's disjunctive phrasing is no accident—it "permit[s] review of an issue not pressed so long as it has been passed upon" below. *Ibid.* Here, the Fifth Circuit *did* pass upon the standing question—so forfeiture or waiver presents no impediment to our review. See *June Medical Services, L.L.C.* v. *Gee*, 814 F. 3d 319, 322–323 (2016). Finally, this Court has held that even truly forfeited or waived arguments may be entertained when structural concerns or third-party rights are at issue. *Freytag* v. *Commissioner*, 501 U. S. 868, 878–880 (1991). Both conditions are present here.

\*

Next consider our rules about facial challenges. Generally, courts decide the constitutionality of statutes as applied to specific people in specific situations and disfavor facial challenges seeking to forestall a law's application in every circumstance. The reasons for this rule are many. Not least, when a court focuses on the parties before it, it is able to assess the law's application within a real factual context, rather than left to imagine "every conceivable situation which might possibly arise in the application of complex and comprehensive legislation." *Barrows* v. *Jackson*, 346 U. S. 249, 256 (1953). Importantly, too, as-applied challenges reduce the risk that a court will "short circuit the democratic process" by interfering with legislation any

more than necessary to remedy a complaining party's injury. *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 451 (2008).

As a result, the path for a litigant pursuing a facial challenge is deliberately difficult. Typically, a plaintiff seeking to render a law unenforceable in all of its applications must show that the law cannot be constitutionally applied against *anyone* in *any* situation. *United States* v. *Stevens*, 559 U. S. 460, 472–473 (2010). This Court has carved out an exception to this high bar for overbreadth challenges under the First Amendment. Some suggest this exception is ill-advised. *United States* v. *Sineneng-Smith*, 590 U. S. \_\_\_, \_\_\_–\_\_\_ (2020) (THOMAS, J., concurring) (slip op., at 5–6). But even in First Amendment overbreadth challenges, a plaintiff still must show that the law in question has "'a substantial number of . . . applications [that] are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U. S., at 473 (quoting *Washington State Grange*, 552 U. S., at 449, n. 6); see also *Stevens*, 559 U. S., at 481–482 (holding law unconstitutional under First Amendment where "impermissible applications . . . far outnumber[ed] any permissible ones").

Today, it seems any of these standards would demand too much. Instead of asking whether the law has a "substantial number of unconstitutional applications" compared to its "legitimate sweep," the plurality asks whether the law will impose a "'substantial obstacle'" for a "'large fraction'" of "'those women for whom the provision is an actual rather than an irrelevant restriction.'" *Ante,* at 39. Concededly, the two tests sound similar—after all, who could say whether a "substantial number" is more or less than a "large fraction"? But notice the switch at the end, where the plurality limits our focus to women for whom the law is an "actual" restriction. Because of that limitation, it doesn't matter how many women continue to have convenient ac-

cess to abortions: Any woman not burdened by the chal-
lenged law is deemed "irrelevant" to the analysis. So in-
stead of asking how the law's unconstitutional applications
compare to its legitimate sweep, the plurality winds up ask-
ing only whether the law burdens a very large fraction of
the people that it burdens. The words might sound famil-
iar, but this circular test is unlike anything we apply to fa-
cial challenges anywhere else.

Abandoning our usual caution with facial challenges
leads, predictably, to overbroad conclusions. Suppose that
for a substantial number of women Louisiana's law imposes
no burden at all. These women might live in an area well-
served by well-qualified abortion providers who can easily
obtain admitting privileges. No one could dispute the law
is constitutional as applied to these women and providers.
But suppose the law makes it difficult to obtain an abortion
on the other side of the State, where qualified providers are
fewer and farther between. Under the standard applied to-
day, it seems the entire law would fall statewide, notwith-
standing its undeniable constitutionality in many applica-
tions.

Nor is this possibility farfetched. Today's decision de-
clares the admitting privileges requirement unconstitu-
tional even as applied to Does 3 and 5, each of whom holds
admitting privileges. Not a single woman would be bur-
dened by requiring these doctors to maintain the privileges
they already have. Yet the State may not enforce the law
even against them. In effect, the standard for facial chal-
lenges has been flipped on its head: Rather than requiring
that a law be unconstitutional in all its applications to fall,
today's decision requires that Louisiana's law be constitu-
tional in all its applications to stand.

*

Even when it comes to assessing the law's effects on the subset of women deemed "relevant," this case proves unusual. Normally, to obtain a prospective injunction like the one approved today, a plaintiff must show that irreparable injury is not just possible, but likely. *O'Shea* v. *Littleton*, 414 U. S. 488, 501–502 (1974); *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 22 (2008). Yet, nothing like that standard can be found at work today.

The plaintiffs allege that statewide enforcement of Act 620 would irreparably injure Louisiana women by making it difficult for them to obtain abortions. To justify injunctive relief on that theory, however, it can't be enough to show that the law would induce any particular doctor or clinic to stop providing abortions. Instead, the plaintiffs would have to show that a sufficient number of clinics would close (without enough new clinics opening) so that supply would no longer meet demand for abortion in the State. And when assessing claims like *that*, we usually proceed with caution, aware of the "the difficulties and uncertainties involved in determining how [a] relevant market" would behave in response to changed circumstances. *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 743 (1977). At a minimum, we expect one change in a marketplace—such as the introduction of a new regulation—will induce other responsive changes. *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 307–309 (1997). When "the claim is one that simply makes no economic sense," too, the plaintiffs "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U. S. 574, 587 (1986).

Rather than follow these rules, today's decision proceeds to accept one speculative proposition after another to arrive at what can only be called a worst case scenario. Take the question whether existing providers will be able to continue

their existing practices. On its way to predicting dire re-
sults, the plurality uncritically accepts that, if Act 620 went
into effect, Doe 5 would be unable to obtain admitting privi-
leges in Baton Rouge. The plurality does so even though it
is undisputed that the sole remaining step for him to obtain
privileges is to find a doctor willing to cover for him—and
that Doe 5 gave up on that effort after asking only one doc-
tor. Similarly, the plurality takes it as given that Doe 2
would be denied admitting privileges even though he
dropped a pending application when the hospital simply
sent him a request for additional information. Maybe these
physicians didn't feel it was worth putting in much effort to
obtain admitting privileges given their chances of prevail-
ing in this lawsuit. But it "taxes the credulity of the credu-
lous" to think they would have treated the process so lightly
if their livelihood depended on securing admitting privi-
leges. *Maryland* v. *King*, 569 U. S. 435, 466 (2013) (Scalia,
J., dissenting). Cf. *ante,* at 12–24 (ALITO, J., dissenting).

That example only begins to illustrate the remarkably
static view of the market on display here. Today's decision
also appears to assume that, if Louisiana's law took effect,
not a single hospital would amend its rules to permit abor-
tion providers easier access to admitting privileges; no
clinic would choose to relocate closer to a hospital that offers
admitting privileges rather than permanently close its
doors; the prospect of significant unmet demand would not
prompt a single Louisiana doctor with established admit-
ting privileges to begin performing abortions; and unmet
demand would not induce even one out-of-state abortion
provider to relocate to Louisiana.

All these assumptions are open to question. Hospitals
can (and do) change their policies in response to regula-
tions. Clinic operators have opened, closed, and relocated
clinics numerous times. There are hundreds of OB/GYNs
with active admitting privileges in Louisiana who could

lawfully perform abortions tomorrow. Millions of Americans move between States every year to pursue their profession. Yet with conditions ripe for market entry and expansion, today's decision foresees nothing but clinic closures and unmet demand.

Not only questionable, the plurality's assumptions are already contradicted by emerging evidence. For example, a major hospital reacted to the law by developing a new type of admitting privileges expressly for an abortion provider seeking to comply with Act 620. Whether this type of privileges satisfies the statute is yet unknown—so, again assuming the worst, today's decision simply ignores the possibility. If nothing else, this development belies the prediction that hospitals statewide would stand idly by as thousands upon thousands of requests for abortions go unfulfilled.

What's more, as this suit was in progress, the State discovered two additional Louisiana abortion providers not reflected in the district court's opinion. No one disputes the accuracy of the State's information about these two providers. Nor could anyone deny the importance of this information, when so much of today's decision seems to turn on the exact quantity and distribution of a relatively small number of abortion providers. Normally, this Court might hesitate to deliver a fact-bound decision premised on facts we know to be incorrect. But today's decision, assuming the worst once more, simply proceeds as if these providers didn't exist.

If there is a silver lining, though, it may be here. This Court generally recognizes that facts can change over time—and that, when they do, legal conclusions based on them may have to change as well. Even so-called "permanent injunctions" are actually provisional—open to modification "to prevent the possibility that [they] may operate injuriously in the future." *Glenn* v. *Field Packing Co.*, 290 U. S. 177, 179 (1933) (*per curiam*). After all, when the facts

change, the law cannot pretend nothing has happened. For that reason, we have instructed lower courts to reconsider injunctions "when the party seeking relief . . . can show a significant change either in factual conditions or in law." *Agostini* v. *Felton*, 521 U. S. 203, 215 (1997) (internal quotation marks omitted). And, given the fact-intensive nature of today's analysis, the relief directed might well need to be reconsidered below if, for example, hospitals start offering qualifying admitting privileges to abortion providers, a handful of abortion providers relocate from other States, or even a tiny fraction of Louisiana's existing OB/GYNs decide to begin performing abortions. Given the post-trial developments Louisiana has already identified but no court has yet considered, there's every reason to think the factual context here is prone to significant changes.

\*

Another background rule, another exception. When it comes to the factual record, litigants normally start the case on a clean slate. While a previous case's legal rules can create precedent binding in the current dispute, earlier "fact-bound" decisions typically "provide only minimal help when other courts consider" later cases with different factual "circumstances." *Buford* v. *United States*, 532 U. S. 59, 65–66 (2001). We've long recognized that this arrangement is required by due process—because while the law binds everyone equally, parties are normally entitled to the chance to present evidence about their own unique factual circumstances. See *Blonder-Tongue Laboratories, Inc.* v. *University of Ill. Foundation*, 402 U. S. 313, 329 (1971).

No hint of these rules can be found in today's decision. From beginning to end, the plurality treats *Whole Woman's Health*'s fact-laden predictions about how a Texas law would impact the availability of abortion in that State in 2016 as if they obviously and necessarily applied to Louisiana in 2020. Most notably, the plurality cites *Whole*

*Woman's Health* for the proposition that admitting privileges requirements offer no benefit when it comes to patient safety or otherwise. But *Whole Woman's Health* found an absence of benefit based only on the particular factual record before it. Nothing in the decision suggested that its conclusions about the costs and benefits of the Texas statute were universal principles of law, medicine, or economics true in all places and at all times. See, *e.g.,* 579 U. S., at \_\_\_–\_\_\_, \_\_\_, \_\_\_–\_\_\_ (slip op., at 22–23, 26, 31–32). Yet that is exactly how the plurality treats those conclusions—all while leaving unmentioned the facts Louisiana amassed in an effort to show that its law promises patient benefits in this place at this time.

Not only does today's decision treat factual questions as if they were legal ones, it treats legal questions as if they were facts. We have previously explained that it would "be inconsistent with the idea of a unitary system of law" for the Supreme Court to defer to lower court legal holdings. *Ornelas* v. *United States*, 517 U. S. 690, 697 (1996). Yet, the plurality today reviews for clear error not only the district court's findings about how the law will affect abortion access, but also the lower court's judgment that the law's effects impose a "substantial obstacle." The plurality defers not only to the district court's findings about the extent of the law's benefits, but also to the lower court's judgment that the benefits are so limited that the law's burden on abortion access is "undue." By declining to apply our normal *de novo* standard of review to questions of law like these, today's decision proceeds on the remarkable premise that, even if the district court was wrong on the law, a duly enacted statute must fall because the lower court wasn't *clearly* wrong.

\*

After so much else, one might at least hope that the legal test lower courts are tasked with applying in this area turns

out to be replicable and predictable.  After all, "[l]iving un-
der a rule of law entails various suppositions, one of which
is that 'all persons are entitled to be informed as to what
the State commands or forbids.'" *Papachristou* v. *Jackson-
ville*, 405 U. S. 156, 162 (1972) (quotation modified).  The
existence of an administrable legal test even lies at the
heart of what makes a case justiciable—as we have put it,
federal courts may not entertain a question unless there are
"'judicially discoverable and manageable standards for re-
solving it.'"  *Rucho* v. *Common Cause*, 588 U. S. ___, ___
(2019) (slip op., at 11).  Nor does the need for clear rules
dissipate as the stakes grow.  If anything, the judicial re-
sponsibility to avoid standardless decisionmaking is at its
apex in "'the most heated partisan issues.'"  *Id.,* at ___ (slip
op., at 15).

Consider, for example, our precedents involving the First
Amendment's right to free speech.  In an effort to keep
judges from straying into the political fray, this Court has
provided a detailed roadmap:  A court must determine
whether protected speech is at issue, whether the re-
striction is content based or content neutral, whether the
State's asserted interest is compelling or substantial, and
whether the State might rely on less restrictive alternatives
to achieve the same goals.  At no point may a judge simply
"'balanc[e]' the governmental interests . . . against the First
Amendment rights" at stake because, as we have recog-
nized, it would be "inappropriate" for any court "to label one
as being more important or more substantial than the
other."  *United States* v. *Robel*, 389 U. S. 258, 268, n. 20
(1967).  Any such raw balancing of competing social inter-
ests must be left to the legislature—"our inquiry is more
circumscribed."  *Ibid.*  Nor is this idea unique to the First
Amendment context.  This Court has consistently rejected
the idea that courts may decide constitutional issues by re-
lying on "abstract opinions . . . of the justice of the decision"

or "of the merits of the legislation" at issue. *Davidson* v. *New Orleans*, 96 U. S. 97, 104 (1878).

By contrast, and as today's concurrence recognizes, the legal standard the plurality applies when it comes to admitting privileges for abortion clinics turns out to be exactly the sort of all-things-considered balancing of benefits and burdens this Court has long rejected. Really, it's little more than the judicial version of a hunter's stew: Throw in anything that looks interesting, stir, and season to taste. In another context, this Court has described the sort of decisionmaking on display today as "*inherently*, and therefore *permanently*, unpredictable." *Crawford* v. *Washington*, 541 U. S. 36, 68, n. 10 (2004). Under its terms, "[w]hether a [burden] is deemed [undue] depends heavily on which factors the judge considers and how much weight he accords each of them." *Id.,* at 63.

What was true there turns out to be no less true here. The plurality sides with the district court in concluding that the time and cost some women might have to endure to obtain an abortion outweighs the benefits of Act 620. Perhaps the plurality sees that answer as obvious, given its apparent conclusion that the Act would offer the public no benefits of any kind. But for its test to provide any helpful guidance, it must be capable of resolving cases the plurality can't so easily dismiss. Suppose, for example, a factfinder credited the State's evidence of medical benefit, finding that a small number of women would obtain safer medical care if the law went into effect. But suppose the same factfinder *also* credited a plaintiff's evidence of burden, finding that a large number of women would have to endure longer wait times and farther drives, and that a very small number of women would be unable to obtain an abortion at all. How is a judge supposed to balance, say, a few women's emergency hysterectomies against many women spending extra hours travelling to a clinic? The plurality's test offers no

guidance. Nor can it. The benefits and burdens are incommensurable, and they do not teach such things in law school.

When judges take it upon themselves to assess the raw costs and benefits of a new law or regulation, it can come as no surprise that "[s]ome courts wind up attaching the same significance to opposite facts," and even attaching the opposite significance to the same facts. *Ibid.* It can come as no surprise, either, that judges retreat to their underlying assumptions or moral intuitions when deciding whether a burden is undue. For what else is left?

Some judges have thrown up their hands at the task put to them by the Court in this area. If everything comes down to balancing costs against benefits, they have observed, "the only institution that can give an authoritative answer" is this Court, because the question isn't one of law at all and the only "balance" that matters is the one this Court strikes. *Planned Parenthood of Ind. & Ky.* v. *Box*, 949 F. 3d 997, 999 (CA7 2019) (Easterbrook, J., concurring in denial of rehearing en banc). The lament is understandable. Missing here is exactly what judges usually depend on when asked to make tough calls: an administrable legal rule to follow, a neutral principle, something outside themselves to guide their decision.

*

Setting aside the other departures from the judicial process on display today, the concurrence suggests it can remedy at least this one. We don't need to resort to a raw balancing test to resolve today's dispute. A deeper respect for *stare decisis* and existing precedents, the concurrence assures us, supplies the key to a safe way out. Unfortunately, however, the reality proves more complicated.

Start with the concurrence's discussion of *Whole Woman's Health*. Immediately after paying homage to *stare*

*decisis*, the concurrence *refuses* to follow the all-things-con-
sidered balancing test that decision employed when strik-
ing down Texas's admitting privileges law. In the process,
the concurrence rightly recounts many of the problems with
raw balancing tests. But then, switching directions again,
the concurrence insists we are bound by an *alternative* hold-
ing in *Whole Woman's Health*. According to the concur-
rence, this alternative holding declared that the Texas law
imposed an impermissible "substantial obstacle" to abor-
tion access in light *only* of the burdens the law imposed—
"independent of [any] discussion of [the law's] benefits."
*Ante,* at 11 (ROBERTS, C. J., concurring in judgment). And,
the concurrence concludes, because the facts of this suit
look like those in *Whole Woman's Health*, we must find an
impermissible substantial obstacle here too.

But in this footwork lie at least two missteps. For one,
the facts of this suit cannot be so neatly reduced to *Whole
Woman's Health* redux. See *ante,* at 2–5; *ante,* at 9–11, 15–
24 (ALITO, J. dissenting). For another, *Whole Woman's
Health* nowhere issued the alternative holding on which the
concurrence pins its argument. At no point did the Court
hold that the burdens imposed by the Texas law alone—di-
vorced from any consideration of the law's benefits—could
suffice to establish a substantial obstacle. To the contrary,
*Whole Woman's Health* insisted that the substantial obsta-
cle test "*requires* that courts consider the burdens a law im-
poses on abortion access together with the benefits th[e]
la[w] confer[s]." 578 U. S., at ___–___ (emphasis added)
(slip op., at 19–20). And whatever else respect for *stare de-
cisis* might suggest, it cannot demand allegiance to a non-
existent ruling inconsistent with the approach actually
taken by the Court.

The concurrence's fallback argument doesn't solve the
problem either. So what if *Whole Woman's Health* rejected
the benefits-free version of the "substantial obstacle" test
the concurrence endorses? The concurrence assures us that

*Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), specified this form of the test, so we must (or at least may) do the same, whatever *Whole Woman's Health* says.

But here again, the concurrence rests on at least one mistaken premise. In the context of laws implicating only the State's interest in fetal life previability, the *Casey* plurality did describe its "undue burden" test as asking whether the law in question poses a substantial obstacle to abortion access. 505 U. S., at 878. But when a State enacts a law "to further the health or safety of a woman seeking an abortion," the *Casey* plurality added a key qualification: Only "*[u]nnecessary* health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Ibid.* (emphasis added). That qualification is clearly applicable here, yet the concurrence nowhere addresses it, applying instead a new test of its own creation. In the context of medical regulations, too, the concurrence's new test might even prove stricter than strict scrutiny. After all, it's possible for a regulation to survive strict scrutiny if it is narrowly tailored to advance a compelling state interest. And no one doubts that women's health can be such an interest. Yet, under the concurrence's test it seems possible that even the most compelling and narrowly tailored medical regulation would have to fail if it placed a substantial obstacle in the way of abortion access. Such a result would appear to create yet another discontinuity with *Casey*, which expressly disavowed any test as strict as strict scrutiny. *Id.,* at 871.

\*

To arrive at today's result, rules must be brushed aside and shortcuts taken. While the concurrence parts ways with the plurality at the last turn, the road both travel leads us to a strangely open space, unconstrained by many of the

GORSUCH, J., dissenting

neutral principles that normally govern the judicial process. The temptation to proceed this direction, closer with each step toward an unobstructed exercise of will, may be always with us, a danger inherent in judicial review. But it is an impulse this Court normally strives mightily to resist. Today, in a highly politicized and contentious arena, we prove unwilling, or perhaps unable, to resist that temptation. Either way, respectfully, it is a sign we have lost our way.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 18–1323 and 18–1460

———————

JUNE MEDICAL SERVICES L. L. C., ET AL.,
PETITIONERS
18–1323                    *v.*
STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS


STEPHEN RUSSO, INTERIM SECRETARY,
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, PETITIONER
18–1460                    *v.*
JUNE MEDICAL SERVICES L. L. C., ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 29, 2020]

JUSTICE KAVANAUGH, dissenting.

I join Parts I, II, and III of JUSTICE ALITO's dissent. A threshold question in this case concerns the proper standard for evaluating state abortion laws. The Louisiana law at issue here requires doctors who perform abortions to have admitting privileges at a hospital within 30 miles of the abortion clinic. The State asks us to assess the law by applying the undue burden standard of *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992).[1] The plaintiffs ask us to apply the cost-benefit standard of *Whole Woman's Health* v. *Hellerstedt*, 579 U. S. \_\_\_ (2016).

Today, five Members of the Court reject the *Whole*

————————

[1] The State has not asked the Court to depart from the *Casey* standard.

*Woman's Health* cost-benefit standard. *Ante*, at 4–11 (ROBERTS, C. J., concurring in judgment); *ante*, at 14–20 (THOMAS, J., dissenting); *ante*, at 4 (ALITO, J., joined by THOMAS, GORSUCH, and KAVANAUGH, JJ., dissenting); *ante*, at 15–18 (GORSUCH, J., dissenting). A different five Members of the Court conclude that Louisiana's admitting-privileges law is unconstitutional because it "would restrict women's access to abortion to the same degree as" the Texas law in *Whole Woman's Health*. *Ante*, at 12 (opinion of ROBERTS, C. J.); see also *ante*, at 16–40 (opinion of BREYER, J., joined by GINSBURG, SOTOMAYOR, and KAGAN, JJ.).

I agree with the first of those two conclusions. But I respectfully dissent from the second because, in my view, additional factfinding is necessary to properly evaluate Louisiana's law. As JUSTICE ALITO thoroughly and carefully explains, the factual record at this stage of plaintiffs' facial, pre-enforcement challenge does not adequately demonstrate that the three relevant doctors (Does 2, 5, and 6) cannot obtain admitting privileges or, therefore, that any of the three Louisiana abortion clinics would close as a result of the admitting-privileges law. I expressed the same concern about the incomplete factual record more than a year ago during the stay proceedings, and the factual record has not changed since then. See *June Medical Services, L.L.C.* v. *Gee*, 586 U. S. ___ (2019) (opinion dissenting from grant of application for stay). In short, I agree with JUSTICE ALITO that the Court should remand the case for a new trial and additional factfinding under the appropriate legal standards.[2]

_____

[2] In my view, the District Court on remand should also address the State's new argument (raised for the first time in this Court) that these doctors and clinics lack third-party standing.